UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN AND JANE DOE, individually and on behalf of their minor child, JILL DOE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 11-11593-DPW |
| v. | ) ) | |
| ANN BRADSHAW, STEPHEN WEIXLER, ALAN WINROW, JANE DAY, PAT FARRELL, CARLA THOMAS, PETER SHEA, JOHN DOLAN, MASHPEE SCHOOL COMMITTEE, and the TOWN OF MASHPEE, | ) ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
September 16, 2013

Plaintiffs John and Jane Doe, on behalf of their child Jill Doe, bring claims against various defendants for violations of the due process and equal protection components of the Fourteenth Amendment; the Individuals with Disabilities Education Act ("IDEA"); section 504 of the Rehabilitation Act; the Americans with Disabilities Act; Title IX; the Massachusetts Civil Rights Act; the right to freedom from sexual harassment under Massachusetts law; and for negligence, intentional and negligent infliction of emotional distress, and loss of consortium. Before me are motions to dismiss filed by the Town of Mashpee, Dkt. No. 46, and by the Mashpee School Committee and certain individual defendants, Dkt. No. 48.

## I.   BACKGROUND

### A.   *The Parties*

John and Jane Doe are the parents of Jill Doe, a minor who was, at the time of the events giving rise to this suit, a student at Mashpee High School.

The defendant Town of Mashpee, Massachusetts, is located on Cape Cod.  The defendant Mashpee School Committee is the civil entity which operates the public schools in the Mashpee School District, including Mashpee High School.

The individual defendants are employees of the Town of Mashpee or Mashpee High School, or were employees at the time of the events giving rise to this lawsuit.

Ann Bradshaw is the School Department Superintendent.  Alan Winrow was the former Principal at Mashpee High School, and Jane Day, the current Principal, was Winrow's Assistant Principal. Patricia Farrell is a guidance counselor at Mashpee High School. Carla Thomas was the former Special Education Director at Mashpee High School.  Peter Shea is a psychologist in the Mashpee School District.  John Dolan is an adjustment counselor in the Mashpee School District.[1]

Stephen Weixler, the only party who has not moved to dismiss the complaint, was an assistant soccer coach at Mashpee High School until he was fired in March 2009.  His alleged sexual

---

[1]I refer to these individuals collectively as the "school officials" or the "employee-defendants."

assault of Jill in the Fall of 2008 precipitated a variety of
litigation initiatives.  Weixler later pled guilty to indecent
assault of a minor, distribution of obscene matter to a minor,
and delivery of alcohol to a minor.  He appears *pro se*.

**B.   *Facts***

Plaintiffs allege that in February 2008, before Jill Doe was
a student at Mashpee High School, supervisors at Mashpee High
School and/or the Mashpee School Committee were made aware of
allegations that Weixler was engaged in inappropriate conduct
with another minor student. Compl. ¶ 23.  Weixler's supervisor
interviewed him about the claim, and Weixler denied the conduct.
Compl. ¶ 25.

In July 2008, Jill's cousin was killed in a car accident.
That fall, Jill began her freshman year at Mashpee High School,
where she joined the school's soccer team, coached by Weixler.
Jane Doe, Jill's mother, notified the school that Jill's cousin
had died that summer and mentioned that Jill appeared depressed
as a result.  Compl. ¶¶ 32-34.

From September 2008 through March 2009, Weixler harassed
Jill and on two occasions sexually assaulted her.  The first
instance of assault occurred in October 2008, when Weixler drove
Jill home from practice and massaged her leg with his hand.
Compl. ¶ 38.  In November 2008, Weixler picked Jill up from her
home, drove her to a remote location, and sexually assaulted her.
Compl. ¶¶ 19, 39.

3

Jill did not disclose either incident until March 2009.  Compl.
¶ 40.

Through the fall and winter, Weixler verbally harassed Jill
in the school hallways, texted pictures of his penis to her, and
repeatedly asked her to send him naked pictures of herself.
Compl. ¶ 40.  During that time, Jill exhibited and developed a
number of behavioral problems, including emotional outbursts,
insubordination and failure to attend class, difficulty
completing assignments, depression, and substance abuse.  She
also began to cut and burn herself.  Compl. ¶ 41.

In January 2009, an employee of the local Boys and Girls
Club reported to someone at Mashpee and/or the Mashpee School
Committee that students had told him that Weixler was engaged in
a sexual relationship with one or more students--other than
Jill--at Mashpee High School.  Compl. ¶ 49.  Principal Winrow and
Assistant Principal Day conducted an investigation of the
allegation, during which they interviewed Weixler, the minor with
whom Weixler allegedly had a relationship, and a friend of the
minor.  All three denied it and, on the basis of their denials,
Winrow and Day concluded their investigation.  Compl. ¶ 51.

In February 2009, Jane and John Doe approached the School
and asked for help designing a program to address Jill's needs,
in light of her outbursts and other conduct.  Compl. ¶ 46.  The
School recommended that they file a Child in Need of Services
petition with the Juvenile Court to begin the process.  Compl.

4

¶ 47.  Meanwhile, Jill remained enrolled in her regular classes. Compl. ¶ 48.

On March 6, 2009, a student reported to Mashpee High School that Weixler was inappropriately texting students and purchasing alcohol for them.  Compl. ¶ 53.  As a result, Weixler was put on administrative leave.  Compl. ¶ 53.  Around the same time, Jill told a friend that Weixler had harassed, assaulted, and raped her; the friend then reported Jill's story to Jane Doe.  Compl. ¶ 56.  At a meeting on March 9, 2009, Jane Doe reported Weixler's misconduct to the school.  Compl. ¶ 57.

On March 12, 2009, the School called the police and reported the allegations of Weixler's sexual assault of Jill.  Police investigated the matter and arrested Weixler.  Compl. ¶ 59.  The School held a meeting open to all Mashpee High School parents to discuss the allegations of abuse and Weixler's arrest.  Compl. ¶ 60.  The school held class-wide assemblies to discuss the incident of sexual abuse and Weixler's arrest.  Compl. ¶ 66.  It did so despite a recommendation by The Children's Cove, a child advocacy group, that the school conduct small group discussions with students to discuss the assault.  Compl. ¶ 65.  As a result of speculation that Jill was the unnamed victim, as well as Jill's absence from the school on the day of a class assembly at which the abuse was discussed, Jill was bullied and harassed by her classmates.  Compl. ¶¶ 67-69.

From February 25, 2009 through April 7, 2010, the Mashpee
Child Study Team (the group serving as the gateway to special
education services under the IDEA) discussed Jill's case at least
13 times.  Compl. ¶ 74.  The Team recommended only general
education accommodations for Jill, even after the reported
assault.  Compl. ¶ 75.

At Jane Doe's meeting on March 9, 2009, the School
recommended that Jill be enrolled in an Anger Management Program
run by defendant Dolan.  Compl. ¶ 57.  Jane Doe did not think
that Jill was making progress, and sought assistance and services
from the School on multiple occasions from March 2009 through
January 2010.  Compl. ¶¶ 76-77.

On January 18, 2010, Jill was admitted to Falmouth Hospital,
and on January 21, 2010 was diagnosed with PTSD, mood disorder
NOS, R/O bipolar, and poly-substance abuse, with probable
emerging borderline personality disorder.  Compl. ¶¶ 79-81.
After being discharged on February 3, 2010, Jane returned to
Mashpee High School.  Compl. ¶ 82.

When Jill returned to Mashpee, Jane Doe met with counselor
Farrell to discuss what services were available to help Jill.
Farrell told Jane that no services were available to Jill, but
that she could go to a guidance counselor during the day if she
had issues.  Compl. ¶ 84.  Jane followed up with written requests
on March 18 and April 6, 2010, that Mashpee evaluate Jill for

eligibility for special education services pursuant to the IDEA. Compl. ¶ 86.

The School again recommended that Jane Doe file a Child in Need of Services petition with the Juvenile Court, which the Does filed in late March 2010.  The Juvenile Court declared Jill a Child in Need of Services.  Compl. ¶ 88.

On April 7, 2010, Jill was hospitalized at Arbor Fuller Hospital after exhibiting symptoms of PTSD.  Compl. ¶ 88.  She was transferred to the Germaine Lawrence Community Based Acute Treatment Unit for stabilization and treatment.  Compl. ¶ 89.  In light of Jill's emotional problems, poly-substance abuse, and propensity to run away, the Does requested that the School place Jill in a residential therapeutic school.  On May 13, 2010, the School denied the Does' request.  Compl. ¶ 91.

On May 27, 2010, the School determined that Jill was eligible for special education and other services.  Jill returned to Germaine Lawrence for a 45-day residential placement where she received an extended evaluation.  Compl. ¶ 92.  At the end of the evaluation, the Does again requested that the School place Jill in a residential therapeutic school, but the school again refused.  Compl. ¶¶ 93-94.

On July 8, 2010, the School held a meeting regarding an individualized education program ("IEP") for Jill and determined that it would fund a residential educational placement.  Compl.

¶ 96.  On July 14, 2010, the Does accepted the proposed IEP.
Compl. ¶ 97.

In June 2011, the Does requested an alternative placement
for Jill because they felt she was not making progress at the
previously-designated residential school.  Compl. ¶ 98.  On June
15, 2011, an IEP meeting was held, and the School denied the
Does' request.  Compl. ¶ 98.  In August 2011, Jill ran away from
the residential school.  Compl. ¶ 99.  Mashpee consented to
explore an alternative placement but the team was unable to
identify or agree on one.  Compl. ¶ 100.  In May 2012, Jill
refused to return to the residential school placement and has
since enrolled in an alternative evening program at a local
school.  Compl. ¶ 101.

## C.  *Procedural History*

Plaintiffs initiated this action on September 9, 2011 and
filed amended iterations of their complaint on January 6, 2012,
August 31, 2012, and October 12, 2012.  All of the defendants,
except Weixler, now move to dismiss the operative Third Amended
Complaint.[2]  Plaintiffs have opposed the motion to dismiss filed

---

[2] In addition to the present suit, the parties have been
involved in two related cases.  In the first case, *CBDE Public
Schools* v. *Massachusetts Bureau of Special Education Appeals*,
Civil Action No. 11-10874, the Town under the name CBDE filed
suit against the Bureau of Special Educational Appeals ("BSEA")
and the Doe plaintiffs seeking to enjoin the BSEA's fact-finding
hearing regarding the Does' damage claims.  In the second case,
*Doe* v. *CBDE Public Schools*, Civil Action No. 12-11082, the Does
sought attorneys' fees as prevailing parties under the IDEA.
Through a September 27, 2012 Memorandum and Order I dismissed
both cases, holding in Civil Action No. 11-10874 that this Court

by the School Committee and the employee-defendants, but have
failed to oppose the Town's motion to dismiss.  Nevertheless,
"the mere fact that a motion to dismiss is unopposed does not
relieve the district court of the obligation to examine the
complaint itself to see whether it is formally sufficient to
state a claim."  *Pomerleau* v. *W. Springfield Pub. Sch.*, 362 F.3d
143, 145 (1st Cir. 2004).[3]

## II.  STANDARD OF REVIEW

In order to survive a motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6), "a complaint must contain sufficient factual

---

lacked jurisdiction because the Does' damage claims had not been
exhausted before the BSEA, and, in Civil Action No. 12-11082,
because the Does, having been awarded no enforceable substantive
relief from the BSEA, did not qualify for an award of fees as a
prevailing party under the IDEA.

It bears noting as well that by the time the instant case
was filed, Plaintiffs' counsel concluded that the press had
received confirmation that "CBDE was, in fact, Mashpee . . . So,
the cat was sort of out of the bag, so to speak, on that."  Sept.
26, 2012 Tr. at 10.  As a consequence, Plaintiffs' complaint in
the instant case abandoned the protocol observed in the two
earlier cases of identifying the Town as "CBDE."  The victim,
however, has apparently not been publicly identified so anonymity
continues to be observed regarding the instant case.

[3] *But see Pomerleau* v. *W. Springfield Pub. Sch.*, 362 F.3d
143, 145 (1st Cir. 2004).  ("Where a district court grants an
unopposed motion to dismiss pursuant to a local rule that
requires a response, we will uphold the sanction provided that it
does not offend equity or conflict with a federal rule.")
*Pomerleau* suggests there is uncertainty as to whether this
Court's Local Rules require a response to a motion to dismiss.
*Id.* at 146.  For myself, I am of the view that the local rule by
use of the word "shall" is straight forward in requiring an
opposition.  *See* D. Mass. L. R. 7.1(b)(2) ("A party opposing a
motion, *shall* file an opposition within 14 days after the motion
is served . . . .") (emphasis added).

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Berner* v. *Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley* v. *Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988) (internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.'" *Maldonado* v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).

I "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993). While I am "generally limited to considering facts and documents that are part of or incorporated into the complaint," I "may also consider documents incorporated by reference in the [complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian* v. *Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation and internal quotation marks omitted; alteration in original).

### III.  DISCUSSION

Plaintiffs seek redress on sixteen counts.  I address each count in turn, except the claims solely against defendant Weixler (Counts III, VI and XI), who has not moved to dismiss.

### A.  *Count I - Fourteenth Amendment (Due Process) Claim against Employee-Defendants*

Count I is a § 1983 claim against Superintendent Bradshaw, Principal Winrow, and Assistant Principal Day, in their personal capacities,[4] for depriving Jill of "her rights, privileges and immunities secured by the Constitution and laws of the United States," including rights arising under various heads of constitutional authority to freedom from sexual abuse, to bodily integrity, and to privacy.  Compl. ¶ 122.  To make out a claim for a due process violation under the Fourteenth Amendment, the Does must show not only that the employee-defendants exhibited

---

[4]Although the caption of this count makes clear that it is brought against these defendants only in their personal capacities, certain language might imply that the claim is also brought against these defendants in their official capacities. *See e.g.,* Compl. ¶ 109 ("Each and every act and omission alleged here was done by the defendants not only as individuals, but also under the color of state law . . . .").  To the extent that the claim is brought against the employee-defendants in their official capacities, it is merely a claim against the Town, as alleged in Count II.  *Cf. Will* v. *Michigan Dep't State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such it is no different from a suit against the State itself."); *Doe* v. *Fournier*, 851 F. Supp. 2d 207, 215 (D. Mass. 2012) (claim against Town made claims against school committee members in official capacities "superfluous").

"deliberate indifference" toward Jill's rights, but that their conduct "shocks the conscience." *Evans* v. *Avery*, 100 F.3d 1033, 1038 (1st Cir. 1996) (Selya, J.).

More specifically, the claim is one for supervisory liability, which exists only where "(1) there is subordinate liability, and (2) the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate," *Aponte Matos* v. *Toledo Davila*, 135 F.3d 182, 192 (1st Cir. 1998), such that the action or inaction amounted to "supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference." *Lipsett* v. *Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988). To establish supervisory liability, plaintiffs rely on the allegedly deficient training and supervision of Weixler and other staff, and the failure to terminate or at least discipline Weixler after the February 2008 and January 2009 reports of his inappropriate behavior. Those failures, they say, ultimately led to the violation of Jill's constitutional rights by Weixler in March 2009.

Plaintiffs face an uphill battle, given that this is not a case in which the defendants entirely ignored warning signals about sexual abuse by Weixler. *Cf. Lipsett*, 864 F.2d at 907 (defendants failed to take "any steps whatsoever to investigate" reports of harassment); *Doe* v. *Fournier*, 851 F. Supp. 2d 207, 222 (D. Mass. 2012) (defendants "failed to conduct any investigation"

12

into reported sexual abuse of students).  That said, defendants rely primarily on cases in which § 1983 claims were dismissed, based on plaintiff's failure to establish deliberate indifference, at the summary judgment stage, rather than on a motion to dismiss.  *See e.g.*, *Shrum ex rel. Kelly* v. *Kluck*, 249 F.3d 773, 775 (8th Cir. 2001).

The complaint alleges that these defendants received reports of Weixler's inappropriate sexual relations with students prior to his abuse of Jill, and that defendants engaged in only minimal efforts to investigate those reports.  Whether plaintiffs can establish that defendants' response amounted to implicit encouragement of Weixler's actions or at least deliberate indifference toward Jill's constitutional rights will depend largely on the credibility of the reports received and finer grained details about the ensuing investigation.  But the claim is at least plausible, and its resolution must await further fact-finding.

The employee-defendants argue that they are nevertheless protected by qualified immunity.  Qualified immunity "balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009).  Defendants are entitled to qualified immunity unless (1) "the facts alleged or shown by the plaintiff

make out a violation of a constitutional right," and (2) such right was "'clearly established' at the time of the defendant's alleged violation."  *Maldonado*, 568 F.3d at 269 (internal quotation and citation omitted).  A right is "clearly established" if "it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)).

Defendants do not argue that Jill's rights were not clearly established, but only that it would not have been clear that defendants' conduct violated those rights.  Assessing the reasonableness of defendants' conduct, however, again requires a better understanding of what these defendants knew and did in response to reports of Weixler's sexual misconduct.  Thus, for reasons similar to those already discussed, dismissal on qualified immunity grounds would be premature.  *Cf. Fournier*, 851 F. Supp. 2d at 222 n.8 (qualified immunity and deliberate indifference analysis essentially coextensive in supervisory liability context (citing *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir. 1999))).

Defendants seek refuge in *DeShaney* v. *Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989), but that case dealt with the state's duty (or lack thereof) to protect against *private* third-party harms.  *DeShaney* gave no indication that it would exempt defendants from liability for deliberate

14

indifference toward constitutional violations by other state employees under their supervisory control. *Cf. Stoneking* v. *Bradford Area Sch. Dist.*, 882 F.2d 720, 724 (3d Cir. 1989) (distinguishing liability for state failure to protect against private harm from supervisory liability for state employee's violations of constitutional rights).

Plaintiffs state a plausible claim for constitutional violations, rooted in defendants' deliberate indifference toward Jill's rights, that cannot be dismissed at this stage.

**B.    *Count IV - Fourteenth Amendment (Equal Protection) Claim against Employee Defendants***

Count IV is a separate § 1983 claim against Bradshaw, Winrow, and Day, in their personal capacities, for violating the equal protection guarantee of the Fourteenth Amendment. Defendants allegedly subjected Jill to a "hostile educational environment," Compl. ¶ 156, involving gender-based sexual harassment, Compl. ¶ 147, and harassment by her peers, Compl. ¶¶ 150-151, which deprived Jill of her right to an equal education, Compl. ¶ 148. These defendants allegedly contributed to gender-based sexual harassment by Weixler through their failure to protect Jill from Weixler. Compl. ¶ 148. With regard to peer harassment, plaintiffs say the defendants again failed to protect Jill and actually approved harassment by failing to adopt the recommendations of The Children's Cove regarding disclosure of the sexual abuse to the school community. Compl. ¶ 153.

### 1.  Harassment by Weixler

The allegations regarding defendants' response to reports of Weixler's sexual misconduct are essentially the same as those discussed earlier, albeit on an equal protection rather than a due process theory.  As already explained, it would be premature, at least until the completion of discovery, to resolve the issue of deliberate indifference to Jill's rights based on the manner in which defendants dealt with Weixler's conduct.

### 2.  Harassment by Peers

The allegations regarding peer harassment, by contrast, do not plausibly establish a constitutional violation.  Although the defendants did not adopt the recommendation of The Children's Cove, they were under no obligation to do so.  There is no indication in the complaint that the defendants released Jill's name, and the complaint specifies that news reports of the assault did not disclose Jill's name.  Compl. ¶ 61.  Moreover, there is no allegation that instances of harassment were referred to school officials, let alone that they ignored or were indifferent to such complaints.

At the very least, on this aspect of the claim, defendants are shielded by qualified immunity.  Case law on protecting students from peer harassment, in the analogous context of liability under Title IX, specifies that schools need not "take heroic measures" or "craft perfect solutions" to satisfy their legal obligations.  *Fitzgerald* v. *Barnstable Sch. Comm.*, 504 F.3d

165, 174 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246
(2009).  The behavior alleged in the complaint may have been
imperfect, but it was far from indifferent.  The complaint
alleges that peer harassment occurred, but also indicates that
the officials took some measures to protect Jill's anonymity, and
makes no allegation that the officials thwarted any effort to
resolve specific complaints about peer harassment or that they
were even delinquent in responding to such complaints.
Reasonable officials would not have understood that defendants'
actions with regard to peer harassment, as alleged in the
complaint, violated Jill's constitutional rights.

**C.   *Counts II & V - Fourteenth Amendment Claims against the Town***

Counts II and V bring against the Town of Mashpee
essentially the same due process and equal protection claims
brought against the employee-defendants in Counts I and IV,
respectively.  The Town moved to dismiss these counts on the
grounds that the Does have failed to allege sufficient municipal
custom or policy to support their claim, as required by *Monell* v.
*Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (Brennan, J.).

In *Monell*, the Supreme Court held that municipalities may be
held liable under section 1983 "when execution of a government's
policy or custom, whether made by its lawmakers or by those whose
edicts or acts may fairly be said to represent official policy,
inflicts the injury."  *Id.* at 694.  The Court has also held that
"[o]nly where a failure to train reflects a 'deliberate' or

17

'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 389 (1989).

Discrete actions by municipal officials with "final policymaking authority," however, may subject the Town to liability. *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 483 (1986); *Welch* v. *Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008). In Massachusetts, the School Committee has such policymaking authority, *Armstrong* v. *Lamy*, 938 F. Supp. 1018, 1035 (D. Mass. 1996) (citing Mass. Gen. Laws ch. 71, § 37), and the Complaint alleges that the School Committee acts through Superintendent Bradshaw. Compl. ¶ 6.

As alleged in the complaint, the School Committee received the February 2008 report of Weixler's sexual misconduct, and Bradshaw was directly involved in investigating the January 2009 report. If Bradshaw acted on behalf of the Committee, acted with deliberate indifference toward Jill's rights in handling these reports, and in doing so directly contributed to the eventual harm Weixler inflicted upon her, the Town may be subject to liability based on her conduct. That said, as in Count IV, the allegations of liability premised on the response to peer harassment are insufficient to state a claim.

It seems implausible that Bradshaw could act unilaterally as the final policymaking official without the concurrence of some number of other School Committee members, or a delegation of

authority by the Committee.  But there is as yet no record on the decisionmaking processes of the Committee, or Bradshaw's ability to act unilaterally on behalf of the Committee.  Here again, the allegations are adequate at this stage to survive a motion to dismiss, and dispositive action on this count must await further factual development.

## D.   Count VII - IDEA

Count VII alleges, through § 1983, a violation of the IDEA--specifically, violation of Jill's right to a free appropriate public education ("FAPE") and safe school environment under 20 U.S.C. § 1412(a)(1).  Plaintiffs bring the claim against the Town of Mashpee, as well as defendants Bradshaw, Winrow, Day, Farrell, Shea, Dolan and Thomas, acting in their official capacities.  Because the employee-defendants were sued in Count VII in their official capacities this claim must also be construed as a claim against the Town.  *See Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).

The First Circuit has repeatedly "explained that § 1983 does not provide a remedy . . . for IDEA violations." *D.B. ex rel. Elizabeth B.* v. *Esposito*, 675 F.3d 26, 44 (1st Cir. 2012) (citing *Diaz-Fonseca* v. *Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006)).  This alone would justify dismissal of Count VII.

In any event, the claim is moot because the Does agreed to an IEP and do not seek reimbursement for any expenses they incurred.  "[J]usticiability requires the existence of an actual

case or controversy.  Even if an actual case or controversy
exists at the inception of litigation, a case may be rendered
moot (and, therefore, subject to dismissal) if changed
circumstances eliminate any possibility of effectual relief."
*Maine Sch. Admin. Dist. No. 35* v. *Mr. R.*, 321 F.3d 9, 17 (1st
Cir. 2003) (internal citations omitted).  In July 2010, the Does
agreed to the proposed IEP for Jill, thus resolving their
prospective special education claim; as a consequence, any claim
relating to placement under the IEP is moot.[5]

As to any claim for damages, plaintiffs failed to plead the
required elements of their case.  Monetary recovery under the
IDEA "is limited to compensatory education and equitable remedies
that involve the payment of money, such as reimbursements for
educational expenses that would have been borne by defendants in
the first instance had they properly developed and implemented an
IEP." *Diaz-Fonseca*, 451 F.3d at 19.  Specifically, when
discussing "reimbursement," the First Circuit meant that "parents
may recover only actual, not anticipated expenditures for private
tuition and related services."  *Id*.

Here, the Does have not alleged that they incurred expenses
for which they are seeking reimbursement in their IDEA claim.
Indeed, the BSEA hearing officer confirmed that "during the

---

[5] I note that the Plaintiffs represented during the
September 26, 2012 hearing in this case they are not appealing
from the BSEA decision.

February 14, 2011 motion hearing, Parents' attorney stated that
Parents did not then have any expenses for which they seek
reimbursement," and "have made no claims for compensatory
educational services."[6]   Thus, the BSEA hearing officer found
that "all of the past and prospective special education claims
appearing in Parents' hearing request have been resolved," and
dismissed their substantive educational claims "as no longer in
dispute."

Accordingly, no claim for violation of the IDEA, through §
1983 or directly, is properly before me now.

**E.   *Counts VIII & IX - Section 504 of the Rehabilitation Act* &
*Americans with Disabilities Act***

Count VIII alleges that the Town and the School Committee
violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794,
by deliberately failing to conduct a timely FAPE evaluation of
Jill, based on her disability.[7]   Count IX similarly alleges that

---

[6]   Although plaintiffs attached an April 28, 2011 BSEA
decision to their Third Amended Complaint, defendants also
submitted an earlier February 24, 2011 decision.  As matters of
public record whose authenticity is not in doubt, such documents
may be judicially noticed without converting the motion to
dismiss into one for summary judgment.  *Alt. Energy, Inc.* v. *St.
Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)
(noting general rule that "a court may not consider any documents
that are outside of the complaint, or not expressly incorporated
therein, unless the motion is converted into one for summary
judgment" does not apply "'for documents the authenticity of
which are not disputed by the parties; [and] for official public
records'" (citation omitted)).

[7]Section 504 of Rehabilitation Act provides:

No otherwise qualified individual with a disability in the

the Town and School Committee failed to accommodate Jill's educational needs on the basis of her disability, in violation of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12132.[8]  These allegations against the School Committee are also nothing more than an allegation against the Town.  There is no dispute that Jill is disabled for purposes of both the Rehabilitation Act, on the basis of emotional disturbance, 34 C.F.R. § 3008.8(c)(4)(i), and the ADA, on the basis of PTSD and other diagnosed psychological disorders.

Defendants argue that plaintiffs are impermissibly attempting to shoehorn their defunct IDEA claim into discrimination claims.  *See Diaz-Fonseca*, 451 F.3d at 29 ("[W]here the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983--or any other federal statute for that matter--in an attempt to evade the limited remedial structure of the IDEA."); *Elizabeth B.*, 675 F.3d at 39

---

United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C.A. § 794(a).

[8]The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  An entity discriminates against a qualified individual if it fails to make reasonable accommodations or modifications for that person.  42 U.S.C. § 12182(b)(2)(A)(ii).

("[Plaintiffs cannot disguise an IDEA claim in other garb '[w]here the essence of the claim is one stated under the IDEA for denial of FAPE.'" (quoting *Diaz-Fonseca*, 451 F.3d at 29)).

Importantly, however, "a discrimination claim under the Rehabilitation Act or the ADA involving a denial of a FAPE is not coextensive with an IDEA claim." *Esposito*, 675 F.3d at 40. In other words, *Diaz-Fonseca* "does not bar a plaintiff from bringing a discrimination claim based on a denial of a FAPE in conjunction with an IDEA claim, because the discrimination claim involves the additional element of disability-based animus. As such, the discrimination claim does not 'turn[] entirely on the rights created by statute in the IDEA.'" *Esposito*, 675 F.3d at 40 n.8 (quoting *Diaz-Fonseca*, 451 F.3d at 29).

Here, plaintiffs have pleaded "something more than a disappointing IEP or the predictable back-and-forth associated with the IEP process," such that the complaint is sufficient to allege discrimination. *Esposito*, 675 F.3d at 42. Plaintiffs, for example, emphasize that Jill was never even referred for evaluation to determine her eligibility for special education services until March 2010, over a year after defendants became aware that Jill was subject to sexual abuse. They argue this delay constituted deliberate indifference toward Jill's rights, given that defendants had an obligation to evaluate children "suspected" to have a disability requiring special education. 34 C.F.R. § 300.111(c).

23

Such deliberate indifference, if it existed, would support a discrimination theory of liability, independent of an IDEA violation.  In *Nieves-Márquez* v. *Puerto Rico*, 353 F.3d 108 (1st Cir. 2003), the First Circuit made clear that claims under § 504 of the Rehabilitation Act and Title II of the ADA require intentional discrimination.  *Id.* at 126.  But the court also alluded to a potential "deliberate indifference" standard for § 504 violations, *id.* at 125 n.17, and cited *Sellers ex rel. Sellers* v. *Sch. Bd. of City of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998), which established a "bad faith or gross misjudgment" standard of liability.  Moreover, courts have recognized that intentional discrimination may be inferred from deliberate indifference.  *See e.g.*, *Barber ex rel. Barber* v. *Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009).

The parties have not dedicated much energy to these arguments, and finer points about the standard of liability in this context remain to be resolved.  But, for now, it suffices that plaintiffs have alleged independent statutory claims for discrimination and not merely sought an end-run around their failed IDEA claims.  The motion to dismiss Counts VIII and IX must be denied.[9]

---

[9] I note that the BSEA concluded plaintiffs would have some success on their discrimination claims.  But that observation, of course, is hardly dispositive here.

**F.    *Count X - Title IX***

Count X is a claim against the Town and the School Committee for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  For the town to be liable under Title IX it must have been deliberately indifferent to known acts of discrimination--in the form of sexual harassment--of which it had actual knowledge and which occurred under its control.  *See Davis* v. *Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999).

Plaintiffs allege that the School Committee failed to appoint a Title IX coordinator.  Compl. ¶ 208.  But that failure, in violation of 34 C.F.R. § 106.8, is not actionable by the plaintiffs.  *See  Gebser* v. *Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998) (noting that a school's "alleged failure to comply with the regulations does not establish the requisite actual notice and deliberate indifference," nor does it constitute "discrimination," and noting that the Court has never held "that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements").

Plaintiffs also allege that the defendants knew of the peer-on-peer harassment that was occurring in the school as a result of speculation that Jill was the victim of Weixler's sexual assault, and did nothing to stop it.  This claim fails for much the same reasons as those discussed in Part III.B.2.  To succeed under Title IX on a claim of peer-on-peer harassment, the Does

must show that (1) Jill was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, (2) the harassment deprived Jill of educational opportunities or benefits, (3) the Town knew of the harassment, (4) the harassment took place in the Town's programs or activities, and (5) that the Town "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Porto* v. *Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007).

Here, plaintiffs claim that, following a school assembly discussing Weixler's sexual assault of an unidentified student, students harassed Jill because they speculated that she had been the victim of the assault.  However, they fail to allege, beyond undetailed and conclusory assertion, that the defendants knew Jill was being harassed by her peers or even knew about the harassment, let alone deliberately avoided remedying the harassment.  The Complaint thus fails to state a plausible claim for relief on the Does' peer-on-peer harassment theory under Title IX, and this portion of Count X must be dismissed.

Finally, plaintiffs allege that the defendants knew of Weixler's prior harassment and abuse and chose not to stop the harassment and abuse, despite its ability to do so.  As discussed in Parts III.A and III.B.1, dismissal of this portion of the claim would be premature.  True, defendants responded promptly to the report of sexual abuse against Jill.  And I recognize that "a

claim that the school system could or should have done more is insufficient to establish deliberate indifference." *Porto*, 488 F.3d at 73.  But the facts regarding earlier reports of sexual misconduct, and defendants' response to those reports, are as yet undeveloped.  Determining whether the Town acted with deliberate indifference toward Jill's rights is again contingent on that factual development.

### G.   *Counts XII through XVI – State Law Claims*

Counts XII, XIII, and XIV bring claims under Massachusetts law for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress against various defendants under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 § 2.  Count XV claims loss of consortium, Mass. Gen. Laws ch. 231, § 85X.  Count XVI alleges a violation of the right to freedom from sexual harasssment, Mass. Gen. Laws ch. 214, § 1C.

### 1.   Background on Tort Claims

The Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 § 2, provides the exclusive remedy for torts by municipal employees.  It provides, in relevant part, that:

> Public employers shall be liable for injury . . .
> caused by the negligent or wrongful act or omission of
> any public employee while acting within the scope of
> his office or employment, in the same manner and to the
> same extent as a private individual under like
> circumstances . . . .  The remedies provided by this
> chapter shall be exclusive of any other civil action or
> proceeding by reason of the same subject matter against
> the public employer or, the public employee or his

estate whose negligent or wrongful act or omission gave
rise to such claim, and no such public employee or the
estate of such public employee shall be liable for any
injury or loss of property or personal injury or death
caused by his negligent or wrongful act or omission
while acting within the scope of his office or
employment . . . .

*Id.*

The Act serves as a limited waiver of sovereign immunity,
but the Town invokes Mass. Gen. Laws ch. 258, §§ 10(c) & (j),
which exclude certain claims from this waiver.  Section 10(c)
preserves a public employer's sovereign immunity for claims
arising out of intentional torts.  *Id.* § 10(c).  Section 10(j)
preserves immunity for claims "based on an act or failure to act
to prevent or diminish the harmful consequences of a condition or
situation, including the violent or tortious conduct of a third
person, which is not originally caused by the public employer or
any other person acting on behalf of the public employer."  *Id.* §
10(j).

For purposes of state tort liability, the Town and the
School Committee rise and fall together.  Under Mass. Gen. Laws
ch. 258, § 1, "public employer" means "the commonwealth and any
county, city, town, educational collaborative, or district . . .
and any department, office, commission, committee, council,
board, division, bureau, institution, agency, or authority
thereof."  Mass. Gen. Laws ch. 258 § 1.  Furthermore, "[w]ith
respect to public employees of a school committee or a city or

28

town, the public employer for the purposes of this chapter shall be deemed to be said respective city or town." *Id.*

### 2.   Count XII - Negligence

Count XII alleges that the Town, the School Committee, Bradshaw, Winrow, Day, Farrell, Shea, Dolan, and Thomas, were negligent in hiring and failing to train, supervise, investigate, and terminate Weixler.

#### i.   *The Town*

The Town claims that it is immune from suit under sections 10(c) and 10(j).  Under section 10(c), as noted above, the Town is immune from suit for claims arising out of the intentional torts of its employees.  Mass. Gen. Laws ch. 258 § 10(c).  Thus, to the extent that Count XII might be read as based on Weixler's intentional tort, it is barred.

Count XII may, however, be read as an independent claim for negligence in hiring and failing to train, supervise, investigate, and terminate Weixler.  As the Massachusetts Supreme Judicial Court has noted, this presents a distinct negligence claim that is not barred by section 10(c).  *Doe* v. *Town of Blandford*, 525 N.E.2d 403, 408 (Mass. 1988); *see also Chaabouni* v. *City of Boston*, 133 F. Supp. 2d 93, 96-98 (D. Mass. 2001) (rejecting motion to dismiss claiming section 10(c) immunized city where complaint alleged negligence in the failure to train officers who assaulted and battered plaintiff).  Section 10(c) does not offer the Town the immunity it seeks.

The Town, however, is shielded to some extent by 10(j).  As noted above, that section bars claims based on a failure to act to diminish the harm caused by a situation, as long as that situation "is not originally caused by the public employer or any other person acting on behalf of the public employer."  Mass. Gen. Laws ch. 258 § 10(j); *Brum* v. *Dartmouth*, 704 N.E.2d 1147, 1155 (Mass. 1999) (concluding that the "originally caused" language refers to the "condition or situation").

The Supreme Judicial Court has "construed the 'original cause' language to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party."  *Kent* v. *Commonwealth*, 771 N.E.2d 770, 775 (Mass. 2002) (citing *Brum*, 704 N.E.2d at 1154-55).  Affirmative acts of a public employer are only the "original cause" of a "condition or situation" if they "materially contributed to creating the specific 'condition or situation' that resulted in the harm."  *Id.* at 775-76.

The Town might be called the "original cause" of the "condition or situation" that resulted in harmful consequences to Jill given that it hired Weixler.  Unduly remote causes, however, are not actionable.  *Kent*, 771 N.E.2d at 775-76.  The hiring decision is not necessarily too remote, but plaintiffs have also failed to allege that any negligence in initially hiring Weixler had any connection to later sexual misconduct.  The complaint alleges that Weixler was given preferential treatment due to his

mother's employment with the Masphee public school system, Compl. ¶ 21, and that he was not qualified for the job, Compl. ¶ 22. Plaintiffs fail to allege, however, that Weixler had a criminal record or history of sexual assault, or that defendants were aware of any other information that would put them on notice of poor character, specifically as relevant to sexual abuse.  *See Armstrong* v. *Lamy*, 938 F. Supp. 1018, 1046 (D. Mass. 1996) ("A claim for negligent hiring requires evidence that the employer failed to exercise due care in the selection of an employee, evidence that the employer knew or should have known that the employee who was hired was unfit and posed a danger to others who would come into contact with the employee during the employment, and evidence that the employer's failure proximately caused the injury of which the plaintiff complains.").

From there, most of the alleged failures to train or supervise or take corrective action, Compl. ¶ 226, are failures to mitigate harm.  *See Armstrong*, 938 F.Supp at 1044 (allegation that "city employees failed to 'protect' [plaintiff], and failed to 'train,' 'supervise,' 'regulate,' 'control,' or 'correct' [defendant teacher]" were "based on the failure to prevent or mitigate a harm, rather than participation in the initial injury-causing circumstance").

That said, the decision to retain Weixler as coach following the earlier reports of sexual misconduct is an affirmative act not shielded by 10(j).  *Cf. Pettengill* v. *Curtis*, 584 F. Supp. 2d

31

348, 367 (D. Mass. 2008) (negligently hiring and promotion not shielded by 10(j)); *Bonnie W.* v. *Commonwealth*, 643 N.E.2d 424, 426 (1994) (negligent recommendation of continued employment not shielded by 10(j)).  On this narrow theory of breach, then, the negligence claim may proceed.

### *ii.  Individual Employee Defendants*

Public employees may only be liable under the Massachusetts Tort Claims Act if they acted outside of the scope of their employment.  Mass. Gen. Laws ch. 258 § 2 ("no public employee or the estate of such public employee shall be liable for any injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment.").  The complaint only alleges that the employee-defendants were acting within the scope of their authority as employees throughout the relevant period.  *See* Compl. ¶¶ 8 (Bradshaw), 9 (Dolan), 10 (Shea), 12 (Winrow), 13 (Day), 14 (Thomas), & 15 (Farrell). Count XII therefore must be dismissed as to the individual employee-defendants.

### 3.   Count XIV - Negligent Infliction of Emotional Distress

Count XIV alleges that the Town, the School Committee, Bradshaw, Winrow, Day, Farrell, Shea, Dolan, and Thomas negligently inflicted emotional distress on the Does.  To succeed on a claim for negligent infliction of emotional distress, the Does must demonstrate "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective

symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton* v. *Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982) (Lynch, J.).   To the extent that Count XIV seeks recovery for Jane and John Doe, their claim fails because they have not alleged any "physical harm manifested by objective symptomatology."   The remainder of the claim may proceed to the same extent as the claim for negligence, as discussed in Part III.G.2, *supra*:  Jill may pursue breach based on the Town's decision to continue its employment of Weixler following the February 2008 and January 2009 reports of sexual misconduct; the claim against the individual defendants, however, must be dismissed.

### 4. Count XIII - Intentional Infliction of Emotional Distress

Count XIII brings a claim for intentional infliction of emotional distress against Bradshaw, Winrow, Day, Farrell, Shea, Dolan, and Thomas.   The conduct alleged, however, does not amount to "extreme and outrageous" conduct as necessary for liability. *Agis* v. *Howard Johnson Co.*, 355 N.E.2d 315, 318 (Mass. 1976). Even demonstration of "malice," without more, is insufficient to sustain a claim for intentional infliction of emotional distress. *See Tetrault* v. *Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997).   Plaintiffs' claims are already on the border of "deliberate indifference" or "intentional discrimination" as necessary to succeed on many of their claims and, as pleaded, the

alleged conduct falls short of being "beyond all possible bounds
of decency" or "utterly intolerable in a civilized society."
*Agis*, 355 N.E.2d at 319.  I do not mean to minimize the other
serious allegations.  But having deliberate indifference towards
Jill's rights does not mean that the defendants' actions were
"extreme and outrageous" or "beyond all possible bounds of
decency."

    5.   <u>Count XV - Loss of Consortium</u>

Count XV claims that John and Jane Doe have been deprived of
the consortium of Jill Doe, and are entitled to compensation from
all defendants under Mass. Gen. Laws ch. 231, § 85X.

Given that I have dismissed plaintiffs' other tort claims as
to the employee-defendants, and a claim for loss of consortium
cannot be supported without an underlying tortious act, *Sena* v.
*Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994), the loss of
consortium claim must also be dismissed as to those defendants.

The loss of consortium claim against the Town fails for a
different reason.  The loss of consortium statute states that
"[t]he parents of a minor child . . . shall have a cause of
action for loss of consortium of the child who has been seriously
injured against any *person* who is legally responsible for causing
such injury."  Mass. Gen. Laws ch. 231 § 85X (emphasis added).
The definitions in Mass. Gen. Laws ch. 4, § 7 apply to all
Massachusetts statutes.  In that section, a "person" is defined
to include "corporations, societies, associations and

partnerships," but makes no mention of municipalities or government entities.  Mass. Gen. Laws ch. 4, § 7.

Though Massachusetts appellate courts have not yet addressed whether a town is a "person" under the loss of consortium statute, they have decided that other statutes using the word "person" do not include governmental entities.  *See, e.g.*, *Williams* v. *O'Brien*, 936 N.E.2d 1, 4 (Mass. App. Ct. 2010) (citing Massachusetts cases holding that governmental entities are not "persons" subject to suit under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11H).  Absent any indication to the contrary, I find that the Town is not a "person" for purposes of the Massachusetts loss of consortium statute.  Count XV therefore must be dismissed as to the Town as well.

    6.   Count XVI - Right to Freedom from Sexual Harasssment

Count XVI is a claim against the Town and the School Committee for violation of the right to freedom from sexual harassment under Mass. Gen. Laws ch. 214, § 1C.  The complaint alleges that, under this provision, defendants are "strictly and vicariously liable for actions committed by their employees that are within the scope of employment and furthered by their employment."  Compl. ¶ 245.  Defendants argue that the Title IX "deliberate indifference" standard should apply because Title IX and Massachusetts law prohibit the same forms of sexual harassment.  *See* Mass. Gen. Laws ch. 151C, § 1(e); *Wills* v. *Brown*

*Univ.*, 184 F.3d 20, 25 (1st Cir. 1999) (describing "quid pro quo" and "hostile environment" theories of sexual harassment).

I decline to enter the fray at this stage.  I have indicated in this Memorandum that a ruling on deliberate indifference will require further factual development and so, even adopting defendants' proposed standard, dismissal is inappropriate.  The parties can pursue the question further on summary judgment.

### IV. CONCLUSION

For the reasons discussed more fully above, the motions to dismiss (Dkt. Nos. 46 & 48) are GRANTED IN PART and DENIED IN PART, specifically:

The motions to dismiss Counts I, II, VIII, IX, and XVI are DENIED; the motions to dismiss Counts VII, XIII, and XV are GRANTED; the motions to dismiss Counts IV and V are GRANTED to the extent liability is premised on failure to protect against peer harassment, but otherwise DENIED; the motion to dismiss Count X is GRANTED to the extent liability is premised on failure to appoint a Title IX coordinator or to protect against peer harassment, but the motion is otherwise DENIED; the employee-defendants' motion to dismiss Counts XII and XIV is GRANTED; the Town's motion to dismiss Counts XII and XIV is DENIED to the

extent liability is premised upon the decision to retain Weixler

following reports of sexual misconduct, but is otherwise GRANTED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE