# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JILL DOE, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) C.A. NO. 1:11-cv-11593-DPW |
| | ) |
| ANN BRADSHAW, STEPHEN WEIXLER, | ) |
| ALAN WINROW, JANE DAY, | ) |
| MASHPEE SCHOOL COMMITTEE, | ) |
| AND THE TOWN OF MASHPEE | ) |
| | ) |
| Defendants. | ) |

_____)

## LEAVE TO FILE GRANTED ON AUGUST 21, 2015
## JILL DOE'S *AMENDED* LOCAL RULE 56.1
## CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, the Plaintiff, Jill Doe, hereby submits the following Amended Concise Statement of Material Facts as to which there is no genuine issue to be tried:

1. In 2004, Steven Weixler graduated from Mashpee High School, obtaining grades of C's and D's. Deposition of Steven Weixler ("Weixler Depo.") pp. 22-23.

2. In the fall of 2004 Steven Weixler attended Cape Cod Community College, obtaining grades that ranged from low Cs to failing. He dropped out in January 2006. Weixler Depo., pp. 21-23.

3. On or about June 2005, Cheryl McIntire, a secretary at Quashnet Elementary School in Mashpee, approached Weixler, who was a recess monitor at the time, and suggested he apply for paraprofessional position at Quashnet. Weixler Depo., pp. 72, 74-76.

1

4.      Superintendent Ann Bradshaw hired Stephen Weixler as a paraprofessional on August 2, 2005 for the 2005-2006 academic year. His Position was renewed for the academic years 2006- 2007, 2007-2008, and 2008-2009 by Superintendent Bradshaw. Offer Ltr. From A. Bradshaw to S. Weixler, Ex. D.

5.      Jill's educational record in the seventh and eighth grade demonstrates that she was an average student, obtaining mostly A's, B's and C's in her classes for the 2006-2007 (seventh grade) and 2007-2008 (eighth grade) academic years. BSEA Hr'g Tr Volume VII, Nov. 29, 2011, Jane Doe ("Tr. Jane Doe"), pp. 186, 188.

6.      Jill required help in order to succeed academically John Doe would help Jill with homework.  Tr. Jane Doe, p. 187.

7.      Jill did not exhibit significant behavior issues in the seventh and eighth grade. Tr. Jane Doe, p. 190.

8.      For all relevant periods since September 2007, the Mashpee Middle School was housed in the same building as the Mashpee High School. *See* http://www.mashpee.k12. ma.us/High.cfm.

9.      Weixler came into contact with high school students at Mashpee High School after he was transferred to work in Mashpee Middle School for the 2007-2008 academic year. Weixler Depo., pp. 60-61

10.      In or around September of 2007 Mashpee School Committee member Kathy Stanley received a report that Steven Weixler was providing alcohol to minors and/or students at Mashpee. Deposition of Kathy Stanley ("Stanley Depo."), pp. 80-83, 71, 77.

11.	Ms. Stanley failed to record in writing any information about this report, and claims no longer to remember anything about the reporter.  Stanley Depo., pp. 75, 136-37.

12.	Ms. Stanley does not know how this individual came to know that Weixler was providing alcohol to students, the names and/or ages of the students to whom Weixler was providing alcohol or any other information.  Stanley Depo., p. 80.

13.	Ms. Stanley testified that she informed the School Committee Chair Mary Rose Grady that she received a report that Weixler was providing alcohol to minors/students. Stanley Depo., p. 80.

14.	Ms. Stanley testified that, upon information and belief, Chairman Grady thereafter informed Bradshaw of the report. Stanley Depo., p. 79.

15.	Stanley did not follow up to ensure there was an investigation. She did not notify the Mashpee Police Department or Department of Children and Families.  Stanley testified, "I guess I thought it would be handled with the school."  Stanley Depo., p. 76-77, 80.

16.	Ms. Stanley testified Superintendent Bradshaw reported to the School Committee in Executive Session regarding Stephen Babbitt's investigation into Weixler related to providing alcohol. Stanley Depo., p. 82.

17.	The defendants did not disclose to the plaintiff that any investigation occurred. *See* Complainant's Int. & RFP at BSEA, Int. No. 1 (no reference to investigation related to alcohol in 2008); *see also* Grady Depo., 47-50; Bradshaw Depo., p 5 (noting only that "a rumor was communicated to me that Mr. Weixler was dating a high school student" in 2008); Babbitt Depo. (stating "I wasn't asked to perform an investigation"); St. Cyr. Depo., p. 234 (testifying that she had never received a report that Weixler was buying alcohol for students).

18.     In the early fall of 2007 Steven Weixler, in his role as a paraprofessional, provided assistance to a student who, as part of their schedule, attended an art class. Student 1 a Mashpee High School Senior attended the same art class as an intern.  (Weixler Depo., p. 98-100); Deposition of Student 1 ("Student 1 Depo") p.36.

19.     Weixler and Student 1 developed a personal relationship and Weixler visited Student 1 at her house socially on two occasions and they kissed "two or three" times while he was at her home.  Student 1 Depo, p.35-43; Wexler Depo., p. 101.

20.     Weixler testified that the teacher in the art class observed his interaction with Student 1 in the classroom and he was informed that she grew concerned.  He testified that she notified administration, who then called Weixler into a meeting with two individuals who he believes were Susan Van Toll, Teachers' Union Representative, and possibly Principal St. Cyr. ("Art Class Report"). Weixler Depo., pp. 116-17.

21.     None of the defendants, in either their interrogatories or deposition testimony, disclosed any information about the Art Class Report to the plaintiff.  The defendants further provided no records related to this meeting, and there are no records in Weixler's employment file.  *See* August 8, 2011 Interrogatory Response by Mashpee Public Schools, Ex. A; Mashpee's Answers to Interrogatories and Production Requests ("IPR"), Ex. G.

22.     Weixler did not receive any discipline, coaching or increased supervision following this meeting.  Weixler Depo., pp. 119-20.

23.     In January of 2008, Lou Ann St. Cyr submitted a letter indicating she would retire at the end of the 2008 school year. Mashpee School Committee Finance Meeting January 16, 2008, Minutes p. 4.

24.     Committee Chair Mary Rose Grady, testified that she received a separate report from a student that Weixler was engaged in inappropriate relationships with a student (the "Grady Report").  Specifically, Student 7, then a junior at Mashpee High School, saw Ms. Grady at a public location and asked her, "How come it's okay for a teacher to date a student?" When Ms. Grady asked "What are you talking about?" Student 7 said that "Stephen Weixler was seeing a student."  Ms. Grady asked "How do you know that?" She replied, "Everybody knows it." Grady Depo., pp. 49-50.

25.     Chairwoman Grady did not attempt to elicit additional information from Student 7, "because I was taking it as a rumor and kids talk all the time."  Grady Depo., p. 51-52.

26.     Ms. Grady told Superintendent Bradshaw of this report in her capacity as Committee Chair when the two next met.  Grady Depo., pp. 52-53.

27.     Ms. Grady informed Bradshaw that she had received this report, but did not provide Student 7 name to Bradshaw at that time because, "she didn't ask."  Grady Depo., p. 55.

28.     When asked: "Did it occur to you that given Stephen Weixler's age and the age of many students within the school that if this were true, this behavior could constitute child abuse or criminal conduct," Grady testified: "You always know that as a mandated reporter."  Grady Depo., p. 52.

29.     Ms. Grady testified that Bradshaw reported to the Committee in an executive session that "there had been a rumor and that it had been investigated and that it was found to be false. . . [and] her administrators had talked with Stephen Weixler and with the girl in question, and that they had both denied anything going on."  Grady Depo., p. 58. There are no notes regarding this meeting.

30.     In February, 2008, Defendant Bradshaw received another report by a now-forgotten individual that Weixler was dating a student or students (the "First Bradshaw Report"). Bradshaw testified that "a rumor was communicated to me that Mr. Weixler was dating a high school student."  Bradshaw Depo., p. 5.

31.     Bradshaw failed to write down the name of the individual who reported this information to her, and no longer knows the names, age, position, or whether the persons was a male or a female.  She remembers only that the individual was a community member, "it might have been a parent."  Bradshaw Depo., pp. 6-15.

32.     In February of 2008 Ann Bradshaw, in her position as Superintendent, had in her care 1,923 students, of those students 915 of the students were enrolled at Mashpee High School. A significant percentage those students were under the age of sixteen a greater percentage of students were under the age of eighteen. Mashpee School Committee Regular Meeting February 6, 2008.

33.     Bradshaw did not ask for the names of the student(s) who Weixler was reported to be dating.  Bradshaw Depo., p. 13.

34.     Bradshaw did not report the allegation to the Department of Children and Families or the police.  Bradshaw Depo., pp. 193-94.

35.     In connection with the First Bradshaw Report, Superintendent Bradshaw asked Principal St. Cyr to conduct an investigation. Bradshaw Depo., pp. 16-17.

36.     Bradshaw did not inform St. Cyr about any details related to the Report, and St. Cyr did not ask for any details.  *Id.*; St. Cyr Depo., pp. 34-35.

37.     St. Cyr testified that she delegated the investigation to Babbitt.  St. Cyr Depo., p. 35.

38.     Babbitt testified that he learned about the Report from Principal St. Cyr and testified that "Lou Ann St. Cyr told me it was mentioned at a School Committee meeting." Babbitt Depo., pp. 82, 111.

39.     Babbitt testified that he, "wasn't asked to perform an investigation." Babbitt Depo., p. 163. Rather, he was asked "to have a conversation with Mr. Weixler regarding a comment made at a school committee meeting." *Id.*, p. 148. He testified that this conversation was approximately ten or fifteen minutes in length. *Id.,* p. 82.

40.     Weixler testified he did not remember any such discussion with Stephen Babbitt. Weixler Depo., pp. 86-88.

41.     Babbitt stated in a February 8, 2008 email to Principal St. Cyr, as follows: "I spoke with Stephen Weixler yesterday at the end of the school day re the comments made to the school committee/superintendent. His response was it was 'non sense [sic] and ridiculous.' Please let me know if you would like further action taken." February 8, 2008 Email, Ex. F.

42.     An August 8, 2011 Interrogatory Response by Mashpee Public Schools notes that Babbitt concluded that, "'[t]here was nothing there. His body language, tone of voice told me he is telling the truth.' There is no documentation of this investigation." Ex. A.

43.     Bradshaw testified that in February, 2008 she was also informed by a separate and now-forgotten individual that Weixler was dating Student 1 (The "Second Bradshaw Report"). Bradshaw Depo., p. 23.

44.     Student 7 testified that in approximately April or May of 2008, she was called in by Principal St. Cyr and asked whether Stephen Weixler was dating a student (the "St. Cyr Report"). Student 7 informed her that "he had a relationship with Student 1." Student 7 Depo., pp.16-18.

45.     Principal St. Cyr testified that at some point in the 2007-2008 academic-year, she asked Student 1 and her parent(s) whether Weixler had engaged in any inappropriate behavior with her. St. Cyr Depo., p. 58.

46.     Student 1 testified that such a conversation with her and/or her parents "never happened." Student 1 Depo. p. 25.

47.     Chairwoman Grady testified that Superintendent Bradshaw reported to the Committee in an executive session that "there has been rumor it had been investigated and it was found to be false… Her administrators had talked with Stephen Weixler and with the girl in question and they both denied anything going on." Grady Depo., p. 58.

48.     When asked whether he was providing alcohol to students during the 2007-2008 academic year, Weixler invoked his Fifth Amendment against self-incrimination. Weixler Depo., p. 84.

49.     When asked whether he was having a sexual relationship with any student under the age of fifteen (15) during the 2007-2008 academic year, Weixler invoked his Fifth Amendment right against self-incrimination. Weixler Depo., p. 121.

50.     Principal St. Cyr retired in June, 2008. Mashpee Public Schools hired Alan Winrow as the Principal for Mashpee High School for the 2008-2009 Academic Year. Stephen Babbitt remained as the Middle School Principal. Bradshaw, Grady, Stanley, Babbitt, and St. Cyr did not inform Winrow of the history of allegations of misconduct involving Stephen Weixler until January 2009. Deposition of Alan Winrow ("Winrow Depo."), pp. 32-33.

51.     The position of Junior Varsity Soccer Coach was posted on June 11, 2008. Varsity Soccer Coach Patricia Morano, who was Weixler's gym teacher while he was a student

at Mashpee Public Schools, sought him out to ask him to apply for the position of junior varsity soccer coach. Weixler Depo., pp. 124-25.

52.     Weixler interviewed for the position, and Morano and Athletic Director Michael Horne recommended Weixler for the position. Deposition of Michael Horne ("Horne Depo."), p. 88; Deposition of Patricia Morano ("Morano Depo."), p. 73.

53.     Ann Bradshaw delegated the task of hiring for the position of JV soccer coach to the athletic director.  Bradshaw Depo., 365-68.  Horne Depo., p. 88.

54.     At no time did Bradshaw notify Horne of any of the information known to multiple administrators regarding the prior reports. Horne Depo., p. 88-90.

55.     Michael Horne and Pat Morano each testified that they would not have hired Stephen Weixler had they know of the prior reports. *Id.*, pp. 90-95; Morano Depo., p. 73.

56.     On July 19, 2008, Jill's sixteen (16) year old cousin died tragically after being hit by a car while a pedestrian. Tr. Jane Doe, pp. 203-05.

57.     Due to anxiety and depression, from losing her cousin, Jill was unable to attend MCAS preparation summer program. Tr. Jane Doe, p. 191.

58.     During the 2008-2009 school year, Jill was a member of the Girls' Junior Varsity and Varsity Soccer Teams.  Jill did not have any relationship with Weixler except that he was her soccer coach. Tr. Jane Doe, p. 245.

59.     At the beginning of Jill's freshman year, Jane Doe informed Pat Farrell, Jill's Guidance Counselor, of Jill's cousin's death. Tr. Doe, pp. 203-05.

60.     Mrs. Doe also shared concerns about the educational impact of the loss on both Jill and her sister.  Mrs. Doe sought guidance on how to prevent the loss from affecting her daughters' educational performance.  Tr. Doe, p. 203.

61.     Early in the school year, Farrell notified Jill's teachers of Jill's cousin's death and the impact on Jill and her ability to access her education. Farrell did not share the information provided by Mrs. Doe with the Child Study Team ("CST") until late October or early November, 2008, nearly two months after Mrs. Doe first expressed her concerns. Mashpee's Answers to Interrogatories and Production Requests ("IPR"), p. 9, No. 11, Ex. C.

62.     The school had established the CST as a "weekly communication and triage to discuss students who were struggling academically, emotionally or behaviorally. The CST also discussed accommodations." IPR, p. 9, No. 11, Ex. C.

63.     During the 2008-2009 academic year, the CST was chaired by Jane Day, then Assistant Principal. Members included: Peter Shea, School Psychologist; John Dolen and Rewa Melby, School Adjustment Counselors; Lindsay Kett, Guidance Director; Dan Patenaude and Patricia Farrell, Guidance Counselors; Judy DuPont, School Nurse; and Elizabeth Babich, Special Education Evaluator. IPR, p.3, No. 4, Ex. C.

64.     The CST was the primary gateway to special education services for students who required an evaluation to determine eligibility. BSEA Hr'g Tr. Volume IV, Oct. 25, 2011, John Dolen ("Tr. Dolen"), p. 70.

65.     Day, Farrell, and Dolen attended the majority of the CST meetings. When asked how many CST meetings he attended, Shea declined to provide an answer. BSEA Hr'g Tr. Volume VI, Nov. 28, 2011, Peter Shea ("Tr. Shea"), p. 188. Interrogatory responses indicate, however, that "most of the members attend every meeting. From time to time one or another may have missed a meeting due to an emergency or illness." IPR, p. 9, No. 11, Ex. C.

66.     With respect to the identification of students who have disabilities pursuant to the IDEA and Section 504, Shea had the most experience and training, with Dolen second to him.

Tr. Shea, p. 138. Dolen and Shea are the only two members of the CST who also regularly attended Staff Meetings for the Special Education Team. Those meetings occurred at least monthly, if not twice a month. *Id*. p. 162.

67.    Steven Weixler's position was announced and approved at the October 1, 2008 School Committee Meeting. It was announced during the Personnel Report by Superintendent Bradshaw. Weixler was approved without comment, question or conditions. Committee Meeting minutes 10/1/2008, Ex. H.

68.    In or about October, 2008, Weixler drove Jill home from soccer practice. On that drive home, he learned where she lived. During the ride, he rubbed Jill's leg with his hand. He let her know he would pick her up sometime, and Jill said no. He continued efforts to develop a relationship with her through texts and interactions at soccer practice. Jill Doe SAIN Interview, Ex. B.

69.    Throughout the season, Weixler was engaged in significant inappropriate behaviors with Mashpee students, mostly girls on the soccer team. *See* Police Report, Ex. I.

70.    Weixler informed team members that if they were drunk, they should call him for a ride. Police Report, Ex. I (Student 11 Interview).

71.    Weixler told Student 12 she was beautiful, and "wanted [her] to drop off her uniform at his house." Police Report, Ex. I (Student 12 Interview).

72.    Weixler obtained team members' phone numbers and texted inappropriate and/or sexually explicit texts to them. Police Report, Ex. I (Student 5; Student 4; Student 12; Student 13, Student 3, Student 6.).

73.    Weixler texted girls at school during school hours. Deposition of Student 4 ("Student 4 Depo."), pp. 114-115 (testifying that on a day of heavy texting, which happened

"regularly," "[i]t was pretty frequent. I mean, each class was an hour and 45 minutes, and I probably got 30 texts in each class, roughly").

74. Weixler texted Student 4 that she was "amazing and sexy." Police Report, Ex. I.

75. Weixler texted girls when he was drunk and talked "dirty." Police Report, Ex. I.

76. He texted girls during school, sometimes for hours. Student 4 Depo., pp 114-15. *See also* Police Report, Ex. I.

77. Weixler offered to drive a student to an All-Star game alone Police Report, Ex. I (Student 14 Interview - declined).

78. Weixler told Student 13 that she was 'pretty' and they should go out on a date. Police Report, Ex. I.

79. Weixler brought Student 4 to a soccer game he played in. Student 4., p. 117 ("[H]e convinced me to go, and, yeah, he showed up to my house and picked me up, drove out. We talked the whole time. I watched him play and then we drove straight home, and he dropped me off.").

80. Weixler told Student 4 that "having sex with someone in regards to age is only a number and age doesn't matter." Police Report, Ex. I.

81. Weixler drove Student 5 alone to a local ball field and tried to kiss her. Deposition of Student 5 ("Student 5 Depo."), p. 49. He told her that he loved her, that she was beautiful and that he had never met anyone like her before. *Id.,* p. 53.

82. Weixler provided alcohol to students. Police Report, Ex. I ("[I]t was common knowledge that Weixler would buy alcohol for students.").

83. Weixler then tried to "hang out" with students after providing them alcohol. Student 5 Depo., p. 48 ("Every time he would buy me alcohol, a couple hours later, he would

always ask if he could hang out with me. . . I'm sure he wanted to take advantage of the fact that I was drinking.").

84.     He attended parties with students where alcohol was present.  Police Report, Ex. I ("In the summer of 2008, Student 12 saw Weixler at a party in the woods someplace in Popponesset where alcohol was present"); ("Two (2) years ago Student 15 was at a party in the woods where alcohol was present.  Weixler was also present."); Student 2 Depo., pp 37-38 (testifying that Weixler attended a party with her and Student 3 at which alcohol was served in the fall of 2008;  Deposition of Student 3 (Student 3 Depo., pp. 22-23, 57) (testifying that Weixler drove her and Student 2 to a party where alcohol was served).

85.     By early November of 2008, Jill was receiving general education accommodations that involved primarily allowing Jill to remain out of class.  The accommodations included (1) sending Jill to guidance if her behaviors (such as crying related to her cousin's death) raised any concerns; (2) granting leniency to Jill regarding misbehavior and failure to complete assignments; (3) increased latitude as to arriving late to class and the ability to leave class when she felt it necessary; (4) reduced and modified work in classes; (5) extended time to complete assignments. IPR p. 8, No. 9, Ex. C to Motion for Summary Judgment as to Section 504 and ADA Claims ("MSJ-Section 504/ADA Claims").

86.     In addition, Jill could access assistance that was available to any non-disabled student, including meeting with guidance on an as needed basis and seeking extra help and tutoring from her teachers.  IPR p. 8, No. 9, Ex. C to MSJ-Section 504/ADA Claims.   The accommodations were not based on a Functional Behavior Assessment ("FBA") (a process for determining the cause of function of a behavior) in order to develop a proper interventions, nor

did the Defendants develop a Behavior Intervention Plan ("BIP"). Deposition of Carla Thomas, pp. 49-51.

87.     By mid-November, Jill was vulnerable and struggling as a result of depression and anxiety related to her cousin's death, and general education accommodations were not resolving her educational deficiencies that resulted from those issues. BSEA Decision, pp 8-11, Ex. A of MSJ-Section 504/ADA Claims; *See also* Dr. Berkowitz Report, p. 25-26, Ex. B to MSJ-Section 504/ADA Claims.

88.     On a Friday in mid-November Weixler drove Jill to a secluded beach where he assaulted her in the back seat of his car. SAIN Interview, Ex. B.

89.     Jill did not immediately report the assault to any adult, fearing that no one would believe her. Dr. Berkowitz Report p. 28, Ex. B to MSJ-Section 504/ADA Claims.

90.     After the assault, Weixler engaged in a pattern of sexually harassing and abusing Jill during school. Jill Doe Statement, 3/12/09, Ex D; Mashpee Police Department Incident Report ("Police Report"), Ex. I.

91.     Weixler verbally harassed Jill in the hallways at school. Jill did what she could to avoid him including purposely taking routes to class that would avoid his classroom. Statement of Jill Doe, Ex. C.

92.     After Weixler assaulted her, Jill's behavior deteriorated significantly both at school and at home, and her grades declined more dramatically. Teachers and administrators at Mashpee observed the changes in Jill's behavior. Defendant Day admitted that Jill's behaviors were more severe after the rape. She further testified that "in the very beginning of freshman year, there were minor discipline issues. The frequency with which she left the classroom grew as the year went on." BSEA Hr'g Tr., Jane Day ("Tr. Day"), p. 237.

93.     At the end of November, after the rape, Jill was identified by the Child Study Team as eligible for Dolan's Anger Management Group. That group, however, was not scheduled to begin until March of 2009. IPR pp. 9-10, No. 11, Ex. C. to MSJ-Section 504/ADA Claims.

94.     By January of 2008, Farrell had been seeing Jill frequently enough that she should have noticed the second steep decline in Jill's behaviors. On January 28, 2009, Farrell wrote an email to Mrs. Doe stating:

> I am concerned about Jill, however, being "stuck" in the grieving process. Every time Jill has an issue, it seems that her cousin's death is somehow at the root of it. Everyone grieves in their own time and own way, but I believe this has really gotten in the way of her progress in school.

Email from P. Farrell to Jane Doe, dated January 28, 2009, Supplemental Exhibit 1.

95.     Rather than request consent for an evaluation to address the lack of academic progress at school, Farrell referred Jill to outside grief counseling. *Id*.

96.     In late January or early February of 2009, Assistant Principal Day met with Mrs. Doe to discuss Jill's educational issues. Day testified that by January, she was aware that "issues around Jill's grief were impeding her ability to stay in the classroom." Tr. Jane Day, pp. 20-24 (Nov. 28, 2011).

97.     At this time, it had been six months since Jill's cousin died, and Jill's oppositional behaviors and symptoms of depression only continued to increase. Jill was having difficulty waking up in the morning, and Mrs. Doe constantly struggled to get her to school. *Id*. *See also* Email Jane Day to Jane Doe, Ex. F to MSJ-Section 504/ADA Claims.

98.     [deleted-duplicate]

99.     In January, 2009, Russell Perry was a staff member of the Boys & Girls Club who supervised an after school program at Mashpee High School. On January 9, 2009, Perry reported

to Principal Winrow and Assistant Principal Jane Day that he had overheard on two separate occasions students discussing that Weixler was engaged in an inappropriate relationship with a student ("the Winrow/Day Report"). Investigation Reports, (Day) Ex. J., (Winrow) Ex. K. Winrow and Day reported this information to Bradshaw.

100.    Bradshaw did not instruct staff to make a referral to DCF or the police at any time during this investigation. She again instructed them to conduct an internal investigation. Bradshaw Depo pp. 211-218. Neither Bradshaw nor Babbitt provided any information about prior reports of misconduct by Weixler to Day or Winrow. Investigation Reports, (Day) Ex. J., (Winrow) Ex. K. Instead, Bradshaw informed Winrow and Day only that Weixler had been looked into on a prior occasion, but told him that "there was nothing there." Mashpee's Answers to Interrogatories and Production Requests ("IPR"), No. 6, Ex. G.

101.    Winrow did not ask for details of the prior report. Day likewise did not ask for details of the report and stated "an assistant principal doesn't jump over the principal to speak to the superintendent. That's not the hierarchy." Deposition of Jane Day ("Day Depo"), p. 165.

102.    Stephen Babbitt also participated in the investigation, but failed to provide any information about his knowledge of the prior reports to either Day or Winrow. Winrow Depo., pp. 77-78. Neither Day nor Winrow asked Babbitt about his prior knowledge. Day Depo., p. 26; 42-44; 79-80; Winrow Depo., pp. 36, 41.

103.    Jane Day and Adjustment Counselor Rewa Melby interviewed Student 2 at approximately 8:00 on Monday morning. An incident report notes: "We opened with a question about what appropriate teacher-student relations entail and what might fall into the inappropriate realm." Before Student 2 was informed of the reason for the discussion, she asked: "Is this about the rumor . . . about Stevie Weixler and me?" At no time did Day or Melby ask about the details

of the rumor she referenced. Student 2 informed them that 'this rumor has been going around since last May,' and she stated that the last time she heard it herself was in the fall of this year. . . She was adamant that she is safe and that Mr. Weixler would never do such a thing." Day Report, Ex. J.

104.     Winrow and Babbitt interviewed Stephen Weixler at approximately 8:00 that Monday. Before being told of the reason for the discussion, Weixler offered that he knew there to be a "rumor about him and a student named Student 3." Specifically, "he heard 'last week' that he 'hooked up' with Student 3 from Student 10, who is the sister of his brother's girlfriend." Winrow Report, Ex. K.

105.     The Incident Report further notes: "When asked directly if there had ever been any other contact or inappropriate behavior with either student, Mr. Weixler said, 'No.' He stated that there was no truth to the rumor. He said that he was pursuing a position as a fireman and would never jeopardize his future by becoming involved in something like this [with students]." (Brackets in original). Winrow Report, Ex. K.

106.     Pending this investigation, Weixler was not placed on administrative leave. Instead he was sent back to serve as a paraprofessional in the classroom. Administrators did not ask him to allow them to review his texts or emails. St. Cyr. Depo., p. 234. *See also* Weixler Depo p. 120.

107.     Day and Melby interviewed Student 3 at approximately 10:45 a.m. The incident report notes, "We started by asking her to define 'appropriate' and 'inappropriate,' and before she even answered that question, she said, 'This is about the Stevie Weixler Rumor, isn't it.?' We said it was and she said, 'That rumor's been going around for a while.' We asked, 'How long is a while?' She stated she first heard it last spring and heard it again this September. We asked

her, 'is there any truth to that?' She firmly stated, 'No.' . . . 'Student 3 insisted she was safe and does not feel threatened by Mr. Weixler.'" Day Report, Ex. J.

108.    Student 3's statement to Assistant Principal Day, who was not trained in interviewing victims of child abuse, is contradicted by Weixler's testimony wherein he asserted his Fifth Amendment Right against self-incrimination when asked if he had sexual intercourse with Student 3. While Student 3 still denies a sexual relationship, she admits that she was afraid to be honest in this investigation. Student 3 Depo., pp. 61-62.

109.    After the interview with Student 3, Mr. Winrow, Mrs. Day and Mr. Babbitt questioned Student 10 about the report. She acknowledged that she heard the information in math class when two students— Student 16 and Student 17—were discussing that "Stevie Weixler" had "hooked up" with Student 3. Because she knew Mr. Weixler, she "wanted him to know about it." Winrow Report, Ex. K.

110.    No one interviewed Student 16 and Student 17 in connection with the Winrow/Day Report. Day Report, Ex. J.; Winrow Report, Ex. K.

111.    The defendants did not report the information disclosed in January to the Department of Children and Families or the Police in connection with the Winrow/Day Report. Mashpee's Answers to Interrogatories and Production Requests ("IPR"), No. 6, Ex. G.

112.    The defendants did not interview any other girls in the school, except those noted in Paragraphs 103-109, or speak with any girls on the soccer team in connection with the Winrow/Day Report. Day Report, Ex. J.; Winrow Report, Ex. K.

113.    The defendants did not terminate Weixler, or discipline or provide any coaching to him in connection with the Winrow/Day Report. Mashpee's Answers to Interrogatories and Production Requests ("IPR"), No. 6, Ex. G.

114. The defendants did not supervise Weixler more closely in connection with the Winrow/Day Report. Weixler Depo., pp. 119-120.

115. Weixler thereafter began a substantial sexual relationship with Student 6, a 17 year-old senior at Mashpee High School, on February 14, 2009. Police Report, Ex. I.

116. By February of 2009, Day, Dolen, and Farrell were aware that Jill was yelling at other people without consistent control; was leaving class frequently without permission, had difficulty controlling her anger, and that many interpersonal reactions "pissed her off." IPR, p. 4, No. 5, Ex. C.

117. The Team was aware that Jill continued to exhibit these behaviors even with the adjustment counseling that started in January. They were aware that Jill had taken the State Trait Anger Expression Index, and that her results showed significant anger issues. Tr. Jane Day, p. 76.

118. According to Dolan, Jill "exhibited signs of depression, mood swings with anger discharge/displacement" before March of 2009. IPR p. 13, No. 16, Ex. C. The Team was likewise aware that Jill's grades continued to worsen. Tr. Day p. 80. Despite this knowledge, at no time during this period was Jill evaluated for special education.

119. In February of 2009, Jane and John Doe met with Winrow, Dolen and Day as well as Janet McFarlane, Assistant Chief Probation Officer of the Barnstable County Juvenile Court Department, and Laura Roach, a representative from the Department of Children and Families, to discuss Jill's behavior. The group recommended a stubborn child Child In Need of Services "CHINS" petition, seeking court interventions rather than addressing Jill's issues within the school. Compl. at ¶ 46.

120.    During this period, Jill remained enrolled in regular education classes, despite the fact that her emotional well-being continued to deteriorate, her grades declined and she could not access her classes.  Instead, Jill sat in the guidance office repeatedly, was frequently truant, and demonstrated emotional outbursts in school.  *See* BSEA Decision, pp. 10-14, Ex. A of MSJ-Section 504/ADA Claims.

121.    On Friday, March 6, 2009, two gym teachers, Brian Corrigan and Matthew Donahue, overheard Student 7 speaking about Stephen Weixler's conduct.  They approached her and she confided to them Weixler was texting students on the soccer team, buying alcohol for students and that he had intercourse with Student 3.  She informed them that this occurred at a party and that Student 2 and Student 18 were downstairs at the time. She further informed them that Student 3 was bragging to her friends that this is happening but she'll never give it up to the office.  Student 7 stated that she saw text messages from Weixler to Student 5 a few weeks ago, that they were explicit and that Student 5 was scared. Matthew Donahue reported all of this information to Principal Day at approximately 2:25 on that day.  Day Notes, Ex. L.

122.    At 4:30, administrators Winrow, Day, and Babbitt met with Student 7 and her mother.  Student 7 informed them that she had been called in by Principal St. Cyr in March or April of 2008 and that she informed her then that Weixler was dating Student 1.  She was concerned that Weixler was now targeting younger girls as he was known to be having sex with Student 3, and he was pursuing Student 2.  Day Notes, Ex. L

123.    After the discussion, Winrow called School Resource Officer Lisa Hettinger, but he provided only limited information.  According to the Police Report, Winrow informed her of the following: "On 3/6/09, at approx. 1751hrs, I (Hettinger) was advised via cellular telephone that school administrators were conducting an administrative investigation involving the

professional conduct of a teacher. They were acting on a rumor that a teacher/coach was having inappropriate contact with students. The teacher inappropriately conversed with the students and may have supplied them with alcohol. He was immediately placed on administrative leave pending the outcome." Police Report, Ex. I.

124.     Winrow did not provide Officer Hettinger with Student 7's name, despite the scope and significance of the information provided by her to the defendants; he did not inform her that Weixler was alleged by multiple students to have engaged in statutory rape having had sexual intercourse with Student 3, who was 15 years old at the time; he did not inform her of any prior reports of impropriety by Stephen Weixler, including the report he had just previously investigated in January, 2009. *Id.*

125.     Weixler returned to the school on Monday, March 9, 2009. Notes from March 9, 2009 Meeting, Ex. M; Letter, Ex. N.

126.     Weixler was interviewed at 1:00 p.m. by Winrow, Babbitt and Day. Susan Van Toll was in attendance. Weixler denied any involvement. He was placed on administrative leave on March 10, 2009. Notes from March 9, 2009 Meeting, Ex. M; Letter, Ex. N.

127.     The defendants did not call the Department of Children and Families or turn over the investigation to the police. Their investigation remained internal. Mashpee's Answers to Interrogatories and Production Requests ("IPR"), Nos. 6, 7, Ex. G.

128.     At some point, Jill disclosed to Student 19, a student at Falmouth Public Schools, that something had happed between her and Stephen Weixler. After speaking with her own parents, Student 19 called Jane Doe and informed her that something inappropriate had happened between Jill and Weixler. Jane informed John Doe. John was the assistant coach for the hockey team that Jill played on. He went to the school on Friday and informed Sean Chiccoine, Head

Coach for the hockey team and Jill's math teacher, that he was informed that something had happened between Jill and Weixler. He approached Chiccoine as a friend and expected the conversation to be "off the record" while he determined the next steps to help Jill. Chiccoine recommended that John inform administration. He did not suggest that he call the police or DCF, and he did not do so himself. Deposition of John Doe ("John Doe Depo."), pp. 169-71.

129. Chiccoine instead informed administration about John's report to him on the morning of Monday March 9, 2009, before the Does had an opportunity to call the school. John Doe Depo., pp. 169-171.

130. Adjustment Counselor John Dolen pulled Jill out of class to interview her about Weixler. *Id.*

131. Dolen did not have any specialized training in forensic interviews of victims of sexual assault and abuse. BSEA Decision, p. 12, Ex. A of MSJ-Section 504/ADA Claims.

132. Dolen's first interview occurred prior to any discussion with Jill's parents and without their permission. *Id.* Doe Depo., pp. 169-171.

133. Jill indicated to Dolen that something had happened, but was reluctant to fully disclose the rape. Dolen sent her back to class. He did not call the Department of Children and Families, or the police. He thereafter informed the Does of his discussion and confirmed that something had happened. *Id.*

134. Winrow and Dolen informed the Does that they needed Jill to disclose what happened before they could take any action. *Id.*

135. No one informed the Does of prior investigations or that Weixler was alleged previously of committing statutory rape. *Id.*

136. From Monday to Thursday, Dolen had several discussions with Jill seeking her a specific disclosure from her about what occurred with Weixler. Tr. Dolen, pp. 71-72; 77; 79-80.

137. From 9:00 – 10:15, Thursday March 12, 2009, Jill disclosed the incident that occurred in the car in an interview with Dolen and Chiccoine, her hockey coach. She disclosed the incident in the car up to the point of the rape, but was unable to verbally state what occurred after that point, so she described it on paper. Written Statement, Ex. C.

138. Jill was then sent home with her parents. Chiccoine informed Winrow of the disclosure. Winrow contacted the police at 11:55 a.m. Police Report, Ex. I.

139. At 12:50 p.m., Officer Hettinger contacted Jane Doe and asked that Jill be brought to the Children's Cove for SAIN (Sexual Assault Intervention Network) interview. Officer Hettinger explained to Jane that the interview would be conducted by a civilian trained child interviewer. Jane agreed to the process and brought Jill to the Cove. Police Report, Ex. I.

140. Jill's interview began at 2:25 p.m. She struggled and was reluctant to disclose the rape again. She said to Mr. Fontes that she "had talked to [her hockey coach and guidance counselor] already about what happened and she was tired of it." Her initial interview concluded at 2:50 p.m. when she became distant and stopped talking. Police Report, Ex. I.

141. Shortly thereafter, Weixler confessed. Police Report, Ex. I.

142. When informed that Weixler was in the process of disclosing the assault, Jill was willing to speak with Mr. Fontes again. Jill's second interview began at 3:45 p.m., and she provided the details of what occurred in the car. Police Report, Ex. I.

143. At the time of Jill's interview, Weixler was interviewed by Detectives Waterfield and Carline of the Mashpee Police Department. His interview began at 3:01 p.m. By 3:51 p.m. on March 12, 2009, Weixler confessed to the statutory rape of Jill Doe. Police Report, Ex. I.

144.     On March 16, 2009 and March 17, 2009, the detectives interviewed twenty two students, and a paraprofessional. Their interviews revealed some, but not all of the additional victims. Victims and witnesses disclosed that Weixler had provided alcohol to at least seven girls, texted inappropriately with at least five girls, and engaged in a sexual relationship with a 17 year-old student. Police Report, Ex. I.

145.     The detectives were not provided information from the school about the report by Student 7 to Brian Corrigan, Matthew Donahue and the administrators. Waterfield Depo., pp. 77, 79, 82-85; Hettinger Depo., pp. 90-91 Their names do not appear anywhere in the police report, and the police did not interview any of those individuals. Police Report, Ex. I.

146.     The defendants did not provide information about any prior investigation by the school, including the January 9, 2009 investigation involving Student 3 or the prior reports regarding Student 1. The police were not informed of the Art Class Report, the Stanley Report, the Grady Report, the two Bradshaw Reports or the St. Cyr Report. Deposition of Robert Waterfield ("Waterfield Depo."), pp. 76-77.

147.     Neither Jane Day nor Alan Winrow provided their investigation notes from January or March to the police. Despite the fact that Student 3 was identified as a victim of statutory rape by Stephen Weixler, she was not identified as such to the police by any of the defendants, and there is no indication in the police report that witnesses informed the school that Weixler had sexual intercourse with her. Student 3 was never engaged in a SAIN interview, and no defendant followed up with her to ensure her safety. Police Report, Ex. I.

148.     Weixler was arrested on March 13, 2009. He entered a plea agreement admitting to one count of indecent assault and battery on a person 14 or older in addition to a charge of

disseminating harmful matter to a minor and three counts of buying alcohol for a minor. Weixler Depo., p. 50.

149.    On April 23, 2010, the plaintiff, through counsel, filed a request for an expedited due process hearing before the Bureau of Special Education Appeals, which letter referenced the plaintiff's federal claims.  *See* April 23, 2010 Letter to Reece Erlichman, Supplemental Ex. 2.

150.    On September 27, 2011, the plaintiffs, through counsel, filed a Presentment Letter.  *See* September 27, 2010 Presentment Letter, Supplemental Ex. 3.

151.    In May, 2012, Kathy Stanley destroyed all of her notes she had taken in her capacity as a school committee member.  Stanley Depo., pp. 39-43.

152.    In 2009, Bradshaw permitted Sean Moroney to repurpose Stephen Weixler's computer.  In the summer of 2010, she permitted him to destroy it.  She likewise permitted him to destroy the server.  Deposition of Sean Moroney ("Moroney Depo."), pp. 96-104.

153.    After Jill's disclosure, Dolen was aware that Jill was traumatized by both reporting the assault, and the assault itself.  He knew the assault was "traumatic and confusing to her."  Jill "had this question as to why this whole thing was happening.  Why Mr. Weixler was approaching her.  [Dolen] saw it as a break in the trust relationship and that's what [he] attributed it to and that she found herself in this situation and was kind of confused as to how it all happened and why it happened." Tr. Dolen, p. 79.

154.    The fact that Weixler was Jill's soccer coach and an employee of the School "made it worse certainly." Tr. Dolen, p. 80.

155.    Dr. Barbara Berkowitz, Forensic Psychologist, noted the particular trauma resulting from the fact that Weixler was her soccer coach, testifying that it was a "dreadful, sad, horrible abuse of his power." BSEA H'rg Tr., Vol. VIII, Nov. 30. 2011.

156. She testified that Jill "saw him as a supportive figure and he then betrayed her by abusing her vulnerability and her trust . . .for his own sexual pleasure." Dr. Berkowitz Report, p. 39, Ex. B of MSJ-Section 504/ADA Claims.

157. Dr. Berkowitz explained that the impact of this trauma for Jill on Jill's ability to access her education: "The school environment itself can become toxified. It becomes a place that's no longer safe. Playing soccer is no longer safe. Walking down the hall in school is no longer safe because you may run into this person as long as they're still there at the institution." Dr. Berkowitz Report, p. 39, Ex. B of MSJ-Section 504/ADA Claims.

158. Following Jill's disclosure, Mashpee convened a Crisis Response Team ("CRT") meeting. The CRT was made up of the same members as the CST and met twice. The initial meeting was also attended by Beth Biro from the Children's Cove. BSEA H'rg Tr., Volume VI, Nov. 28, 2011, Ann Bradshaw (BSEA Tr. Bradshaw"), p. 340.

159. At the initial CRT meeting, Biro recommended that students be informed of the Weixler incident in small group settings. *Id.*, p. 344.

160. Rather than follow the Cove's recommendation, however, the school informed the students, based on the request of Committee Member Kathy Stanley, in class-wide meetings. *Id.*, p. 341.

161. On March 17, 2009, the Cape Cod Times printed that a "14 year-old freshman, a member of the junior varsity soccer team he coached" was the victim. Cape Cod Times, "Mashpee parents demand answers" March 17, 2002 (www.capecodonline.com). Cape Cod Times, "Mashpee Parents Demand Answers." March 17, 2002, available at www.capecodonline.com.

162.    Because Jill was the only freshman from the JV soccer team not present at the freshman assembly, students guessed that she was the victim. BSEA Tr. Bradshaw, p. 341-43. Students blamed Jill for Weixler's termination, and as such, bullied, taunted, and criticized her during school. Student 2 Depo., pp. 92-98.

163.    The CRT met a second time immediately after, and Bradshaw testified that the meeting was "emotionally charged" and a "highly emotional environment." Tr. Bradshaw p. 338. Mashpee did not provide any notes from the meeting.

164.    The CRT neither drafted a plan for Jill nor referred Jill for an evaluation for special education services.  After the revelation of the rape, the accommodations made available by Mashpee for Jill remained essentially unchanged.  *See* BSEA Decision, Ex. A of MSJ-Section 504/ADA Claims.

165.     By early March of 2009, Dolen and the entire CST were on notice that Jill had been raped by an employee of the school; that the rape occurred four months prior; that there was a significant violation of a trust relationship by an employee of the school and that such a violation had clinical implications for Jill; that Jill was struggling academically in a way that was inconsistent with her prior record; that she had attendance gaps; that she displayed oppositional behaviors in school; that she had peer issues in school; that she had anger issues in school; and that all of these issues were impacting her ability to access her education. BSEA Tr. Dolen, pp. 84-85.

166.    The defendants knew that while Jill had been struggling prior to the rape, her issues worsened following the rape.  *See* BSEA Decision, Ex. A of MSJ-Section 504/ADA Claims.

167.    Dolen and the CST had knowledge that Jill had been provided general education accommodations starting in September of 2008, and increasing in October and November of 2008. They also had knowledge that those accommodations were not enabling Jill to access her education. Additionally, they knew about the rape and its serious ramifications for Jill's education. Rather than request an evaluation, Dolen and the CST continued providing the same general education services that were provided before the rape and subsequent disclosure, with the exception that Jill started Dolan's Anger Management Class that she was referred to in December, 2008. *See* BSEA Decision, Ex. A of MSJ-Section 504/ADA Claims.

168.    After the disclosure, Jill began to have difficulty with her peers in a way that she never had before, including physical altercations at school. In April of 2009, Jill was overly upset about peer relations and her relationships with a boy, to such an extent that she could not stay in her classes. She continued to spend much of her time in the guidance office. *See* BSEA Decision, 12-22, Ex. A of MSJ-Section 504/ADA Claims. On April 16, 2009, Farrell called Mrs. Doe because Jill was failing her classes. IPR, p. 6, No. 7, Ex. C of MSJ-Section 504/ADA Claims.

169.    Despite Jill's grades and emotional disturbance, the defendants failed to request an evaluation. Instead, defendants shifted responsibility to Jill by having Jill attend after school tutoring to catch up in her classes. Jill was unable to attend the tutoring in light of her emotional state. *See* BSEA Decision, 17, Ex. A of MSJ-Section 504/ADA Claims.

170.    In the fall, Mrs. Doe asked Farrell whether accommodations were available for Jill in her other classes. Farrell told Mrs. Doe that they were not available, on the basis that Jill did not qualify for special education. BSEA Tr. Doe, p. 271.

171.  From September of 2009 through January, 2010, Jill's emotional health continued to deteriorate, and her deprivation of access to public education intensified, yet no additional accommodations were proposed or suggested by the Defendants. *See* BSEA Decision, pp. 17-22, Ex. A of MSJ-Section 504/ADA Claims

172.  On November 12, 2009, Mrs. Doe called Farrell to ask about educational alternatives for Jill, particularly the Cape Cod Collaborative, which is a "therapeutic educational setting designed to provide a wide range of services to address education, behavior, and clinical concerns affecting the academic performance of students. Schools district referrals may be the result of students' truancy, poor relationships, anger and frustration, underdeveloped problem solving, mental health issues, severe discipline or any combinations of personal and environmental conditions that may contribute to an unsuccessful school experience." BSEA Tr. Doe, p. 271.

173.  Farrell informed Mrs. Doe that Jill would not qualify for the program because she was not a special education student, and that the Collaborative would not be appropriate for her, despite Jill's interest in the program. BSEA Tr. Doe, p. 271.

174.  Farrell again failed to inform Jane of her right to request an evaluation for Jill for special education services, or that the emotional issues that prevented her from accessing her education would qualify her for special education.  While Farrell informed Mrs. Doe that she could speak with Dolen or Shea about the Collaborative, Mrs. Doe elected not to in reliance upon Farrell's professional opinion that Jill would not qualify for the program. BSEA Tr. Doe, p. 271.

175.  On that same date, Mrs. Doe asked Farrell about the general education PM Program, a program that, much like Jill's summer school class, occurred in small classes led by an instructor and involved computer programs to facilitate learning.  Farrell had already given

Jill's name to the CST for consideration in that program, but Jill did not have sufficient credits for consideration. Neither Farrell nor any other member of the CST informed Mrs. Doe that Jill was entitled to similar accommodations through special education. BSEA Tr. Doe, p. 272.

176.    Weixler pleaded guilty to indecent assault of a minor regarding his sexual assault against Jill in December, 2009. He also pleaded guilty to distribution of obscene matter to a minor in connection with his texting of pictures of his penis to Jill, and the sale or delivery of liquor to a person under 21. BSEA Tr. Doe p. 276.

177.    Jill's downward spiral intensified after the new year. Farrell testified that Jill's grades were "abysmal" by the end of her first semester, and she was not able to access her education at all as she was unable to come to school. Tr. Farrell, p. 167.

178.    On January 18, 2010, Jill was admitted at Falmouth Hospital by her mother following the manifestation of significant symptoms of Post-Traumatic Stress Disorder ("PTSD") and other emotional difficulties. Jill assaulted a male stranger at a convenience store because he was "looking at her." Jill was experiencing severe symptoms of PTSD, including intrusive thoughts, flashbacks and nightmares. Discharge Summary, Ex. G of MSJ-Section 504/ADA Claims.

179.    In her testimony about the severe behavior which led to the hospitalization, Mrs. Doe recalled Jill's attempts to cut her wrists with a knife, and her efforts to physically restrain Jill in order to stop this behavior. Mrs. Doe drove Jill to Bethany Phillips, a social worker with the Department of Children and Families, who called mobile crisis. On January 21, 2010, Jill was placed in the Community Based Acute Treatment (CBAT) Unit at Saint Vincent's Home. Jane Doe Depo. p. 242.

180. Jill was diagnosed with PTSD, Mood Disorder NOS, R/O Bipolar Disorder and polysubstance abuse dependence. St. Vincent's Home, Discharge Summary, Ex. G of MSJ-Section 504/ADA Claims. The discharge summary, which was provided to the School, noted that Jill responded well to the structure of her treatment. *Id*.

181. Jill was discharged by St. Vincent's on February 3, 2010. Mrs. Doe brought the discharge summary to the School and met with Farrell pleading for help from the school. BSEA Tr. Jane Doe p. 297. The discharge summary was also forwarded to the members of the CST. *See* BSEA Decision, p. 17, Ex. A of MSJ-Section 504/ADA Claims. In addition, Jane shared the details of the incident that led to Jill's hospitalization with Farrell. Tr. Jane Doe, pp. 294-295. Neither Farrell nor any other member of the CST requested an evaluation for special education services, despite the clear diagnosis of emotional disabilities that confirmed Jill's need for a comprehensive special education evaluation. Instead, the defendants considered Jill's downward spiral an outside issue, and therefore not the responsibility of the School. Farrell recommended that Mrs. Doe continue to find an outside counselor for Jill. *See* BSEA Decision, pp. 17-22, Ex. A of MSJ-Section 504/ADA Claims.

182. After her discharge from St. Vincent's, Jill returned to Mashpee without any additional supports. *See* BSEA Decision, pp. 20-22, Ex. A of MSJ-Section 504/ADA Claims.

183. By this time, rumors had circulated among the students that Jill had been locked up in a psychiatric ward. Upon return to school, Jill was further harassed, taunted and criticized by her peers. *See* BSEA Decision, p. 20, Ex. A of MSJ-Section 504/ADA Claims.

184. By March, Mrs. Doe was unable to get Jill to come to school and Jill's behaviors continued to prevent her from accessing her education. Mrs. Doe reached out to Farrell. Notwithstanding Jill's eligibility for special education services or a Section 504 Plan, Farrell

informed Mrs. Doe that there were no services available for Jill because the school did not currently have a program for sophomores. IPR, Ex. C of MSJ-Section 504/ADA Claims; *See also* BSEA Tr. Doe, p. 272-273.

185.    Left with no alternatives, Mrs. Doe was forced to seek alternatives for Jill's education outside the Mashpee school system.

186.    Upon applying for a CHINS Petition, DCF assigned Mrs. Doe an education advocate, Maureen Stanton. Ms. Stanton informed Mrs. Doe that Jill was entitled to an evaluation for special education services. On March 18, 2010, Mrs. Doe, with the assistance of Ms. Stanton, sent a written request that Mashpee evaluate Jill for eligibility for special education services or accommodations pursuant to the IDEA and/or Section 504. She sent another request on April 6, 2010. *Compl.* ¶ 86; *See also* BSEA Decision, 17, Ex. A of MSJ-Section 504/ADA Claims.

187.    In late March of 2010, as the result of the school's prior recommendation, the Does filed a CHINS petition and Jill was adjudicated a Child in Need of Services. Jill exhibited severe symptoms of PTSD, including an outburst at the court, which resulted in hospitalization at Arbor Fuller Hospital on April 7, 2010. *See* BSEA Decision, 20-21, Ex. A of MSJ-Section 504/ADA Claims.

188.    On April 16, 2010, Jill was transferred to the Germaine Lawrence Community Based Acute Treatment ("CBAT") Unit for stabilization and treatment. In light of Jill's severe emotional disabilities, her propensity to run away, and polysubstance abuse, the Does requested that Mashpee place Jill in a residential therapeutic school in order to protect her safety and provide specialized educational services. *See* BSEA Decision, p. 21, Ex. A of MSJ-Section 504/ADA Claims.

189.     On May 13, 2010, Mashpee refused such placement on the basis that Jill's needs were not severe enough to require a residential placement by the school.  They relied on the Department of Children and Families, however, to effectuate a forty-five day placement after Jill was discharged from the CBAT Unit.  Compl. at ¶ 91.

190.     On May 13, 2010, fourteen months after Jill disclosed that she was raped by Defendant Weixler, and eighteen months after Jill showed signs of trauma that prevented her from accessing her education, Mashpee determined, for the first time, that Jill was eligible to receive special education and related services.  *See* BSEA Decision, 22, Ex. A of MSJ-Section 504/ADA Claims.  The Department of Children and Families, and not Mashpee, facilitated Jill's residential placement at Germaine Lawrence for purposes of a forty-five (45) day extended evaluation.  Compl. at ¶ 92.

191.     Based upon the results of the extended evaluation, and Jill's continued propensity to run away, the Parents again requested that Jill be placed in a therapeutic residential school. Mashpee refused the Parents' multiple requests for a residential therapeutic placement. *See* BSEA Decision, pp. 23-24, Ex. A of MSJ-Section 504/ADA Claims.

192.     On July 2, 2010, Jill ran away from home and was gone for over a week. Compl. at ¶ 95.

193.     On July 8, 2010, Mashpee held an IEP meeting, and for the first time, agreed to fund a residential educational placement for Jill at the F.L. Chamberlain School. *See* BSEA Decision, 23, Ex. A of MSJ-Section 504/ADA Claims.

194.     Parents accepted this IEP and placement on July 14, 2010, and Jill was placed at Chamberlain on July 20, 2010. *Id*.

195.    On May 5, 2012, Jill turned eighteen.  She signed herself out of the Chamberlain School.  Since that time, she completed the PM program and the Defendants offered that Jill could accept her diploma.  Because the acceptance of her diploma would effectively end any services provided by the school, and because Jill requires additional academic support and support to meet her social/emotional goals on her IEP, Jill opted not to graduate.  Jill Doe Depo. pp. 38-39. After a number of emotional setbacks that are not relevant to this motion, Jill is now presently employed at a restaurant. Jill Doe Depo; pp. 9-10 and participating in testing in preparation for the annual review of her IEP.

196.    After a nine day hearing, the BSEA (Crane, H.O.) made findings of fact and conclusions of law that the defendants acted with deliberate indifference and gross misjudgment and are liable for compensatory damages under Section 504 of the Rehabilitation Act. BSEA Decision, Ex. A of MSJ-Section 504/ADA Claims.

197.    The Hearing Officer found that in the fall (probably November) of 2008, Jill Doe was raped.  As a result, she was seriously traumatized, particularly because she was raped by a person in a position of trust and authority and because the rape followed the death of her beloved cousin in July 2008.  When Jill disclosed the rape to Mashpee on March 12, 2009, Mashpee was immediately aware of the likely traumatizing effect of the rape; and Mashpee knew that since the beginning of the school year, Jill had been struggling with emotional and behavioral difficulties, requiring accommodations and counseling and causing her grades to plummet.  BSEA Decision, pp. 59-60, Ex. A of MSJ-Section 504/ADA Claims.

198.    The hearing officer found that Mashpee violated child find requirements by failing to refer Jill for an evaluation to determine eligibility under special education laws and Section 504 immediately after Jill's disclosure of the rape on March 12, 2009.  No evaluation

occurred until after Jill's Parents requested an evaluation in March 2010. Thus, Jill essentially lost one year of eligibility. BSEA Decision, pp. 59-60, Ex. A of MSJ-Section 504/ADA Claims.

      199.   The hearing officer found that Mashpee's failure to refer Jill for an evaluation under child find in March 2009 cannot be supported by any accepted professional judgment or standard; Jill's Parents therefore satisfied the compensatory damages standards under Section 504. By February 2010, CBDE's continuing failure to refer Jill for an evaluation, even after a residential psychiatric admission and diagnoses of PTSD and Mood Disorder (NOS), became a blatant disregard of Jill Doe's child find rights. BSEA Decision, pp. 59-60, Ex. A of MSJ-Section 504/ADA Claims.

RESPECTFULLY SUBMITTED,
JILL DOE

BY:     /s/Elizabeth Knight Adams
        Elizabeth Knight Adams, Esq. /BBO# 659562
        The Law Office of Elizabeth Knight Adams
        81 Wethersfield Avenue, Suite 2
        Hartford, CT 06114
        Phone: (860) 724-1300
        Fax: (860) 724-1302
Date: August 17, 2015                eadams@ekadamslaw.com

## LOCAL RULE 7.1(a)(2) CERTIFICATE AND CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1(a)(2), I certify that, on August 17, 2015, this document through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants.

/s/ Elizabeth K. Adams
Elizabeth Knight Adams