## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JILL DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | C.A. NO. 1:11-cv-11593-DPW |
| | ) | |
| ANN BRADSHAW, STEPHEN WEIXLER, | ) | |
| ALAN WINROW, JANE DAY, | ) | |
| MASHPEE SCHOOL COMMITTEE, | ) | |
| AND THE TOWN OF MASHPEE | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS TOWN'S
## AND SCHOOL COMMITTEE'S MOTION FOR SUMMARY JUDMENT

The Plaintiff, Jill Doe, ("Plaintiff") hereby submits her Memorandum in opposition to

Defendants' Motions for Summary Judgment, including the Town of Mashpee and Mashpee

School Committee's Motion for Summary Judgment ("Town/Committee Motion"); Defendant

Ann Bradshaw's Motion for Summary Judgment ("Bradshaw Motion"); Alan Winrow's and

Jane Day's Motions for Summary Judgment ("Winrow/Day Motion"[1]).[2]

A consolidated Disputed Statement of Material Fact for each Memorandum in Opposition

is set forth herein in Section II, and incorporated by reference in the Bradshaw Motion and

Winrow/Day Motion. Additional disputed facts are set forth as necessary in each Memorandum

---

[1] Given that the Memoranda in support of the Motions for Summary Judgment by Day and
Winrow are nearly identical, the Plaintiff filed her response in one consolidated Memorandum in
Opposition.
[2] Corresponding Memoranda of Law will be referenced herein as follows: "Town MOL";
"Bradshaw"; and "Winrow/Day MOL."

in Opposition. Facts set forth in Jill Doe's Amended Rule 56.1 Concise Statement of Material Facts, dated August 17, 2015, are also incorporated herein by reference.

The defendants' Motions for Summary Judgment should be denied, as there is sufficient evidence to proceed against each defendant as stated below.

## I.    INTRODUCTION

In August of 2008, just three month before she was raped by Stephen Weixler in November, 2008, Jill began her soccer season as a freshman at Mashpee High School. By that time, at least two members of the Defendant Mashpee School Committee, and likely the entire committee, were aware of multiple reports of criminal conduct by defendant Stephen Weixler stemming back to September, 2007, when Weixler was transferred to the building that housed Mashpee High School. Instead of adherence to mandated reporting laws, the Town and Committee delegated authority to Defendant Ann Bradshaw, then Superintendent of Mashpee Schools, who directed and oversaw a deliberate and intentionally incompetent investigation. Notwithstanding separate, repeated reports made to multiple agents of the Defendant Town and Committee, the defendants took no action to report information to the proper authorities. They failed to identify whether students were victims of criminal conduct or child abuse. They took no action to discipline, remove or report Weixler from Mashpee Public Schools, or at the very least, limit or supervise his access to young girls. Instead, the defendants hired Weixler as the junior varsity girls' soccer coach, increased his unsupervised access to victims, and allowed him to continue to use his position to seek sexual gratification from the young girls in his care.

As a consequence, a month after the School Committee formally approved Weixler's hiring as soccer coach in an October, 2008 Committee Meeting, Weixler having "used [his] position as a paraprofessional and coach to engage in gross misconduct involving minors who

2

are students at Mashpee High School . . . assaulted one or more female students," one of whom

was Jill Doe. *See* Cobra Denial Letter, Exhibit A. This changed the trajectory of the life of a

young girl who would be in college right now had that night not happened.

The defendants claim that "[a] single incident (such as the dead-end February, 2008

investigation of Stephen Weixler or the decision to hire him as the Girls Junior Varsity Soccer

Coach)" is not sufficient to establish a "custom or policy" giving rise to liability. The

defendants' argument is fatally flawed, however, because it ignores the defendants' own

testimony regarding multiple reports of child abuse, misconduct and criminal conduct, and their

failure, as a matter of law, to comply with their obligations as mandated reporters, or, at the very

least, to conduct a competent investigation into the matters before them. Instead, their response,

was so incompetent that it amounted to no action at all.

## II.    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT

The Plaintiff's Amended Concise Statement of Undisputed Facts, dated August 27, 2015,

and her Statement of Disputed Facts, filed this same date, are incorporated herein by reference.

The following questions of fact preclude summary judgment for the Defendants Town and

School Committee.

> **A.    There is a Dispute of Material Fact as to whether the Town/Committee knew or should have known that Weixler was engaged in a pattern of misconduct, criminal conduct and child abuse prior to hiring Weixler as the Girls Junior Varsity Soccer Coach.[3]**

---

[3] As set forth in her Motion to Compel Discovery Responses, Plaintiff notes that Defendants have not provided complete answers to Interrogatory Requests, nor have they produced all requested electronic data in their possession related to these disputed questions of fact. The Defendants make much of the fact that Plaintiff did not take a Rule 30(b)(6) Deposition, suggesting that they were less obligated to provide information as a result. *See* Town/Committee Motion, p. 2, fn2; Defendants' Memorandum in Support of their Opposition to Plaintiff's Motion to Compel, p. 4. Each defendant, however, in their official capacities, *see* Compl. ¶¶ 8, 12, 13, had an obligation to respond to all answers using all reasonably obtainable information within their possession, custody or control, including records maintained by the Defendants

The Defendants frame their knowledge prior to June 2008 as the "dead-end February, 2008 investigation of Stephen Weixler." Town MOL, p. 14. This is consistent with their initial characterization of their knowledge as related only to a "vague rumor that Weixler was dating a student. His supervisor investigated and reported with confidence, 'There was nothing there. His body language, tone of voice told me he is telling the truth.'" Mashpee Public Schools' Answers to Supplemental Interrogatories and Requests for Production, dated August 8, 2011, Ex. B. As set forth more fully below, these representations are inconsistent with the facts disclosed in discovery.

### 1. The Stanley Report[4]

Committee Member Kathy Stanley was asked, "You had heard from someone in the community that Stephen Weixler was purchasing alcohol for minors, correct?" She replied, "Correct." Stanley Depo., p. 80. When asked: "Were you concerned that . . . Stephen Weixler may be giving alcohol to students and may be taking advantage of them," Stanley responded: "Sure." *Id.*, p. 78. Ms. Stanley further testified as follows:

> Q:    So in September of 2007 you had brought information to Maryrose Grady that someone had informed you that Stephen Weixler was or may have been providing alcohol to minors, correct?
> MR.   WILUSZ: Objection.
> A:    That was your date. I don't recall the date.
> Q:    You said that it was right after you had been appointed.
> A:    It was early on in my tenure.
> Q:    So in or around September of 2007, correct?
> A:    I guess, yeah.

---

Town/Committee. *See e.g. Tyler v. Suffolk County,* 256 F.R.D. 34, 38 (D. Mass 2009). In other words, Plaintiff need not have filed a Rule 30(b)(6) Deposition in order for defendants to have filed complete responses to her Interrogatories and Requests for Production.

[4] For convenience, the Grady Report, the Stanley Report, the First Bradshaw Report, the Second Bradshaw Report and the St. Cyr Report are collectively referred to as the "Reports of Misconduct."

Q:      And then separately you had heard that Stephen Babbitt had conducted an investigation, correct?

MR.    WILUSZ: Objection.

A:      I believe I remember that, yeah.

Q:      And that was information that was provided to you in executive session by Ann Bradshaw, correct?

A:      I believe so.

Q:      And was that investigation related to an assertion that Stephen Weixler was engaging in an inappropriate relationship with a student?

A:      No.

Q:      What was that investigation related to?

A:      The alcohol thing, as far as I recall. That's what you asked me about.

Q:      So your recollection is that the investigation conducted by Stephen Babbitt was related to the alcohol issue?

A:      To my knowledge.

*Id.*, pp. 81-83. The defendants Town/School Committee now claim that Ms. Grady was simply mistaken:

> The Town submits that Ms. Stanley simply mixed up the dates and confused any "rumor" about Weixler buying alcohol for students with an entirely separate matter known as the "in the presence of alcohol" rule, which was a topic of conversation by the School Committee in the Fall, 2007. This conversation grew out of an incident/party involving several members of the Girls' Soccer Team (Spring, 2007) in which they faced the possibility of forfeiting 25% of their games (Fall, 2007) because they were found in the presence of other students who were consuming alcohol. This matter had nothing to do with Stephen Weixler. SOF No. 62.

Town MOL, p. 5, fn 6.

Ms. Stanley did not, individually or as a committee member, follow-up to ensure that administrators conducted an appropriate investigation. She testified: "I guess I thought it would be handled with the school." *Id.*, p. 76. Ms. Stanley does not have any notes regarding the information provided to her or the ensuing investigation. Any notes she took in her capacity as a committee member were destroyed in 2012:

Q:      Did you take notes as a . . . committee member?

A:      Yes.

Q:      Did you keep those notes?

| A: | No. |
|---|---|
| Q: | Why not? |
| A: | Because they were just generally my own personal little notes, and I never kept them as a record. Minutes generally contained everything that was in a meeting, and that's the way I did it.[5] |
| Q: | What would be your practice related to discarding the notes that you maintained during the meetings? |
| A: | I probably just threw them out. |
| Q: | When in proximity to the meeting did you throw them out? . . . |
| A: | I'm sure I kept them until I was done with the School Committee, so it would have been 2012. |

Stanley Depo. pp. 39-40.[6]

### 2. The Grady Report

The defendants claim that the Grady Report, the First Bradshaw Report, the Second

Bradshaw Report and the St. Cyr Report do not separately exist and are instead "a single

incident," Town MOL, p. 14, suggesting that each of these reports is the one "vague rumor"

referenced in Interrogatory No. 1, in Mashpee Public School's August 8, 2011 Answers to Jill

Does' Supplemental Interrogatories and Requests for Production ("BSEA IPRs"):

> In February 2008, in a casual conversation at the Mashpee Commons shopping center, a MHS student, Student 7, mentioned to the School Committee Chair, Maryrose Grady, that she wanted to know "how come it's okay" that Stephen Weixler was dating a student. Student 7 did not provide the name of the other student whom Weixler was supposedly dating.[7] . . . As Ms. Grady understood this rumor to be a personnel issue, she reported it promptly to the Superintendent, Ann Bradshaw. Ms. Grady testified that the School Committee did not have oversight of these types of situations and did not handle discipline of staff, if warranted, at that level. Ann Bradshaw, in turn, asked the High School Principal, Lou Ann St. Cyr, to look into this rumor involving Weixler. Following the February, 2008 investigation by the High School Principal, Lou Ann St. Cyr, and

---

[5] The Defendants failed to provide Executive Session Committee Meeting Minutes for the January, February and March Executive Session Meetings from 2008.

[6] Prior to Ms. Stanley's deposition, Michael Horne, the former Director of Athletics at Mashpee Public Schools, testified that he learned from the now Director of Athletics at Mashpee Public Schools that administration had conducted an investigation regarding Weixler's purchasing of alcohol for students. Horne Depo., p. 92.

[7] Student 7 did not provide the name of the Student because Ms. Grady "Did not ask" because she "was taking it as a rumor, and kids talk all the time." Grady Depo p. 51.

> the Middle School Principal, Steven Babbitt, Ms. Grady testified that
> Superintendent Bradshaw reported back to the Mashpee School Committee "that
> there had been a rumor and that it had been investigated and that it was found to
> be false, that they had – that her administrators had talked with Stephen Weixler
> and with the girl in question, and that they both had denied anything going on."
> SOF Nos. 39-42, 56, 99.

Town MOL, pp. 3-4. The defendants' claims are disputed. First, Ms. Grady did not

testify that the discussion with Student 7 occurred in February, 2008 – only that it

occurred "in the winter of 2008." Grady Depo., p. 49. It is unclear that the student

reporter was actually Student 7, who did not reference this discussion with Grady in her

deposition. It well may be that the Grady report was provided by a different student.

Again, there are no notes regarding this Report, and the defendants' memories are

selective. Moreover, at no time did Bradshaw testify that the information in the Grady

Report was the same as the information provided to her in the First Bradshaw report that

sparked their "investigation." Such a claim is a dispute of Bradshaw's own testimony.

    Bradshaw did not write down the name of the individual who reported this

information to her, and as of the dates of her deposition, no longer knew the names, age,

position, or whether the persons was a male or a female. She remembers only that the

individual was a community member, "it might have been a parent." Bradshaw Depo.,

pp. 6-15. When asked again about the role of the Committee, she testified as follows:

> Q:    In [the February 8, 2008] email it notes, "I spoke with Stephen Weixler
>     yesterday, Re, the comments made to the *School*
>     *Committee*/Superintendent." Can you explain to me how the School
>     Committee played a role in this information? (Emphasis added).
> A:    I don't believe they did.
> Q:    So why is Stephen Babbitt referencing the School Committee?
> MR. SIMMS: Objection. It calls for speculation.
> A:    I think the information went from me to Lou Ann St. Cyr, and she
>     conveyed to him that someone had told me a vague rumor about Weixler,
>     and why he put School Committee/superintendent I don't know.

Bradshaw Depo., pp. 140-41.

A further dispute is whether, as the Town now suggests, Ms. Grady is the "community member" who, standing next to Ms. Bradshaw, reported that Weixler may be dating a student. Bradshaw Depo., p. 11 ("I believe we were both standing watching an event. That's the best recollection I have. . . "). When asked when and how Ms. Grady informed Bradshaw of the report to her by Student 7, Ms. Grady did not state that it was at an event. Rather, Ms. Grady testified that she informed Bradshaw in a regular meetingwith Ms. Bradshaw at the school: Ms. Grady would "meet on a weekly basis [with Bradshaw] and [they] would review issues that had -- were going to be coming up for the next meeting and setting the agenda, and we had meetings every two weeks. . . . So the next meeting within that week that I met with Ann, I brought it up." Grady Depo., p. 53.

### 3. *Committee Members*

The extent of the knowledge of other school committee members during the 2007-2008 and 2008-2009 academic years is a disputed question of fact. On August 8, 2011, Ann Bradshaw, as Superintendent and representative of Mashpee Public Schools, answered Interrogatories and Requests for Production served in the matter before the Bureau of Special Education Appeals. In that sworn document, Bradshaw answered the following:

> 1) Did Mashpee Public Schools conduct any investigation of any wrongdoing of any kind by Stephen Weixler at any time before, during or after his employment with Mashpee Public Schools? If so, please state:
> a. The date of each investigation;
> b. The specific incident/incidents that gave rise to the investigation;
> c. Mashpee Public School's findings for each investigation; and
> d. The specific basis of those findings.
>
> Answer:
>
> In addition to investigating whether Weixler was inappropriately texting students and investigating rumors that he provided students with alcohol,

8

> Mashpee also investigated rumors that he dated two students. The first such investigation was in February, 2008. There was a vague rumor that Weixler was dating a student. His supervisor investigated and reported with confidence, "There was nothing there. His body language, tone of voice told me he is telling the truth." There is no documentation of this investigation. ...

August 8, 2011 BSEA IPR No. 1.

On July 31, 2014, Scott McGee, Representative of the School Committee, answered Interrogatories and Requests for production served on the Defendant Committee. In that sworn document, McGee answered the following:

> 6) List each individual rumor, allegation or complaint of sexual or other misconduct allegedly perpetrated by Stephen Weixler about which you are aware, whether involving a student at Mashpee Public Schools or any other third party, including Jill Doe. For each instance, please provide the following information:
> a. The names and contact information of any member of the Mashpee School Committee, or any officer, employee, or agent of the defendants known to you who learned of, observed, witnessed, had or claimed to have knowledge of each rumor, allegation or complaint;
> b. The date of the alleged occurrence;
> c. The date on which you became aware of the rumor, allegation or complaint;
> d. The person or entity that provided information to you regarding the alleged misconduct;
> e. Whether and when you notified the police or the Department of Children and Families of the rumor, allegation or complaint.

Answer No. 6:
> ...
> In February, 2008, a community member told Ann Bradshaw that there was a rumor that Stephen Weixler may be dating a student. No further details were provided to Ms. Bradshaw. This rumor was investigated by Lou Ann St. Cyr and Steve Babbitt; no evidence to support the rumor was discovered.

Defendant School Committee's Answers to Plaintiff's First Set of Interrogatories ("Committee IPRs"). Exhibit C. This answer is identical to Bradshaw's Answer to Interrogatories served upon her, except that Bradshaw provides the following additional response:

Answer No. 6

> Around this time, Ms. St. Cyr was told that Stephen Weixler was dating a student, Student 1. Ms. St. Cyr does not recall how she learned this information nor does she recall who told her. In any event, Ms. St. Cyr spoke with Student 1 in her office and with Student 1's parents over the phone, and both Student 1 and her parents denied that Student 1 was involved in any sort of relationship with Stephen Weixler.

Defendant School Committee's Answers to Plaintiff's First Set of Interrogatories ("Bradshaw IPRs"). Exhibit D. The responses fail to indicate the date on which Bradshaw made the Committee aware or that members individually became aware of reports about Weixler's impropriety, or whether such reports were in fact addressed to the Committee by Bradshaw at all. The witnesses have differing testimony on that issue: Bradshaw denied any communication with the Committee. *See* Bradshaw Depo., pp. 140-41, *supra*. Ms. Stanley claimed that a different issue – the question of whether Weixler was providing alcohol to students – was presented to the Committee. *See* Stanley Depo., pp. 81-84, *supra*. Ms. Grady claims that Bradshaw reported back to the Committee regarding the report that Weixler may be dating a student:

> Q: Did Ann Bradshaw ever bring this information back to the [committee] to discuss the outcome of her investigation?
> A: I believe that she came back to us and said that there had been a rumor and that it had been investigated and that it was found to be false, that they had – that her administrators had talked with Stephen Weixler and with the girl in question, and that they both had denied anything going on.
> Q: And was this meeting in executive session, this discussion you had with Ann Bradshaw?
> A: I would imagine so. I can't remember exactly, but I would imagine we wouldn't have been talking about it in public.
> Q: Do you recall specifically that this information was presented to the entire committee?
> A: Yes.
> Q: Do you know what month?
> A: It was – I don't know exactly what month, but I know it wasn't long after I had brought it to her attention.

Grady Depo., p. 58. The questions of when and how St. Cyr and Bradshaw were made aware that one of the students in question was Student 1, whether they were informed that the other victim was Student 3, and the Town's response to that knowledge, are also in dispute. Bradshaw claims, "Around this time [February, 2008], Ms. St. Cyr was told that Stephen Weixler was dating a student, Student 1. Ms. St. Cyr does not recall how she learned this information nor does she recall who told her." Bradshaw IPR No. 6. Student 4 testified that she informed St. Cyr in March or April of 2008 that Weixler was dating Student 1:

> Q:  And is there any time when Miss St. Cyr contacted you to ask questions about Stephen Weixler?
> A:  Yes.
> Q:  Can you tell me about that?
> A:  She had asked me to come – she had called me to her office and she – I'm not sure if she had asked me because she had heard that me – you know, that I knew something from another student or if she called me down on a personal level and wanted to know what I knew and if I had heard anything. I told her yes, that I heard that he had a relationship with Student 1, who was 18 at the time and a senior.[8]

Deposition of Student 7 ("Student 7 Depo."), pp. 16-17. Handwritten notes from Jane Day regarding her later discussion with Student 7 on March 6, 2009 indicates the following: "called in last year by Ms. St. Cyr, Mar. 08, Apr." Day Notes, at Exhibit I. Student 7 testified: "I have a pretty good memory. I mean, it's been too long now, but if I said that then, yes, it's probably

---

[8] Student 1 turned 18 in February, 2008, making it likely that she was 17 years of age at the time that Weixler had kissed her. This means that the interaction not only implicated misconduct by Weixler, but child abuse as defined by § 51A as well. "Abuse" is defined by the statute to mean the non-accidental commission of any act by a "caretaker" upon a "child" that causes or creates a substantial risk of physical or emotional injury or an act by a caretaker involving a child that constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual. A "caretaker" includes teachers and staff in a school setting and a "child" is defined as a person under the age of eighteen.

when it was." Student 4 Depo., pp. 17-19. The question of when and how many investigations occurred, and if, when and how they were communicated to the Committee, is in dispute.[9]

### 4. *The Art Teacher Report*

Student 1 testified that she first met Stephen Weixler when they "mentored together in an art class." Student 1 Depo., p. 14 ("I don't know if he was a teacher assistant or if he was still in the school. I think it was my senior year, but I helped out with the 7th graders."). Stephen Weixler likewise testified that he was a paraprofessional for a student in a classroom in the Fall of 2007 – the same classroom in which Ms. Student 1 participated in an internship. Weixler Depo., p. 99. They both testified that they developed some sort of relationship in that classroom from which Weixler came to Student 1 house between two and five times. Weixler testified that he kissed her two to three times when he was at her house. Weixler Depo., p. 106.

Weixler testified that he was brought to the office by two people who he recalled to be Lou Ann St. Cyr, and Susan Van Toll. Weixler Depo., pp. 118-119. He was informed that the teacher in the art classroom had reported to them that he was inappropriately talking with Ms. Student 1. Weixler Depo., pp. 112-114 ("The fact that we could have a conversation must have struck people that fact that I took advantage of people."). This was based on the art teacher's observation of your interaction with Student 1 and/or her interaction with Weixler in the classroom. *Id.*, p. 113. Weixler testified that this discussion occurred prior to Christmas, 2007. Weixler Depo., p. 119.

---

[9] The question of whether the Committee provided full and complete answers to Interrogatory Nos. 6-8 was raised in a Motion to Compel Discovery Response. The issue is raised again in a Rule 56(D) Affidavit of Elizabeth Knight Adams in Support of Plaintiff's Application for Stay of Proceedings Relating to its Opposition to Defendants Motion for Summary Judgment, filed this same date.

When asked about her administration's knowledge of the Art Class Report, Bradshaw was unresponsive. *See* Bradshaw Depo., pp. 340-349. Stephen Babbitt did not disclose any knowledge about the Art Class Report, but stated approximately 100 times on the first day of his deposition that he did not remember various events related to this case. For her part, St. Cyr does not recall who told her that Student 1 may have been dating Stephen Weixler. St. Cyr Depo., p. 50.

### 5. *The First Bradshaw Report*

In her Memorandum of Law, Bradshaw describes what she frames as the singular report she received that Stephen Weixler was dating a student:

> In February, 2008, while they were at the Mashpee Commons, *i.e.,* a private commercial shopping mall, a MHS student (Student 7) approached the then-Chair of the School Committee, Maryrose Grady, and told her that it was "unfair" that Weixler was allowed to date a student. Ms. Grady had no idea what Student 7 was talking about; Ms. Grady told her that she "would look into it." Student 7 did not provide the name of the girl who Weixler was supposedly dating. Deposition of Maryrose Grady, pp. 68-69. Maryrose Grady, in turn, passed this information on to Ann Bradshaw. They did not discuss this situation during a formal meeting of the Mashpee School Committee as has been suggested. Instead, "this was a chance meeting and an off-the-cuff comment." Bradshaw Depo., p. 253. No matter, Ann Bradshaw, in turn, asked the MHS Principal, Lou Ann St. Cyr to look into this rumor.

Bradshaw MOL, pp. 4-5. As set forth, *supra*, this is inconsistent with the testimony of both Bradshaw and Grady: Bradshaw testified that she was informed by a community member, possibly a parent, that Weixler was dating a student. She has at all times represented that she received information from someone who was not a committee member, but a member of the community. And that testimony is consistent with her initial representation in her August 8, 2011 Responses to Interrogatories that, "In February, 2008, a community member told Ann Bradshaw that there was a rumor that Stephen Weixler may be dating a student." She likewise

13

stated, as set forth more fully below regarding the Second Bradshaw Report, that a separate person informed her that the subject of the report was Student 1.

Bradshaw claims now, for the first time, that it was Maryrose Grady who provided her with the information that is referenced in Interrogatory Responses. The facts set forth in her Memorandum do not align, and there is a dispute as to who informed Bradshaw that Weixler was known to be engaging in an inappropriate relationships with a students, and when and on how many occasions she received such reports.

In a footnote, Bradshaw claims, "Now, nearly seven years later, Ann Bradshaw could not recall who provided her with this information.[10] At her deposition, Maryrose Grady confirmed that she was the one who told Ms. Bradshaw about this first rumor involving Weixler and an unidentified MHS student." Bradshaw MOL, p. 4, fn9. This "chance meeting and off the cuff comment" referenced in her Memorandum, which she elsewhere described as occurring when she was standing side by side with a person at an event with a community member who informed her of Weixler's impropriety, is in dispute with Grady's testimony. Grady testified that she informed Bradshaw of the Grady Report in their regularly scheduled meeting.

The identity of the student who is the subject of the report regarding Weixler's impropriety is also a disputed question of fact. Weixler pleaded the fifth as to whether he engaged in a sexual relationship with Student 3 in the 2007-2008 academic year. Weixler Depo., p. 121 ("Q: Did you have a sexual relationship with Student 3 during the 2007 to 2008 school year? A. At this time I [invoke] my Fifth.). Given the disputed nature of the testimony, and the lack of documentation regarding the report and the reporter (notwithstanding the new claim that

---

[10] Bradshaw's initial incomplete answer in her August 8, 2011 interrogatory responses in the BSEA proceeding was made approximately 3.5 years after the discussion in question, and not seven years as suggested by Bradshaw.

Grady was the reporter), questions of fact remain as to whether the First Bradshaw report is a wholly separate report from the others regarding Student 3 and not Student 1.

### 6. *The Second Bradshaw Report*

It is a disputed question of fact as to when and from whom Bradshaw was informed that Student 1 was one of the students identified as having been a victim of Weixler's inappropriate conduct. Bradshaw testified that in or about February, 2008 she was also informed by a separate and now-forgotten individual that Weixler was dating Ms. Richard (the "Second Bradshaw Report"). Bradshaw Depo., p. 23-24. Bradshaw testified as follows:

> Q: What is your understanding of who the student was who was the subject of this rumor?
> A: At some point during this small piece of time, the name Student 1 came up.
> Q: When did that come up?
> A: I'm not exactly sure.
> Q: Did it come up more than once?
> A: No, I believe it came up once.
> Q: And how did that information come to your attention?
> A: I don't recall.
> Q: Did you take any written notes at any time during the process of investigating this rumor?
> A: No.
> Q: If Student 4 testified that in or April of 2008 she was called in by Lou Ann St. Cyr and asked whether Stephen Weixler was engaging in any inappropriate relationships and she reported to Lou Ann that she had heard that Stephen Weixler was dating Student 1, does that refresh your recollection as to when you received this information?
> A: No.
> Q: Does that refresh your recollection as to how you heard this information or how this information came to the administration's attention?
> A: No, for two reasons: One, the timing was off. The name Student 1 came right at the same time of the rumor or within a very small time period, and, second, if a student had come to Ms. St. Cyr and said that, Ms. St. Cyr would have told me.

Bradshaw Depo., p. 23-24. Without any notes or emails, and given disputes related to the timing, this necessarily calls into dispute whether the First Bradshaw report related to Student 1 or Student 3.

## 7. *The St. Cyr Report*

There is a dispute of material fact as to whether Student 7 informed Lou Ann St. Cyr, in March or April of 2008, that Student 1 was one of the victims of Weixler's misconduct. Student 7 testified that she was called in by Principal St. Cyr and asked whether Stephen Weixler was dating a student (the "St. Cyr Report").[11] Deposition of Student 7 ("Student 7 Depo."), pp.16-18. Student 7 informed St. Cyr that "he had a relationship with Student 1." *Id.*, p.16. St. Cyr testified that Student 7 did not provide that information to her.

> A:   I don't recall ever having that conversation with Student 7.
> Q:   So it was not Student 7 who told you that Stephen Weixler was dating Student 1 initially; is that correct?
> A:   Not that I remember, no.
> Q.   But you don't remember who it was that told you that?
> A.   That's correct.

St. Cyr. Depo., p. 65.

There is also a dispute of material fact as to St. Cyr's response. St. Cyr testified that at some point in the 2007-2008 academic-year, she asked Student 1 and her parent(s) whether Weixler had engaged in any inappropriate behavior with her. Student 1 testified, however, that such a conversation with her and/or her parents "never happened." Student 1 Depo, p. 25. She testified that had she been asked about Weixler by St. Cyr, she would have disclosed that he came to her house. *Id.*, p. 43. She stated she did not feel the contact was inappropriate: "I didn't really view him as a teacher, just because I was working with him [as a student intern]." *Id.*, p. 43.

## 8. *Extent of Knowledge*

---

[11] St. Cyr testified that she never called Student 7 in to her office to ask her whether Weixler was dating a student. "I don't recall ever calling Student 7 into my office to discuss the topic." St. Cyr Depo. pp. 164-65. "I do recall saying that Student 7 was very prone to lying in her high school career." *Id.*, p. 164. All of the information provided by Student 7 was substantiated by testimony of other witnesses.

There is a dispute of material fact as to the scope of the knowledge of the reports of misconduct by Weixler among Weixler's supervisors. The defendants note that Fran LaPorte, the Lead Teacher/Supervisor in the Student Support Center (for 7th and 8th grade) in which Weixler sometimes worked in his capacity as a Paraprofessional, testified that he "never observed, nor did any one report to him, any inappropriate conduct of any kind involving Weixler." Committee MOL, p.18 (citing SOF No. 32; LaPorte Depp., pp. 85-87, 136, 149.). St. Cyr testified, however, that she believed that Babbitt spoke with Fran LaPorte regarding the report that Weixler was dating a student.

> Q: Do you know if Stephen Babbitt spoke with anyone who worked with Stephen Weixler to investigate further whether or not there was any truth to the allegation that he was dating a student?

> A: I believe he had a conversation with Fran LaPorte about Stephen. But I don't know what exactly was discussed at that meeting.

St. Cyr Depo. p. 37. Stephen Babbitt testified that he did not know whether he spoke with Fran LaPorte. Babbitt Depo., p. 95 ("Q: Did you speak with Fran LaPorte? A: I don't know.").

On March 14, 2009, a reporter from the Cape Cod Times emailed Mashpee Police Chief Rodney Collins, with the subject: Investigation of Weixler Source. The email reads: "Deborah Saldana. [Phone number redacted]. For 12 years worked for Student Service Center at Mashpee High. Resigned last year. Told me last year a student accused Weixler with sexually inappropriate behavior but school did not do anything with that information. Thank you for your help Chief Collins. Take care, K.C. Myers, Cape Cod Times." March 14, 2009 Email, Exhibit E. A second document, a handwritten note, states the following: "April or May 2008. Dorian Wilson – Lead Teacher of Student Support Center. Told Saldana. Allegations of Inappropriate Touching. To: Fran LaPorte – Stephen Weixler. Unknown Student." Exhibit F.

Deborah Saldana testified that that she had a discussion in the teacher's lounge with Wilson, who was the Lead Teacher of 9-12th grade students in the Student Support Center, after an interaction Saldana overheard between LaPorte and Wilson.

A:  We came out of the classroom. When I say the "classroom", I'm talking about the Student Support Center. Dorian Wilson had been speaking to Fran LaPorte. Fran LaPorte was saying his reputation was on the line.

Q:  Fran LaPorte's reputation?

A:  Well, I guess that's who he was talking about. He said his reputation was on the line. I overheard that conversation, and Dorian Wilson was aware that I overheard that conversation. On the way into the teachers' lounge, she clarified what was going on, that Stephen Weixler had been, I guess, accused of inappropriate behavior with a student. She didn't specifically say "touching." She said "inappropriate behavior."

Q:  Did Dorian Wilson mention the student by name?

A:  No.

Q:  Did you ever find out through some other source who the student was that Stephen Weixler was allegedly involved with?

A:  I think it was just in hearsay. I don't recall anybody telling me directly.

Q:  Who is it you heard about through hearsay?

A:  I don't recall. That's why I'm saying it was hearsay. Someone mentioned that they thought that that could be the student that he was involved with or that was inappropriately, I don't know, speaking with or whatever [sic]. I don't know the exact situation.

Q:  If I were to suggest to you the name of Student 1, does that ring any kind of bell?

A:  I don't recall. I'm not sure.

Q:  So I want to make sure I have your prior answer straight. You had overheard Fran LaPorte tell Dorian Wilson that Mr. LaPorte's reputation was on the line?

A:  Yeah.

Q:  Is that your best recollection?

A:  I'm pretty sure that's what he was referring to. I can't say -- yeah, I think he did say, "My reputation is on the line."

Q:  And Fran LaPorte was concerned about his reputation at least as far as you understood it because Stephen Weixler had been accused of being engaged in inappropriate behavior with a student?

A:  Well, you see, I didn't understand that at the time. I didn't know what the conversation was about until we left the classroom and then Dorian Wilson explained.

Q:  Presumably Fran LaPorte was concerned because he was Stephen Weixler's direct supervisor?

A:  I don't really know if that was the reason.

18

Q:      Back in the spring of 2008 was Fran LaPorte Stephen Weixler's direct
        supervisor?
A:      As far as I know, yes.

Saldana Depo., pp. 23-25. Fran LaPorte states that he has no recollection of any discussion

about Weixler, Laporte Depo p. 78, and claims "I don't believe I had anything to do with an

investigation on Stephen Weixler a year before his arrest." *Id.*, p. 129. He further testified that

he does not remember the discussion with Stephen Babbitt referenced by St. Cyr. LaPorte Depo.

pp. 45-46.

**B. There is a Dispute of Material Fact as to whether the Failures to respond to reports of
criminal conduct and sexual abuse by Weixler reflected customs, policies and practices
of the Town/Committee caused the deprivation of Jill's constitutional rights.**

*1. Final Policy Making Authority*

There are disputed questions of fact as to whether the acts of Defendant Bradshaw were

in her capacity as final policymaker, and whether they deprived Jill of her constitutional rights.

In Massachusetts, the School Committee has policy making authority. Mass. Gen. L. ch.

71, § 37. As it relates to this case, the Committee and Bradshaw both acted as final policy

makers in various contexts. The parties dispute the nature and extent of the Committee's

oversight of the mandated reporting policies, whether the Committee delegated unilateral

decision making authority to Bradshaw regarding reports of criminal conduct and abuse by

employees, and the training and supervision of school administrators regarding responding to

and investigating allegations of criminal conduct and sexual abuse. As a matter of law,

defendant Bradshaw acted as the final policymaking official for the Committee with respect to

all matters related to personnel. Her relevant actions were not constrained by policies not of her

own making.

There is a dispute of material fact as to whether the Bradshaw acted as the final policy making authority when the members delegated the handling of the reports received by the Committee (the Grady Report, the Stanley Report) and the reports received by administrators (the Art Teacher Report, the First and Second Bradshaw Reports, the St. Cyr Report) to her. Ms. Grady testified that "being on the School Committee, its drilled into us that personnel is not our realm, so immediately I just thought, this is – this has to do with personnel. I have to just bring it to Ann's attention and let her handle it." Grady Depo., p. 52. *See also*, Stanley Depo., p. 76 (testifying that despite knowledge that provision of alcohol to minors is a crime, she did not call DCF or the police because "I guess I thought it would be handled with the school."). Grady, in her capacity as the Chair of the Committee, delegated the handling of the report despite knowledge that, given Weixler's age and the age of many students within the school, if the Grady Report were true, this behavior could constitute either child abuse or criminal conduct. *Id.*, p. 52 ("You always know that as a mandated reporter.")

There is a disputed question of fact as to whether Bradshaw acted with final policy making authority when she implemented a policy, custom and/or practice of deliberately not maintaining and sharing written documents regarding reports and/or investigations of sexual abuse and criminal conduct by employees. There was no official policy regarding the maintenance of investigation records. None of the Administrators involved in the various reports created or maintained written documentation of reports made to them or their actions or alleged investigations in response, and there are no investigation notes or discipline records in Weixler's employee file. *See* Bradshaw Depo., pp. 13, 16, 24, 57-63, (testifying that she took no notes, and did not ask administrators to take notes); Stanley Depo., p. 136; Babbitt Depo., pp. 22, 26-27 (testifying that the February 9, 2008 Email is the only document he created in

connection with his discussion with Weixler, despite his policy of taking notes related to employee and student discipline issues); *see also*, St. Cyr Depo., pp. 31, 36, 38, 48-49, 50, 58. *Cf* St. Cyr Depo., p. 63 ("Q: Did you take notes about your conversations with Student 4? A: There were multiple notes on Student 4 for disciplinary issues.")

There are questions of fact as to whether the policy and custom to not document reports to share with decision makers related to hiring decisions, caused the violations of Jill's constitutional rights. Mr. Winrow was not provided information about the prior reports of misconduct by Weixler. *See* Winrow Depo., p. 328 (testifying that at the time Weixler was hired over the summer by Michael Horne to serve as soccer coach, he was not aware that Weixler had been investigated); pp. 83-84 (testifying that if he had known about prior reports of misconduct "it certainly would have at prompted some further scrutiny."). Mr. Winrow further testified as follows:

> Q:  So let's look back now at the summer of 2008 when you were first beginning your role as principal? If you knew then that Stephen Weixler had developed a social -- at least a social relationship with Student 1 having worked with her in a classroom and had gone to her house on two occasions to visit with her specifically, would you have had concerns about him being hired as a soccer coach for the girls' JV soccer team?
> MR. SIMMS: Objection. It calls for speculation.
> A:  To get it straight in my mind I just want to restate your question.
> Q:  Sure.
> A:  So if I had known in June of – excuse me, July of 2008 that he had some sort of relationship with a student, in this case Student 1, I can state that it would have given serious cause for consideration of this appointment as girls' soccer coach.
> Q:  And that's because it demonstrates poor judgment, at the very least, with respect to maintaining appropriate boundaries, correct?
> A:  Yes. The way you've described it, yes.
> Q.  If you knew that he had gone to her house on two occasions at some point after he had been engaged as a soccer coach, in other words, someone under your control, would you have fired him?
> MR. SIMMS: Objection. It calls for speculation.
> A.  You are asking if I discovered it during, for example, the soccer season if it were brought to my attention and it was borne out, proven to be true?

Q: Yes.

MR. SIMMS: Same objection.

A: Would I have most likely he would have been terminated or curtailed at the very least.

Q. So certainly limited in his ability to interact with students of that age of that age, female students of that age – correct?

MR. SIMMS: Same objection. Go ahead.

A: Given your description, yes. if I had known it, if it were true, and if it were inappropriate, yes.[12]

Mr. Horne similarly testified that he was not made aware of prior investigations before he recommended that Weixler be hired as Girls Junior Varsity Soccer Coach. Horne Depo., pp. 89-90.[13] Had he known about the prior reports of misconduct, he testified that "that would be, your term, a red flag. And I would want to know more about this investigation in some detail." *Id*., p. 90. He further testified that had he known that Weixler was alleged to have dated Student 1, he would have reposted the position to see what other candidates were out there. Horne Depo., pp. 93-94.

## 2. *Policy and Custom*

---

[12] At the time of this deposition, counsel was not aware of the Grady or Stanley Reports, and was unable to examine witnesses regarding those reports.

[13] Athletic Director Michael Horne described the hiring process:

A: The chain of command was I would do the interviews. I would recommend to the principal. The principal would -- I would send a list, "These are the people who I recommend for fall coaching, you know, football, soccer, track," blah-blah blah, "cheerleading." And I would send that to the principal. The principal would in turn send it to the superintendent – if, in fact, he or she approved of those people, send that to the superintendent. And the superintendent would send out a form letter to that person indicating the salary, "Good luck in the season. Your payments are going to be on three different dates," such and such dates.

Q. So Ann Bradshaw had final say in whether or not Stephen Weixler would be hired?

A. Yes.

Horne Depo., p. 88.

There is a dispute of material fact as to whether Jill's federally protected rights were violated pursuant to the policies, practices and customs of the Defendant Committee, executed through their policy making officials, regarding mandated reporting.

There is a dispute of material fact as to whether the School Committee's custom and policy to delegate authority to its agents, including Bradshaw, St. Cyr, Babbitt, Winrow and Day, to determine in the first instance whether reports of sexual and/or criminal misconduct were substantiated prior to calling the police and/or the Department of Children and Families ("DCF") exhibited deliberate indifference to the rights of Jill Doe and other victims.

Massachusetts' Child Abuse and Neglect Reporting Statute, Chapter 119, Section 51A, is included in the Mashpee High School Faculty Handbook, 2007-2008. Ex. J, pp. 39-40. That same handbook includes the Defendants' specific "Child Abuse/Neglect Reporting Policy." The policy reads as follows:[14]

> Chapter 199 of the General Laws of the Commonwealth of Massachusetts as amended and specifically 51A (in forms addenda) requires that every member of our staff is responsible to report any suspected cases of child abuse/neglect under penalty of law. The procedures at our school will be:
>
> 1. Staff member(s) report a suspected case to the School Nurse
> 2. The School Nurse checks the student involved and schedules a meeting of the School Investigating Committee

---

[14] There is no dispute of material fact that this policy does not comport with the requirements of § 51A. The policy does not require that "any school teacher, educational administrator [or] guidance . . .counselor, who **in his professional capacity** shall have reasonable cause to believe that a child under the age of eighteen years is suffering serious physical or emotional injury resulting from abuse inflicted upon him including sexual abuse . . . **shall immediately report such condition to the department** by oral communication and by making a written report within forty eight hours after such communication." Where a teacher is required to report to the school's designated agent, it fails to require that the agent **"shall then become responsible to make the report in the matter required by this section"** based on *the reporter's* professional judgment. Instead, this policy permitted the defendants to themselves investigate suspicions of abuse or neglect, in direct violation of § 51A.

3. The school Investigating Committee (The Principal, Housemaster, School Nurse, Guidance Counselor and reporting Staff Member) must decide what action to take:
   a. Continued observations.
   b. Drop the case.
   c. Institute a Written Report
4. If the committee decides to forward a written report, the Principal is responsible to:
   a. Verbally notify the Department of Social Services.
   b. Verbally notify the parents involved.
   c. Forward a written report to the [Department of Children & Families] in South Yarmouth, MA

5. The Department of Social Services is responsible to investigate the case within 48 hours and return a written summary of the action taken to the school within ten (10) days.

Mashpee High School Faculty Handbook, 2007-2008, Exhibit J.

There are further disputes of fact as to whether Committee members and staff were properly trained on their requirements as mandated reporters.[15] There are also disputes of fact as

---

[15] *See e.g.*, Grady Depo., p. 131 ("I cannot remember where my training came from," and stating that it could have been Massachusetts Nurse's Association or Children's Hospital Grady); Stanley Depo., p. 11-12 (Chairwoman Stanley testifying that she could not remember if she received training on mandated reporting during her two day training after her appointment to the Committee); Bradshaw Depo., pp. 191-92 (stating that she "thinks" she went to a couple of sessions on mandatory trainings within the last ten years from the attorney general's office, sometime *after* the 2008 investigation); St. Cyr Depo., pp. 13-14, 122-23 (testifying that her mandatory training was covered in several courses that she took for her Master's degree and Post Master's education and that she did not recall the most recent training she took; Testifying that she did not personally provide training of staff while she was serving as a principal, but had reviewed the handbook with staff at the "beginning of the year meeting" when she was a headmaster); Day Depo., pp. 47-48 (testifying that over time had attended various workshops with respect to her obligations as a mandated reporter; no workshop was specific to mandated reporting obligations but there were several where mandated reporting would have been part of the discussion; she had not read the Mashpee Policy, "but we would get some – we would have discussions about it and some training on it from time to time;" also claiming there is a review of mandated reporting expectations at the beginning of every school year and the review was provided by the Superintendent ); Saldana Depo., pp. 18-19 (stating she was trained on mandatory reporting by the school department as part of the orientation process but could not recall if she was provided training every year); LaPorte Depo., p. 23 (received mandated reporter training at professional development at the beginning of the year, but did not remember who provided the training or how training was provided). St. Cyr testified that in the 2007/2008

to whether the policy and customs at Mashpee Public Schools altered the definition of "reasonable suspicion" set forth in 51A to improperly vest greater authority in administrators than DCF to determine, in the first instance, whether information provided to administrators rose the level of a suspicion of abuse or neglect sufficient to file a report.[16]

There is no dispute of material fact, however, that the defendants' policy does not comport with the requirements of § 51A. The policy does not require that "any school teacher, educational administrator [or] guidance . . .counselor, who in *his* professional capacity shall have reasonable cause to believe that a child under the age of eighteen years is suffering serious physical or emotional injury resulting from abuse inflicted upon him including sexual abuse . . . **shall immediately report such condition to the department** by oral communication and by making a written report within forty eight hours after such communication." Where a teacher is required to report to the school's designated agent, it fails to require that the agent, here the members of the "school investigating committee" "**shall then become responsible to make the report in the matter required by this section**" based on *the reporter's* professional judgment about whether there is reasonable cause to believe a child is suffering from abuse. Instead, this policy permitted the defendants to *themselves* investigate suspicions of abuse or neglect, in direct violation of § 51A, and to find a suspicion substantiated *before* making a report to DCF.

*3. Failure to Train:*

    *a. Mandated Reporting*

---

academic year the handbooks were reviewed with the faculty by the assistant principals, Steven Babbitt, Jane Day and Sheila Arnold. St. Cyr dep., pp. 120, 122. Lindsay Kett testified it was typically the principal who provided the overview of the mandated reporter policy and it was "likely" that Lou Ann St. Cyr who provided the training in 2007/2008, and Alan Winrow in 2008/2009. Kett Depo., pp. 19-20.

[16] Definition of reasonable suspicion.

As set forth, *supra*, there are questions of fact in dispute as to whether the training policies of the defendants Town/Committee were adequate to train its administrators and employees to handle the recurring situations to which they must respond, i.e., reports of sexual misconduct and criminal misconduct in general, and those in particular committed by an employee. There are also questions of fact as to whether the defendants were deliberately indifferent to the obvious consequences of their failure to train their administrators and employees appropriately. Finally, there are questions of fact in dispute as to whether the defendants' failures caused the violation of Jill's bodily integrity and violation of her constitutional rights.

The defendants repeatedly testified that they took no action to contact DCF because the information provided was "only a rumor." There is a question of fact as to whether the defendants' dismissal of reports regarding sexual abuse and criminal misconduct as a "rumor" resulted from policy decisions, lack of training, deliberate indifference, or if all three factors were at play.

> Q:    Once you're given information that a teacher may be acting inappropriately with young female students, as administrator, isn't it your obligation to ensure that that is not true before he is allowed to continue working with students?
> MR. SIMMS: Same objection.
> A:     Yeah, my responsibility as administrator is to provide a safe learning environment for students. And in 20 years or so as administrator, there were hundreds, if not thousands, of rumors that went around in the school building.
> Q:    How many rumors related to a student being in an inappropriate relationship with a teacher? More than one?
> A:    Well, there was this rumor here that was presented to me.
> Q.    Is that the only one you've ever dealt with related to a teacher being in a relationship with a student?
> A:    That's my recollection, yeah.
> Q:    So it's not your ordinary rumor.
> A:    It's not your ordinary rumor –

Babbitt Depo., pp. 181-182. Babbitt also testified that he did not have specific training related to investigation into reports of child abuse:

> Q:     What training have you had regarding assessing credibility in an investigation related to allegations of sexual misconduct?
> A:     I don't know.
> Q:     Do you have any training? For example, there are trainings about evaluating truthfulness in investigations. Have you ever taken a training like that?
> A:     I've taken hundreds of training courses in my career.
> Q:     Have you ever taken a specific training that you can point to today regarding investigating truthfulness in evaluations?
> A:     I don't know.

Babbitt Depo., pp. 85-86, 100. (Q: Can you point to any specific training that gives you the ability to assess someone's tone and body language and make a determination about whether someone is telling the truth? A: No."); pp. 35-38 (unable to identify any specific training related to the investigations of sexual abuse).

With respect to his understanding of his role as a mandated reporter, Babbitt's testimony is consistent with the policy that he would only report information about sexual abuse if he determined that it was substantiated:

> Q:     Aren't administrators required under law when there is a suspicion of abuse or neglect to give the information to the Department of Children and Families so that they can conduct an investigation into whether or not the allegation rises to the level of abuse or neglect?
> A:     That's correct.
> Q:     And that's not what happened when Stephen Weixler was investigated in 2008, is it?
> MR SIMMS: Objection. Go ahead.
> A:     Stephen Weixler was – it wasn't allegations. It was rumors: There's a big difference. Allegations usually can be substantiated by fact.

Babbitt Depo., p. 57.

His testimony indicates deference to employees being investigated: "I don't think it's fair to assign guilt or blame on some loose rumor." *Id.*, p. 184. Even after Jill disclosed that she was

raped by Weixler, Bradshaw compiled notes to memorialize that administrators believed that

Weixler was a "victim of rumors" when they conducted their investigation. Bradshaw Depo., p.

306; *See* also Bradshaw Note dated March 13, 2009, Ex. G.

Ann Bradshaw's notes after Jill's disclosure further indicate Mashpee's policy that the

school endeavored to substantiate suspicions of abuse or neglect prior to filing a 51A Report:

*See* Bradshaw Note, dated March 18, 2009, Exhibit H stating with respect to January 9, 2009

investigation, "no evidence to substantiate."

    *b. Investigation Policies:*

Even if an internal investigation was appropriate, whether the defendants exhibited

deliberate indifference in their "investigation" is a disputed question of material fact.

According to Bradshaw's testimony, which is in dispute, a community member informed

Bradshaw of a "vague rumor" that Weixler was dating a student. BSEA IPRs, No. 1; Bradshaw

IPRs, No. 6; Bradshaw Depo., p. 6. She did not write the name down of the reporter, and did not

ask for the reporter's contact information. Bradshaw Depo., p. 13. She did not ask for the name

of the student or the source of the information to the reporter. *Id.*, p. 19. As of the dates of her

depositions, she could not remember the gender or any identifying characteristics of the reporter,

or where the report took place.[17] *Id.*, p. 12. Bradshaw remembers that she contacted Principal St.

Cyr by phone and asked her to investigate. *Id.*, p. 12. She did not provide the name of the

reporter to St. Cyr, *Id.*, pp. 16-17, and St. Cyr did not ask for that information from Bradshaw.

*Id.*, p. 20. Bradshaw did not ask anyone else to follow up with the reporter. *Id.*, p. 17.

---

[17] She stated that she did remember, however, that this genderless reporter "shrugged", and said that the information was "just a rumor," but later said that wasn't something she actually remembered, but that would be "fairly typical when someone brings forward a rumor." Bradshaw Depo., pp. 18-19.

Bradshaw testified, "I asked [St. Cyr] to look into it and get back to me, and when she did, I said – I asked her to push back on Weixler, and Steve Babbitt did that. She spoke to the student." It is unclear whether the initial request to St. Cyr to "look into it and get back to me" is a separate incident, perhaps related to the Art Teacher Report or another report. Bradshaw did not take any notes of her conversation with St. Cyr. *Id.*, p. 16. She did not ask St. Cyr to take notes about the information Bradshaw provided her. *Id.*, p. 16. At some point, St. Cyr was made aware that Student 1 was the subject of the rumor. She did not follow up with that information with Weixler, nor did she ask anyone else to do so. St. Cyr Depo., p. 61.

Bradshaw and St. Cyr testified that St. Cyr spoke with Student 1 and called her parents. Student 1 stated that such conversations "never happened." There is no record of any discussion. If the phone call did happen, St. Cyr testified that she did not ask whether Student 1 knew Weixler outside of school, or whether they were spending time together outside of school. St. Cyr pp. 59-60. St. Cyr testified that she did not factor in whether Student 1 might have motivation to be untruthful.

Stephen Babbitt, claims he was not asked to conduct an investigation and did not in fact do so. Babbitt Depo., p. 72 ("I was asked by my supervisor to have a conversation based on a rumor"); p. 74 ("I was asked by my superior to inquire about a rumor and that's what I did."); p. 163 ("I wasn't asked to perform an investigation. . . . My directive from my supervisor was to have a conversation regarding a rumor that was discussed at a school committee about one of the staff members in my building."). He was not provided information about the source of the rumor and testified that "[t]here wasn't a source. . . I didn't have information as to who the person was, who said what. All I had was a rumor." *Id.* p. 74. Babbitt describes the discussion with Weixler as follows:

Q:     Where did that conversation take place with you and Stephen Weixler?

A:     In my office.

Q:     And how did you come to bring him into your office?

MR. SIMMS: Objection to form. You can answer.

Q:     Did you call him? Did you go get him out of his classroom?

A:     I don't remember.

Q:     Did you take any notes regarding your interaction with Stephen Weixler?

A:     I don't remember.

Q:     You don't remember. So there may be notes that you took when you interviewed Stephen Weixler in February of 2008?

MR. SIMMS: Objection. Go ahead.

A:     I don't remember taking notes.

Q:     Is it fair to say you did not take notes?

A:     I don't remember.

Q:     How long was the meeting in your office?

A:     I don't remember.

Q:     Was it under a half hour? Was it two hours? Approximately how long?

A:     It was six, seven years ago. I don't remember. 10 minutes, 15 minutes.

Q:     What questions did you ask him?

A:     I don't remember.

Q:     What information did you give him?

A:     My recollection is that I asked him or told him that there was a rumor at a recent committee meeting regarding his involvement with females.

Q:     Was it one female or more than one female?

A:     I don't remember.

Q:     So it could have been more than one female?

MR. SIMMS: Objection. Go ahead.

A:     I don't remember.

Q:     Was anyone else in the meeting when you met with Stephen Weixler?

A:     No.

    . . . .

Q:     Now, you testified that you told him that there was a rumor at a recent School Committee meeting regarding his involvement with females. What is your understanding of what was discussed by the School Committee? Was this in a School Committee meeting?

A:     My understanding is that it wasn't during the meeting.

Q:     And so what was your understanding of when this rumor was initially discussed?

A:     I don't know. It was after the meeting.

Q:     Do you know who from the School Committee discussed this?

A:     No idea.

Q:     Do you know if Kathy Stanley discussed this with anyone?

A:     I don't know.

Q:     And so what did Stephen Weixler tell you?

A:     He said it was nonsense and ridiculous.

Q:     Did he tell you anything else?

A:    I don't remember.

Q:    And is it on that basis that you concluded that the rumor was unsubstantiated?

A:    You have to use your interpersonal skills with professionals in the conversation that you have and make the best judgment.

Q:    And so on what did you base – first of all, did you make any conclusions coming out of that interview? Did you conclude whether or not the allegation was substantiated or not substantiated?

A:    I concluded that the rumor, based on what I was told and what I garnered from Weixler, was a rumor.

Q:    Did you conclude whether the rumor was true or false?

A:    I made a judgment at that time that it was false.

Q:    What was the basis for your judgment?

A:    I think I'm pretty skilled at interviewing people and can separate when people are being earnest and honest.

Q:    It turns out you are not skilled, doesn't it?

    . . . .

Babbitt testified that this was the only discussion he had with Weixler.

The only document Babbitt created in connection with the reports against Weixler was the February, 2008 email to Principal St. Cyr that indicated, "I spoke with Stephen Weixler at the end of the school day re the comments made to the school committee/superintendent. His response was it was 'non sense [sic] and ridiculous'. Please let me know if you would like further action taken." Stephen Weixler does not recall speaking with Babbitt as referenced in the February, 2008 Email. Weixler Depo., pp. 86-88.

There is no evidence that the Stanley Report, the Grady Report, the Art Teacher Report, the First Bradshaw Report, the Second Bradshaw and the St. Cyr Report were investigated. There is a dispute as to whether Student 1, the student implicated in one of the reports, was interviewed and her parents contacted by St. Cyr. St. Cyr testified that at some point in the 2007-2008 academic-year, she asked Student 1 and her parent(s) whether Weixler had engaged in any inappropriate behavior with her. Student 1 testified, however, that such a conversation with her and/or her parents "never happened." Student 1 Depo., p. 25.

### 4. *Ratification of acts of Babbitt; St. Cyr; Day and Winrow*

To show ratification, a plaintiff must prove that "authorized policymakers approve a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality). There are questions of fact as to whether Bradshaw and/or the Committee knew of, and specifically approved of the acts of Grady. Stanley, Bradshaw, St. Cyr and Babbitt in their responses to the Grady Report, the Stanley Report, the First Bradshaw Report, the Second Bradshaw Report and the St. Cyr Report.

In addition to the foregoing, electronic data, committee notes and executive meetings have been destroyed since the Defendants were placed on notice of this suit. The plaintiff is therefore entitled to an adverse inference that the Committee and Bradshaw had knowledge of and specifically approved their actions and inactions. At the very least, there are questions of fact as to the substance of and motivation for destroying the aforementioned evidence.

### C. There are questions of fact as to whether the Defendants Exercised Substantial Control Over Weixler's Misconduct and Harassment

On April 15, 2009, Ann Bradshaw acknowledged the connection between Weixler's conduct and his position within the school in a letter denying him COBRA benefits, The letter reads, in relevant part, as follows:

> You were terminated for willful and continuous gross misconduct. Therefore, the Mashpee Public Schools has denied your eligibility for COBRA coverage. Your gross misconduct includes:
>
> 1. You have had an inappropriate relationship with one or more female students at Mashpee High School.
> 2. You have communicated inappropriately with one or more female students at Mashpee High School.
> 3. You assaulted one or more female students.
>
> *There is a clear connection between this conduct and your former position as a paraprofessional. You used your position as a paraprofessional and coach to*

*engage in gross misconduct involving minors who are students at Mashpee High School.*

Cobra Denial Letter, Ex. A. This is consistent with the testimony of numerous witnesses that state that Weixler developed relationships in his capacity as paraprofessional and soccer coach in which he engaged in misconduct.

Weixler testified that he met Student 3, the other Student who has a victim of statutory rape and who was the subject of reports of misconduct, when she was a student in the school. Weixler Depo., pp. 123-24. Weixler testified that he would "walk around and meet people, see people." *Id.*, p. 124. From that introduction, he began having interactions with Student 3 outside of school. *Id.*

Student 1 testified that she first met Stephen Weixler when they "mentored together in an art class." Student 1 Depo., p. 14 ("I don't know if he was a teacher assistant or if he was still in the school. I think it was my senior year, but I helped out with the 7th graders."). Stephen Weixler likewise testified that he was a paraprofessional for a student in a classroom in the Fall of 2007 – the same classroom in which Student 1 participated in an internship. Weixler Depo., p. 99. They both testified that they developed some sort of relationship in that classroom from which Weixler came to Student 1's house between two and five times. Weixler testified that he kissed her two to three times when he was at her house. Weixler Depo., p. 106.

Weixler met each of the students who were the victims of his misconduct through his role as their soccer coach, including Student 4 and Student 5. Weixler texted girls at school during school hours (Deposition of Student 4 ("Student 4 Depo."), pp. 114-115) (testifying that on a day of heavy texting, which happened "regularly," "[i]t was pretty frequent. I mean, each class was an hour and 45 minutes, and I probably got 30 texts in each class, roughly"). He texted Student 4 that she was "amazing and sexy." He offered to drive a student to an All-Star game alone

33

(Student 14 Interview - declined). He told Student 13 that she was 'pretty' and they should go out on a date. He brought Student 4 to a soccer game he played in. Student 4 Depo., p. 117 ("[H]e convinced me to go, and, yeah, he showed up to my house and picked me up, drove out. We talked the whole time. I watched him play and then we drove straight home, and he dropped me off."). Additional conduct that occurred outside of school would not have occurred but for his position as soccer coach.

Pre-season soccer began in August, 2008. Jill was a freshman. On July 19, 2008, she lost her cousin Jill Doe's Cousin in a tragic accident. Multiple witnesses noted that Jill had a difficult time with the grieving process. Jane Doe notified the school that Jill's cousin had died that summer and informed them that Jill seemed depressed as a result. Weixler befriended Jill and engaged in efforts to develop a relationship with her.

In or about October, 2008, Weixler drove Jill home from soccer practice. On that drive home, he learned where she lived. During the ride, he rubbed Jill's leg with his hand. He let her know he would pick her up sometime, and Jill said no. He continued efforts to develop a relationship with her through texts and interactions at soccer practice. Jill Doe SAIN Interview, Ex. B. It is only based upon the relationship that Weixler developed with her at school that he later had an opportunity to isolate and rape her.

## III. ARGUMENT

As it relates to this memorandum of law, the plaintiff alleges that the defendants are liable for her injuries directly resulting from the defendants' actions and failures to act under: (1) the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 (Count II); Section 504 of the Rehabilitation Act ("Section 504") (Count VIII); the Americans with Disabilities Act ("ADA") (Count IX); Title IX of the Education Amendments of 1972 ("Title IX") (Count X),

various state law claims including: negligent hiring, retention and supervision; negligent infliction of emotional distress; and violation of the right to freedom from sexual harassment under Mass. Gen. Laws ch. 214 § 1C (Counts XII, XIV and XVI). Because of the material facts in dispute, the plaintiff respectfully requests that this Court deny Defendants' Motion in its entirety.

## A. SUMMARY JUDGMENT STANDARD

Summary judgment should be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Whether a genuine issue of material fact is presented will be determined by asking if a reasonable jury could return a verdict for the non-moving party. *Id.* When evaluating a motion for summary judgment, the facts are to be construed in a light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U. S. 574, 587 (1986). Further, in assessing the record "[a]t the summary judgment stage, the nonmoving party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in genuine dispute accepted, and all internal conflicts in the evidence resolved favorably to him." *Blanchard v. Peerless Insurance Company,* 958 F.2d 483, 489 (1st Cir.1992). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

## B. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

### 1. The Defendants Have Not Met their Burden to Show the Absence of Genuine Issues of Material Fact as to Counts II & IV Regarding the Question of Whether their Policies and Customs Inflicted Injury Upon Jill

"It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Monell v. Department of Social Services*, 436 U.S. 658, 698 (1978). A practice may be deemed an "official policy or custom" if it is either a formal, promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013). Municipalities are not vicariously liable under section 1983 for the actions of their non-policymaking employees. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997). However, a municipality "may be liable under [section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692, (1978).

The Town and Committee, as well as the individual defendants in their official capacities, are liable for violations of § 1983 under municipal policy, custom and practice theories for their failures to implement policies that complied with mandated reporting requirements under §51A; their failure to train committee members, administrators and employees regarding the legal mandates of §51A; failure to implement policies regarding the investigation of reports of sexual and/or criminal misconduct of employees; failure to train administrators regarding competent investigations; failure to implement policies regarding documentation of reports of sexual and/or

criminal misconduct; failure to train administrators regarding necessary documentation and sharing of information regarding reports of criminal and/or sexual misconduct.

The standard of care that the Town, the Committee and Officials owe students to protect them from child abuse is well established. Under Section §51A and DCF regulations, a mandated reporter must *immediately* report to DCF when he or she has reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from "abuse, including sexual abuse, which causes harm or substantial risk of harm to the child's health or welfare." "Abuse" is further defined by the statute to mean the non-accidental commission of any act by a "caretaker" upon a "child" that causes or creates a substantial risk of physical or emotional injury or an act by a caretaker involving a child that constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual. A "caretaker" includes teachers and staff in a school setting and a "child" is defined as a person under the age of eighteen.

The plain language of 51A leaves "no uncertainty that mandated reporters have an 'affirmative obligation' to report to the department when they have reason to suspect that a child under the age of eighteen years is suffering from abuse or neglect." *Cobble v. Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 386 n.2 (1999). As mandated reporters, the defendants "were not permitted to weigh the credibility of witnesses, sift the evidence, or determine whether DCF would find reasonable cause to conclude the abuse did in fact occur." *In the Matter of Grand Jury Investigation*, 437 Mass. 340, 353 (2002). This is precisely what the defendants did under the policy promulgated by the Committee. Babbitt testified that when Weixler informed him that "there was a rumor at a recent committee meeting regarding his involvement with females," he said it was "nonsense and ridiculous." From that information

alone, Babbitt used his interpersonal skills with professionals in the conversation that he had and made the "best judgment": he concluded that "the rumor, based on what I was told and what I garnered from Weixler, was a rumor." This is the reason that employees of schools are mandated by law to adhere to a very low standard, to report when he or she has "reasonable cause to believe" that an employee is committing sexual abuse of students.

The Massachusetts Appellate Court has held that "some exercise of judgment should occur to rule out, for example, assertions that are impossible, utterly fantastic, plainly fabricated, or made only in jest." *Cooney v. Dep't of Mental Retardation*, 52 Mass. App. Ct. 378, 386 (2001). In this case, school officials had multiple distinct reports of potential criminal behavior and abuse. None of the reports were impossible, utterly fantastic, plainly fabricated or made only in jest. Indeed, the defendants provided no information upon which they could reasonably rule out that Weixler was committing child abuse.

Any one of the Reports of Misconduct required a report to DCF. The failure of the defendants to make a report to DCF after receiving the six reports, however, and to instead hire him[20] as the Girls Junior Varsity Soccer Coach, a nearly unsupervisable[21] position with increased access to young female students, is outrageous.

---

[20] The Defendant claims that "[t]here is simply no evidence to support the claim that the Town / School Committee had a deficient hiring "policy" or that Weixler's hire, in particular, was based on the fact that his mother worked for the School Department, as Jill contends." Town MOL p. 15. Weixler's initial hire in 2005, though troubling, is not the crux of the Plaintiff's claim. Rather, liability stems from the decisions by Bradshaw, Grady, and Stanley, acting in their official capacities, as well as the Committee in its entirety, to allow Weixler's hire as the Junior Varsity Soccer Coach despite their knowledge of the various Reports of Misconduct.

[21] Patricia Morano's testimony highlights her inability to supervise his position:

> Q: If you had supervised him more closely, would it have been more difficult for him to be engaging in inappropriate behavior with other students?
> MR. SIMMS: Objection. Go ahead.
> A: I don't know how you are talking about supervising him closely. I can't be with him all the time.

Each of the defendants and administrators identified as having received reports dismissed their failures by characterizing the Reports of Misconduct as "rumors." *See* e.g., Grady Depo., p. 51 (testifying that she did not ask the Student Reporter for the name of the subject of the report because she "was taking it as a rumor, and kids talk all the time"). Babbitt testified as follows:

> Q: So do you disagree when there is some sort of allegation or rumor regarding abuse by a teacher against a student, do you disagree that that information should be promptly reported to the Department of Children and Families?
>
> MR. SIMMS: Objection. Go ahead.
>
> A: I disagree if it's a rumor.
>
> Q: What if it's an allegation?
>
> MR. SIMMS: Objection. Go ahead.
>
> A: If it's an allegation based on fact, specific information, then yes, I report it.
>
> Q: So under your policy, then, the school system would not ever report to the Department of Children and Families unless they had conducted their own investigation and had substantiated the abuse when there is an allegation against a teacher; is that what you're saying the policy was?
>
> MR. SIMMS:
>
> . . .
>
> A: What I'm saying is that, you know, based on my experience, which is pretty extensive working with kids and staff, I get confronted or I got confronted with rumors daily.
>
> Q: I'm going to ask you to answer the question and not answer a different question.
>
> MR. SIMMS: You have to let him finish his answer, though.
>
> MS. ADAMS: But it's not responsive.
>
> MR. SIMMS: You don't know that yet because he wasn't finished.
>
> A: And so based on that experience and my involvement with kids and staff and knowing kids pretty well, knowing kids real well and being a professional, that I think I am or was, the amount of rumors that go around in a building in a middle school or high school, you couldn't put them out all day versus an allegation of fact when someone comes to me and says I saw this, I have this e-mail, it's documented. There's a big difference. There's a huge difference.
>
> Q: How many rumors have you heard in your experience as an administrator that a teacher was having inappropriate relationships with their students? How many times have you heard that rumor in your professional career?
>
> A: I don't know. Q
>
> Q: More than once?
>
> A: Yes.

---

Morano Depo., p. 160.

Q:    More than twice?

A:    In 34 years?

Q:    Yes.

A:    I don't know.

Q:    More than ten times?

A:    I don't know. I can't answer that.

Q:    So is it fair to say that rumors amongst students do not frequently involve allegations that they are having an inappropriate relationship with a teacher? Is that a rumor that frequently abounds among students?

MR. SIMMS: Objection.

A:    It's a rumor.

Q:    That wasn't my question. Go ahead. Is that a rumor you frequently dealt with in the past?

MR. SIMMS: Objection. Go ahead.

A:    I don't know.

Q:    Why is it that you don't know if that's a rumor that you frequently dealt with in the past?

MR. SIMMS: Same objection.

Q:    You had just testified that based on your experience, that you use that information to inform your policy regarding reporting information to DCF, but now you are telling me you can't remember whether or not you have dealt with this issue on any prior occasion?

MR. SIMMS: That's not what he testified. What's the question?

Q:    My question is, on how many occasions have you personally addressed rumors or allegations that a student and a teacher are having an inappropriate relationship? How many times has that come up where you specifically have addressed it?

A:    The one situation here, the rumor that was around for this one.

. . .

Q:    So does that specific rumor, does that circulate like wildfire in a school system generally?

MR SIMMS: Objection. Go ahead.

A:    Kids say a lot of crazy things.

Babbitt Depo., pp. 58-61, 63.

St. Cyr testimony indicates the mindset behind her policy of deference to a teacher under the belief that kids are inherently dishonest when reporting the misconduct of a teacher:

Q:    On how many occasions in your role as either Headmaster or principal at Mashpee Public Schools did you investigate rumors or allegations of impropriety against any teacher?

A:    I think there was one. When I was housemaster of 7 and 8, a mother came in and said that one of the male teachers was staring at her daughter.

Q: And who was the male teacher?
A: I don't remember.
Q: And what year was that?
A: It was when I was in 7th and 8th grade -- housemaster, so that would have been '99 to 2001.
Q: And what actions did you take to investigate that allegation?
A: The parent, the student, and the teacher sat down with me and we discussed the issue, and it was resolved.
Q: Was the teacher disciplined?
A: Other than -- he wasn't found to have done anything. The student admitted to her mother that she was just -- wanted to give the teacher a hard time.
Q: Did that bother you?
A: Did what bother me?
Q: That the student admitted that she was doing this to give the teacher a hard time.
A: That's what kids do.
Q: What do you mean?
MR. SIMMS: Objection. Go ahead.
A: They are unhappy about something, so they try to get back at somebody else, whether it's another student or an adult and that's the way of a teenager.

St. Cyr Depo., pp. 265-267.

It is also worth noting that her resolution to the matter noted above involved investigating the child's concern in the presence of the teacher about whom she made a report.

In the present case, the Reports of Misconduct were not simply, rumors, however, and school officials' cavalier approach caused significant harm to Jill and other students. The information provided to them came from different sources, all involving the same teacher. And the information contained in the reports did not relate to everyday gossip. Rather, the reports involved information related to criminal conduct of providing alcohol to students, as well as child abuse and possibly statutory rape by a male in a position of trust and authority in the school.

Even if in some universe Babbitt's investigation was proper in lieu of a report to DCF or the police, the investigation protocols were fatally flawed to such an extent that violation of a

student's constitutional rights was not just foreseeable, under the circumstances known to the defendants, it was nearly inevitable.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when [town] policymakers are on actual or constructive notice that a particular omission in their training program causes [town] employees to violate citizens' constitutional rights, the [town] may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, (2011).

Section 1983 suits based on the Equal Protection Clause are "available to plaintiffs alleging unconstitutional gender discrimination in schools." *Fitzgerald v. Barnstable School Committee,* 555 U.S. 246, 258, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). An alleged victim of harassment must show that she was afforded a lower level of protection than other students as a result of her membership in a protected class. *See Doe v. Town of Stoughton*, No. 12-cv-10467, 2013 WL 6498959 (D. Mass. Dec. 10, 2013) (citing *Freeman v. Town of Hudson* 714 F.3d 29, 38 (1st Cir.2013). With respect to the plaintiff's equal protection claim against the Town, there are disputed questions of material fact as to whether the Defendants implemented policies, customs and/or practices of responding differently to threats that impacted the entire community, versus those that impacted only female students. A more detailed examination of the Plaintiff's Equal Protection claim is set forth in Section __ of her memorandum in opposition to the Winrow/Day Motion.

## 2. The Town/Committee is Not Entitled to Summary Judgment on Plaintiff's Title IX Claims.

Title IX of the Education Amendments of 1972 provides as follows:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). For the town to be liable under Title IX it must have been deliberately indifferent to known acts of discrimination--in the form of sexual harassment--of which it had actual knowledge and which occurred under its control. *See Davis* v. *Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999). When a Title IX claim for damages is based on a teacher's conduct, the plaintiff must prove only that "a single school administrator with authority to take corrective action responded to the harassment with deliberate indifference." *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 277 (1998)(Title IX applies when "an official of the school district who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the teacher's misconduct.")

The basis of the Defendants motion seeking summary judgment as to Plaintiff's Title IX claims is that "the earlier reports of "sexual misconduct" consisted of a single, unsubstantiated rumor regarding Weixler's dating a student; the Department's responses to those reports were hardly "deliberately indifferent." The Defendants further claim that the harassment did not take place in a context subject to the school district's control. *See Davis,* 526 U.S. at 644-45 (1999). Finally, the Defendants claim that the school district did not "exercise substantial control over both the harasser and the context in which the known harassment occurs." *Id.* As set forth above, there are disputed questions of material fact regarding each of these claim.

There are questions of fact that only a jury can resolve about whether Defendants intentionally buried Wielxer's abuse in an effort to protect one of their own. Plaintiff can

establish that Bradshaw, St. Cyr, Babbitt, Grady and Stanley, if not the entire Committee, made a conscious choice to insulate Stephen Weixler from consequences, either for the protection of the school's reputation, to avoid confronting a difficult and uncomfortable issue related to a life-long Mashpee resident and former graduate, or to protect Stephen Weixler, who was the son of a Mashpee Public School employee. Plaintiff has sufficient evidence for a reasonable jury to find the Town and Committee liable under Title IX because of the inactions of its employees who had authority to stop Weixler before he raped Jill.

Schools are deliberately indifferent to acts of sexual harassment when the lack of response is "clearly unreasonable in light of the known circumstances." *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 649 (1999). Plaintiff's evidence as stated in the Plaintiff's Motion for Summary Judgment and above establishes that the defendants' officials had actual knowledge of Weixler's repeated conduct, yet continued to enable the abuse to continue. This constitutes deliberate indifference so that the Town/Committee is liable under Title IX.

### 3. Defendants are not entitled to Protections of the Massachusetts Torts Claims Act Because Defendants were Not Acting Within their Professional Discretion When They Ignored Weixler's Abuse and Misconduct.

"A claim for negligent hiring requires evidence that the employer failed to exercise due care in the selection of an employee, evidence that the employer knew or should have known that the employee who was hired was unfit and posed a danger to others who would come into contact with the employee during the employment, and evidence that the employer's failure proximately caused the injury of which the plaintiff complains." *Armstrong v. Lamy*, 938 F. Supp. 1018, 1046 (D. Mass. 1996).

The Defendant claims that prior to the date that Weixler was hired as the Girls Junior Varsity Soccer Coach, "not a single student, parent, teacher, coach, or any third party had raised

any concerns about Weixler." This claim is so divorced from the facts established in discovery that the Defendants must be referring to another case.

The defendants argue that Section 10(j) of the Massachusetts Torts Claims Act bars "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Mass. Gen. Laws c. 258, §10(j). As set forth more fully above, there are disputed questions of fact as to whether the defendants caused the condition or situation when they hired an employee with a known propensity to engage in criminal and sexual misconduct.

Likewise, Section 10(b) of the MTCA does not preclude this claim. The MTCA is a legislative waiver of the state's sovereign immunity and provides for tort liability against the municipality for the negligence or wrongful conduct of its employees:

> Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment in the same manner and to the same extent as a private individual under like circumstances.

Mass. Gen. Laws ch. 258, § 2. That liability is subject to the discretionary function exception:

> The provisions of [liability], shall not apply to:-...
> (b) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused;....

"The model used by the Massachusetts legislature in enacting the MTCA was the Federal Tort Claims Act (FTCA). The SJC has identified a two-step analysis for application of the

discretionary function exception: (1) whether the governmental actor had any discretion at all as to what course of conduct to follow, and, if so, (2) whether the discretion that the actor had is that kind of discretion for which § 10(b) provides immunity from liability." *Crete v. City of Lowell*, 418 F.3d 54 (1st Cir. 2005).

Neither step is satisfied here. With respect to the first step, there are questions of fact as to whether the Committee and its agents had discretion to hire an individual with the knowledge that he had numerous reports of sexual abuse and misconduct, and had not been investigated or reported to DCF or the authorities. Mandated reporting laws required the defendants to take certain actions, and those actions were ministerial duties rather than discretionary duties. Defendants are not entitled to immunity for their failures to comply with the law.[22]

The Massachusetts legislature has not granted discretion as to the hiring of employees within a school where there are strong indications that the employee has engaged in sexual misconduct involving students, and where ambiguity about such concerns exists because defendants failed to comply with Section 51A. There should be no degree of deference regarding such decisions.

Under the law, a jury could reasonably find that all of the defendants' acts with respect to the screening and hiring of Stephen Weixler were ministerial, not discretionary, because they had a clear mandated under Section 51A to report suspicions of Weixler's abuse. Hence, summary judgment is improper.

---

[22] As for the second step, "the SJC has stated that the key to determining whether the second step is satisfied, and thus immunity is provided, is whether the discretionary action at issue involves policy making or planning. . . . Even decisions made at the operational level or made based on an individual, case-by-case analysis, can involve conduct immunized by the MTCA, as long as the conduct involves considerations of public policy." *Id.* (Internal citations omitted). That step is likewise not satisfied here.

### 4. There is Sufficient Evidence to Proceed on Plaintiff's Claims for Negligent Infliction of Emotional Distress

In order to recover on a claim of this negligent infliction of emotional distress, Jill must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs*, 437 N.E.2d 171, 181 (Mass.1982) (Lynch, J.).

The Defendant claims that Jill has not satisfied these elements because "the February 2008 and January 2009 reports were not "reports of sexual misconduct," but, instead, rather vague rumors that were investigated and turned out to be unsubstantiated. Town MOL p. 32. As set forth above, this is a disputed question of material fact. The defendants' further argue that "neither rumor remotely involved Jill Doe." This is not the case. There is more than enough evidence that the defendants received sufficient notice of Weixler's abuse to know of the high risk to girls on junior varsity soccer team. It is important to note that not only did the defendants fail to report Weixler's abuse, but they affirmatively hid the reports and let him have access to over a dozen girls on the soccer teams. Defendants had to know the high probability that their conduct would cause emotional distress, and a reasonable jury could conclude that Jill suffered extreme emotional distress as a result of their failures.

Had the defendants properly responded to the Reports of Misconduct, Weixler would not have been hired into the position through which he was able to gain access to groom Jill as a victim of sexual abuse. Accordingly, disputes of material fact preclude summary judgment for the defendants.

### 5. The Defendants have not Met their Burden of Demonstrating the Absence of Genuine Issues of Material Fact that they Unreasonably and with Deliberate

**Indifference Interfered with Jill's Education by Creating an Intimidating, Hostile, and Sexually Offensive Educational Environment**

The defendants unreasonably interfered with Jill Doe's education in a manner prohibited by M.G.L. ch. 214 §1C.

Chapter 214 Section 1C provides: "A person shall have the right to be free from sexual harassment, as defined in chapter one hundred and fifty-one B and one hundred and fifty-one C." Sexual harassment is defined by M.G.L. ch 151C §1(e) as "any sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when...such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment." There is no genuine issue of fact as to whether Weixler's actions meet this threshold, and the plaintiff is entitled to judgment as a matter of law.

Mass. Gen. Laws ch. 214, Section 1C further provides that "the superior court shall have the jurisdiction to enforce this right and to award the damages and other relief provided in the third paragraph of section 9 of chapter 151B." Section 9 of chapter 151B provides:

> [A]n action filed pursuant to this section shall be advanced for a speedy trial at the request of the petitioner. If the court finds for the petitioner, it may award the petitioner actual and punitive damages. If the court finds for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust.

When a statute is plain and unambiguous, [courts must] interpret it according to its ordinary meaning." *Commonwealth v. Russ R.,* 433 Mass. 515, 744 N.E.2d 39, 43 (2001). On its face, M.G.L. c. 214§ 1C confers strict vicarious liability on an educational institution for sexual harassment by any employee vested with authority to care for and/or supervise students. *See*

*e.g., Newell v. Celadon Sec. Servs., Inc.*, 417 F. Supp. 2d 85 (D. Mass. 2006) (interpreting M.G.L. c. 151B, § 4(16A), a related antidiscrimination statute, to impose strict liability of an employer for sexual harassment by its supervisors premised on the legislative conclusion that an employer should be liable for discrimination committed by those on whom it confers authority).

The defendants argue, in their motion for summary judgment, that the Title IX deliberate indifference standard should apply because Title IX and Massachusetts law prohibit the same forms of sexual harassment. There is nothing in the text of the statutes related to M.G.L. ch.214, §1C in case law that suggests such an intention by the legislature, and it is doubtful that the intent of the legislature was to create a duplicative avenue for recovery.

In *Bloomer v. Becker College*, No. 09-cv-11342, 2010 WL 3221969 (D. Mass. Aug. 13, 2010), the plaintiff sought recovery under M.G.L. ch.214, §1C and ch. 151C. The defendant in that case likewise argued that the standard of Title IX should apply to claims under M.G.L. ch. 151C. The Court distinguished the standards under Title IX and Ch. 151C as follows:

> [The defendant] contends that the "actual knowledge" **standard** of Title IX should apply to claims under Chapter **151C**. It cites only one case in support of that contention, which expressly did not reach the issue. *See [Morrison v. Northern Essex Community College]*, 56 Mass. App. Ct. 784, 795 n. 17 (2002)]("[w]e also do not address whether a Chapter **151C** claim against an educational institution requires that its administrators have knowledge of harassment perpetuated by its coaches or teachers, a requirement imposed on claims under Title IX."). There is thus, apparently, no authority stating that knowledge of the misconduct is a necessary element for recovery under Chapter **151C**. In any event, even if such a knowledge element is required, this element would likely be satisfied as to the Chapter **151C** claims for the same reasons described above as to the Title IX claims.

*Id.* p. 6.

Even if recovery under Chapter 214 requires the heightened standard under Title IX, as set forth *supra*, the undisputed facts of this case establish that Jill is entitled to summary judgment as a matter of law.

6. **The Plaintiff is entitled to Summary Judgment as to her Section 504 and ADA Claims in light of the BSEA Decision Which Found that the Defendants Acted with Deliberate Indifference and Gross Misjudgment as to their Failure to Properly Respond to Jill's Special Education Needs.**

To the extent that there have been questions of fact related to Mashpee's failure to identify Jill as a student entitled to special education services, such questions have been resolved by a finder of fact. *See In Re: CBDE Public Schools*, BSEA #10-6854, Decision (Mar 27, 2015) ("BSEA Decision").

The Plaintiff incorporates herein her arguments set forth in her Memorandum of Law in Support of Her Motion for Summary Judgment as to Claims of Violation of Section 504 and the ADA. Jill maintains that she is entitled to summary judgment as a matter of law, and that the court should adopt the findings of the BSEA that the defendants acted with deliberate indifference and gross misjudgment when they failed to identify Jill as a student with a disability. Jill is, accordingly, entitled to a hearing to determine compensatory damages.

RESPECTFULLY SUBMITTED,
JILL DOE

BY: */s/Elizabeth Knight Adams*
Elizabeth Knight Adams, Esq. /BBO# 659562
The Law Office of Elizabeth Knight Adams
81 Wethersfield Avenue, Suite 2
Hartford, CT 06114
Phone: (860) 724-1300
Fax: (860) 724-1302
Date: September 9, 2015          eadams@ekadamslaw.com

## LOCAL RULE 7.1(a)(2) CERTIFICATE AND CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1(a)(2), I certify that, on August 17, 2015, this document through the ECF system will be sent electronically to the registered participants as identified on

the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants.

/s/ Elizabeth K. Adams
Elizabeth Knight Adams