UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JILL DOE,                              )
                                       )
          Plaintiff                    )
                                       )    CIVIL ACTION NO.
     v.                                )    11-11593-DPW
                                       )
ANN BRADSHAW, STEPHEN WEIXLER,         )
ALAN WINROW, JANE DAY,                 )
MASHPEE SCHOOL COMMITTEE, AND          )
THE TOWN OF MASHPEE                    )
                                       )
          Defendants.                  )

MEMORANDUM AND ORDER
August 26, 2016

Table of Contents

I.   BACKGROUND ............................................. 2
     A. Factual Background.................................. 2

          1. Events Relating to Constitutional and Tort Claims.. 4
          2. Events Relating to Rehabilitation and Disability
             Claims......................................... 9

     B. Procedural History.................................. 10

II.  STANDARD OF REVIEW..................................... 12

III. ANALYSIS............................................... 13
     A. Sexual Abuse Claims................................. 13

          1. Count I: Due Process Claim against Employee-
             Defendants..................................... 13
          2. Count IV: Equal Protection, Employee-Defendants... 21
          3. Counts II & V: Fourteenth Amendment Claims against
             the Town....................................... 23
          4. Count X: Title IX.............................. 30
          5. Count XII: Negligence.......................... 34
          6. Count XIV: Negligent Infliction of Emotional Distress
             ............................................... 38
          7. Count XVI: Right to Freedom from Sexual Harassment 40

     B. Rehabilitation and Disability Claims................. 45

IV.  CONCLUSION............................................. 49

This case concerns the response of the Mashpee School Department to acts of sexual abuse committed by one of its employees against one of its students.  The Plaintiff contends that the Town of Mashpee, the Mashpee School Committee, and various Mashpee school officials failed to protect her from the employee and then failed to provide her the special education services she needed as a result of his abuse.  Plaintiff's surviving claims[1] arise under the due process and equal protection clauses of the Fourteenth Amendment and under section 504 of the Rehabilitation Act ("section 504") and the Americans with Disabilities Act ("ADA"), Title IX, the Massachusetts Civil Rights Act, state sexual harassment statutes, and state common law.  Before me are motions for summary judgment filed by the Plaintiff [Dkt. Nos. 110 & 113] and by the Town, School Committee and individual defendants [Dkt. No. 112].

## I.   BACKGROUND

### A.   *Factual Background*

Evidence in the summary judgment record would support the following:

In the fall of 2008, Stephen Weixler, a school paraprofessional and soccer coach, sexually abused Mashpee student Jill Doe, one of the team members he coached.  In

---

[1] Earlier in this litigation, I dismissed a number of the counts in this action for failure to state a claim, *Doe* v. *Bradshaw*, No. 11-cv-11593-DPW, 2013 WL 5236110 (D. Mass. Sept. 16, 2013)

November 2008, Weixler picked Jill up from her home, took her to a secluded location, and sexually assaulted her.  It is contested whether in October 2008 Weixler also drove Jill home from soccer practice and, in the car, inappropriately touched her leg.  The evidence provides a basis for concluding that meanwhile, both before and after his assaults on Jill, Weixler engaged in inappropriate sexual behavior with other students, some reports of which were relayed to school administrators.

During this time period, defendant Ann Bradshaw was the superintendent of the Mashpee School Department.  Defendant Alan Winrow was the principal of Mashpee High School beginning in the summer of 2008; before then, Lou Ann St. Cyr, who is not a defendant, was principal.  Defendant Jane Day was the assistant principal at Mashpee High School during the relevant period.

The events relevant to Jill's claims fall in two basic categories: those corresponding to Jill's constitutional, tort, and sexual harassment claims and those corresponding to her claims under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.  The first category primarily involves the period before March 9, 2009, when school officials first learned of actual sexual abuse of Jill.  This category concerns the defendants' responsibility to prevent such an assault upon her and to prevent her subsequent sexual harassment.  The second category concerns the defendants'

responsibility to provide Jill with different educational
resources in response to the trauma of her abuse.

1.  Events Relating to Constitutional and Tort Claims

    Stephen Weixler was hired by the Mashpee schools in August
2005, working as a paraprofessional in an elementary school.
For the 2007-2008 school year, he was transferred to the middle
school.  In the summer of 2008, Weixler was hired to serve as
the junior varsity soccer coach.  After the hiring process
worked its way from the athletic department up through the
school administration, Weixler's hire was either announced or
approved at a school committee meeting on October 1, 2008.  Also
in the summer of 2008, Mashpee High School Principal Lou Ann St.
Cyr was replaced as principal by Defendant Winrow.

    During this time, some number of reports emerged about
Weixler acting inappropriately with students; the parties and
the witnesses, however, disagree about what was reported when.
First, in September of 2007, School Committee Member Kathy
Stanley may have received a report that Weixler was providing
alcohol to minors, possibly students.  Although Stanley was
unable to recall most details of this report, Stanley remembered
telling School Committee Chair Mary Rose Grady, whom Stanley
testified then informed Superintendent Bradshaw.  However, Grady
did not recall these events taking place.  Additionally, Weixler
testified that he had never purchased alcohol for students prior
to beginning as soccer coach in 2008.

4

Second, Weixler recalls that in the fall of 2007, an art teacher made a report of her concerns that Weixler, who was working with one of her students, and Student 1, who was working as a student intern in her class, were in an inappropriate relationship.  Weixler further testified that based on this report, he was called into a meeting with the school administration, possibly with Principal St. Cyr.  However, both art teachers then employed at Mashpee High School have stated that they never observed Weixler engaged in inappropriate conduct or reported him having done so.  St. Cyr does not recall holding such a meeting.  Accordingly, there is no testimony regarding which other administrators apart from St. Cyr heard of this report, if it occurred.

The third set of reports came in February 2008.  School Committee Chair Mary Rose Grady was asked by a student why it was okay for Weixler to date a student, the student saying that "everybody knows" he was doing so.  Grady relayed this information to Superintendent Bradshaw.  Bradshaw asked then-principal St. Cyr to conduct an investigation, and St. Cyr further delegated the task to Stephen Babbitt.  These basic facts about the events of February 2008 are not disputed, although the details are.

Whether Babbitt's investigation of this report was rigorous, or consisted merely of informal conversations, is contested.  Evidence of record can be viewed to suggest that

Babbitt's investigation was cursory. He testified that he was asked only to have a short conversation, not "to perform an investigation"; when he e-mailed St. Cyr to say that he had spoken with Weixler, he noted only that Weixler's "response was that it was 'non sense and ridiculous'"; and Babbitt based his finding that there was "nothing there" based on "body language" and "tone of voice." Bradshaw testified that, through Principal St. Cyr, she pushed back on Babbitt's preliminary investigation and asked for a second conversation. However, neither Babbitt nor St. Cyr could remember such a push-back or second conversation having occurred. For his part, Weixler does not remember any conversation with Babbitt at all.

Plaintiff contends that Bradshaw received up to two separate reports that Weixler was dating Student 1 during this same month. In roughly the same time period, Bradshaw came to be aware that the previously-unknown student who was allegedly dating Weixler was Student 1. The new information of the student's name could be taken to indicate an additional source of information in addition to the report from Grady. When Bradshaw recounted how the rumor about Weixler and Student 1 was relayed to her, she could not remember who had told her but thought that "it might have been a parent." Plaintiff contends that the report from a parent must have been different than the report from the School Committee Chair. Defendants contend that these are slightly different accounts of a single event.

A fourth potential report came in the spring of 2008, when Principal St. Cyr may have engaged in her own investigation of Weixler.  St. Cyr testified that at some point during that school year, she asked both Student 1 and Student 1's parents whether she was dating Weixler; St. Cyr says both daughter and parents denied any such relationship.  Student 1, however, testified that no such conversations with St. Cyr ever occurred. Another student, Student 7, testified that in the spring of 2008, she was called in to St. Cyr's office to discuss whether Weixler was dating a student and that she told St. Cyr that he was.  Thus, it is disputed whether St. Cyr conducted her own investigation of Weixler and when she did so; there is also no indication on the record of precisely what prompted St. Cyr to investigate or who in the administration she discussed her investigation with.

By the time that Weixler was hired as soccer coach, therefore, Ann Bradshaw and members of the school committee had received at least one report of misconduct by Weixler: the February 2008 report from Mary Rose Grady.  There is sufficient evidence in the record to show that at least some investigation of that report had taken place; what kind of investigation was undertaken, however, is contested.  It is contested whether there were two reports prior to February 2008, whether there were additional sources of information in February 2008 besides

Grady, and whether St. Cyr was continuing to investigate Weixler in the spring of 2008.

Throughout the fall of 2008, Weixler allegedly engaged in a substantial amount of inappropriate behavior with multiple students, including sexual relations, graphic text messages, inappropriate comments, and the related purchase of alcohol.  He may have also continued to harass Jill, including in the school hallways.  However, Weixler's inappropriate behavior was not again brought to the attention of school administrators until January 9, 2009, when a staff member of the Mashpee Boys & Girls Club reported to Winrow and Day that he had heard students discuss Weixler's inappropriate relationship with a student. Winrow and Day reported this to Bradshaw, who instructed them to investigate the matter.  The following school day, Winrow and Day interviewed three students, and possibly an additional staff member.  Their investigation ultimately cleared Weixler and no disciplinary action was taken.

Finally, on March 6, 2009, two gym teachers relayed to Assistant Principal Day a student report that Weixler was engaged in sexual relations with one student and was explicitly texting a different student.  An investigation began immediately thereafter.  Jill's abuse was reported to the school for the first time on or about Monday, March 9.  A different coach, who was a friend of Jill's father, informed the administration that something inappropriate had happened between Jill and Weixler.

Weixler was sent home on March 9 and placed on leave on March
10.

The police were called on March 12, when the school learned
the details of Jill's sexual assault.  That December, Weixler
pled guilty to one count of indecent assault and battery of a
minor, two counts of buying alcohol for a minor, and one count
of sending inappropriate materials to a minor.

2.    Events Relating to Rehabilitation and Disability Claims

The facts of the school's educational response to Jill's
sexual abuse are comparatively clearer.  Jill suffered severe
trauma as a result of her sexual abuse.  Her grades fell
dramatically, as did her attendance, although the details of her
academic decline are contested.  She also developed new anger
issues.  In December 2008, Jill was enrolled in a school-run
anger management class.  Beginning in March 2009, Jill was also
provided rape counseling outside the school.  During this
period, Jill's mother requested educational accommodations for
Jill, some of which were denied because Jill was not a special
education student.  However, Jill's mother did not specifically
request testing for special education services because she was
not aware of her right to do so.

On January 18, 2010, Jill was admitted to Falmouth Hospital
after attacking a stranger in a convenience store for "looking
at her;" she had previously made more than one attempt to cut
her wrists.  On January 21, she was admitted to a Community

Based Acute Treatment Unit, where she was diagnosed with post-traumatic stress disorder, mood disorder NOS, R/O bipolar disorder, and poly-substance abuse.  She returned to Mashpee High School on February 3, 2010, after being discharged, but she continued to have difficulty.  On April 7, 2010, Jill was again hospitalized for her psychological conditions and on April 16, again transferred to a Community Based Acute Treatment Unit.

From February 25, 2009 to April 7, 2010, the Mashpee Child Study Team, a group of educators who served as the gateway to special education services, discussed Jill's case at least 13 times.  During that period, however, the Team did not recommend that Jill be evaluated to determine her eligibility for special education services, relying instead on general education accommodations.  None of Jill's teachers recommended such an evaluation.

The school ultimately determined that Jill was eligible for special education on May 13, 2010 and an individualized education program was developed in July, 2010.  While Jill's education remained a source of conflict for a number of years thereafter, Jill's claims in this action are based on events through 2010.

## B.   *Procedural History*

All defendants, except Weixler, moved to dismiss the

complaint at the outset of this action.[2]  On September 16, 2013,
I granted defendants' motions to dismiss Plaintiff's causes of
action: under the Individuals with Disabilities Education Act,
20 U.S.C. § 1412(a)(1); for the intentional infliction of
emotional distress; for the loss of consortium; relating to
peer-on-peer harassment; and against individual employees for
negligent hiring and supervision under state law. *Doe* v.
*Bradshaw*, 2013 WL 5236110 (D. Mass. Sept. 16, 2013).[3]  The
parties have since conducted discovery and filed cross motions
for summary judgment now before me.  Meanwhile, on July 30, 2015
Jill Doe, who had come of age, was substituted as plaintiff in
place of her parents, John and Jane Doe, who had initiated the
action on her behalf.

At a hearing on September 16, 2015, I indicated that I was
likely to deny summary judgment on at least some core claims and
set this matter for trial.  This Memorandum and Order now
provides an extended explanation of my determinations regarding

---

[2] Weixler, who appears *pro se*, has only participated in the
litigation of this action to a very limited extent. At a
scheduling conference on October 29, 2013, in order to permit
the fullest possible discovery of the merits if possible, I
instructed that a motion for default judgment not be brought
against Weixler at least until after summary judgment practice.
[3] In a September 27, 2012 Memorandum and Order, I had dismissed
two related cases involving these parties.  In the first case,
*CBDE Public Schools v. Massachusetts Bureau of Special Education
Appeals*, Civil Action No. 11-10874, the Town sought to enjoin a
fact-finding hearing by the Bureau of Special Educational
Appeals regarding the Does' damage claims.  In the second, *Doe
v. CBDE Public Schools*, Civil Action No. 12-11082, the Does
sought attorney's fees under the IDEA.

the pending motions for summary judgment in anticipation of such a trial, which has been continued to accommodate the parties' schedules.

## II. STANDARD OF REVIEW

On a motion for summary judgment, the moving party bears the burden of showing that "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if it "may reasonably be resolved in favor of either party." *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008). A fact is material if it could sway the outcome of the litigation. *Id.* In determining whether genuine disputes of material fact exist, all reasonable inferences must be drawn in the non-movant's favor. *Id.*

Once the moving party has carried its burden, the burden shifts to the non-moving party, which must provide specific and supported evidence of disputed material facts. *LeBlanc* v. *Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993). The non-moving party "may not rest upon mere allegation or denials" and must "establish a trial-worthy issue." *Id.*

Cross-motions for summary judgment "do not alter the basic Rule 56 standard." *Adria Int'l Grp., Inc.* v. *Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). Rather, the court must assess each motion for summary judgment independently and

"determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.*

## III. ANALYSIS

### A. *Sexual Abuse Claims*

<u>1.</u>   <u>Count I: Due Process Claim against Employee-Defendants</u>

Count I, brought under § 1983, alleges that Superintendent Bradshaw, Principal Winrow, and Assistant Principal Day each deprived Jill of rights protected by the Fourteenth Amendment's Due Process Clause, specifically, rights to bodily integrity and privacy.  Weixler's sexual abuse indisputably infringed upon these constitutionally protected rights.  "It is beyond question that the Fourteenth Amendment protects the right to bodily integrity and that right 'is necessarily violated when a state actor sexually abuses a schoolchild....'"[4] *Doe* v. *Fournier*, 851 F. Supp. 2d 207, 219 (D. Mass. 2012), *citing Doe* v. *Taylor*

---

[4] Defendants make much of the fact that Weixler sent text messages on his personal cell phone, rather than through a device provided by the school, and that his sexual assaults and inappropriate behavior took place off school property and outside school hours.  To the extent that defendants seek to suggest Weixler was not acting as a state actor when violating student rights, as opposed to merely illustrating the limits to their ability to supervise an employee, these facts are to no avail. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Monroe* v. *Pape*, 365 U.S. 167, 184 (1961) (quoting *United States* v. *Classic*, 313 U.S. 299, 326 (1941)). That Weixler used his position as a public school employee and coach to students to violate their rights is enough to make him a state actor under § 1983 and the Fourteenth Amendment.  Nevertheless, the use of a personal cell phone may be relevant for evaluating whether the other defendants had notice of Weixler's activities.

*Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994);
*Stoneking* v. *Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d
Cir. 1989); *Doe* v. *D'Agostino*, 367 F. Supp. 2d 157, 172 (D.
Mass. 2005).

Establishing a claim under § 1983 against the school
administrators, however, requires more than that a school
employee engaged in a civil rights violation.  Supervisory
liability exists only where "(1) there is subordinate liability,
and (2) the supervisor's action or inaction was 'affirmatively
linked' to the constitutional violation caused by the
subordinate." *Aponte Matos* v. *Toledo Davila*, 135 F.3d 182, 192
(1st Cir. 1998).  There is no dispute regarding Weixler's
liability.  However, a supervisor's action or inaction must
constitute "supervisory encouragement, condonation or
acquiescence, or gross negligence amounting to deliberate
indifference." *Lipsett* v. *University of Puerto Rico*, 864 F.2d
881, 902 (1st Cir. 1988).  The "deliberate indifference"
standard extends to include indifference that is "reckless or
callous." *Sanchez* v. *Alvarado*, 101 F.3d 223, 227 (1st Cir.
1996).  The causal link between supervisor action or inaction
and subordinate wrongdoing must be tight: Deliberate
indifference will be found only "if it would be manifest to any
reasonable official that his conduct was very likely to violate
an individual's constitutional rights." *Pineda* v. *Toomey*, 533
F.3d 50, 54 (1st Cir. 2008).

Jill contends that there were three types of behavior by the defendants that were deliberately indifferent to the risk of future sexual abuse by Weixler: (a) failure to investigate past reports of inappropriate behavior by Weixler, leading to his continued employment and opportunity to violate Jill's constitutional rights; (b) failure to notify the state Department of Children and Families of those past reports, instead relying on ultimately ineffective internal investigations; and (c) a "cover-up" of Weixler's acts from police and other parties.  Essentially, Plaintiff argues that the administrators repeatedly ignored or minimized warning signs, leaving her and others vulnerable to Weixler.  Under these theories, the relevant behavior for a due process claim is that which preceded Weixler's sexual assault of Jill in November 2008.  *See Doe* v. *Town of Bourne*, 02-cv-11363-DPW, 2004 WL 1212075, at *6 n. 15 (defendants' "failure to take appropriate action after they learned about the rape… does not relate to a deprivation of [plaintiff's] right to bodily integrity.").

Winrow and Day's motions for summary judgment must be granted with regards to Count I. Indeed, Plaintiff concedes as much in her memorandum in opposition to Winrow and Day's motions for summary judgment.  Winrow and Day were, by all accounts, uninvolved with the supervision of Weixler and the handling of the reports of his inappropriate behavior until July 2008.  All the relevant alleged reports of Weixler's behavior to the school

administration identified by Plaintiff either occurred before
they became involved — indeed, before Winrow even came to work
in Mashpee — or after Weixler assaulted Jill.  In the former
category are the report to School Committee Member Kathy Stanley
concerning Weixler's purchasing of alcohol for students in
September 2007, the art teacher's report of an inappropriate
relationship between Weixler and Student 1 in the fall of 2007,
the conversation between Student 7 and School Committee Chair
Mary Rose Grady about Weixler dating a student in February 2008,
and the separate report to Bradshaw that Weixler was dating a
student, also in February 2008.  In the latter category, taking
place after Jill was assaulted, is the January 9, 2009 report
from the Boys and Girls Club staffer to Winrow and Day that he
had heard of Weixler's inappropriate relationships with
students.  Winrow and Day had no notice of Weixler's behavior at
a time when they could have prevented Jill's assault. No
indifference on their parts caused the deprivation of Jill's
right to bodily integrity.

     In contrast, Bradshaw served as Superintendent throughout
the period in question and each of the alleged incidents
potentially implicates her as deliberately indifferent to Jill's
constitutional rights.  Had Bradshaw failed to take "any steps
whatsoever to investigate" Weixler's behavior, establishing
deliberate indifference would be easier. *Lipsett*, 864 F.2d at
907; *Fournier*, 851 F. Supp. 2d at 222.  Here, all parties agree

that defendants investigated at least some reports concerning Weixler, although it is disputed which reports were investigated and to what extent.  At issue is whether those investigations, in sum, showed concern for Jill's rights, even if they proved insufficient, or whether they showed indifference.

In hindsight, it is clear that the school's investigations of Weixler were insufficient; whether Bradshaw was actionably indifferent at the time, however, depends on what she knew when. This question turns largely on the reliability of the past reports to the administration, and whether they ought to have put Bradshaw on notice of further risk to her students or of an obligation to report to the state.  For example, a jury could reasonably find that the February 2008 investigation conducted by Babbitt at Bradshaw's request consisted of nothing more than a short conversation and Babbitt's own (incorrect) determination of Weixler's credibility.  That perfunctory investigation might show deliberate indifference if either Bradshaw had already heard reports of misbehavior by Weixler or if she otherwise believed the Grady report to be credible.  In contrast, if Bradshaw had good reason to distrust the Grady report, it would be more difficult to find deliberate indifference, as opposed to mere negligence or even reasonable behavior.

Where reports are understood to be mere "rumors," particularly rumors circulating only within the student body, school administrators have greater leeway to ignore them without

17

being deliberately indifferent to their students' rights. *Shrum ex rel. Kelly* v. *Kluck* 249 F.3d 773, 780 (8th Cir. 2001); *Johnson* v. *Elk Lake School Dist*. 283 F.3d 138, 144 n.1 (3d Cir. 2002) ("In the absence of any direct complaints made to school officials, the mere floating around of unsubstantiated rumors regarding a particular employee — particularly in the high school setting, which is notoriously rife with adolescent gossip — does not constitute the kind of notice for which a school district can be held liable").  Many of the alleged reports were only rumors, even in the light most favorable to Plaintiff.

That said, Massachusetts law cabins a school official's discretion to ignore even rumors.  As a school official, Bradshaw was a mandated reporter under state law, Mass. Gen. Laws ch. 119, § 51A, and affirmatively obligated to report to the Department of Children and Families if she had "reasonable cause to believe" that a child was being abused. *In re Grand Jury Investigation*, 772 N.E.2d 9, 18 (Mass. 2002).  Sexual contact between a "caretaker," including a school coach, and a child under 18, constitutes abuse that must be reported. 110 Mass. Code Regs. 2.00.  A reporter's discretion to "winnow out complaints" is "extremely modest in the context of reporting child abuse." *In re Grand Jury Investigation*, 772 N.E.2d 9, 18 (Mass. 2002).  Reporters are "not permitted to weigh the credibility of witnesses, sift the evidence, or determine whether the department would find reasonable cause to conclude

18

that abuse did in fact occur." *Id.*   Discretion is limited to ensuring that something more than a mere allegation of abuse exists, to rule out "assertions that are impossible, utterly fantastic, plainly fabricated, or made only in jest." *Cooney* v. *Dep't of Mental Retardation*, 754 N.E.2d 92, 98 (Mass. App. Ct. 2001).

Plaintiff's cause of action does not turn on whether Bradshaw violated her obligations as a mandatory reporter. Rather, the statutory scheme, of which she was or should have been aware, provides the context in which her response to the risk of a constitutional violation must be understood.  Her increased obligation to act, and decreased discretion merely to investigate abuse internally, could be seen to transmute an inadequate response to Weixler's inappropriate behavior into a deliberate choice not to act.  For the same reason, the mandated reporter statute could cast the Babbitt investigation — which turned on Weixler's "tone of voice" and "body language" even though mandated reporters are not meant to make credibility determinations — in a more culpable light.

Given the evidence on record, a jury could reasonably find that Bradshaw had heard enough about Weixler by the fall of 2008 that her failure to take additional action constituted deliberate indifference.  A jury could find credible Kathy Stanley's memory of an inquiry, which made its way to Bradshaw, into Weixler's purchase of alcohol.  It could then find that

Bradshaw failed to ensure that the February 2008 rumor was appropriately investigated in light of Weixler's history and the responsibilities of school officials as mandated reporters.  It could find that school officials, either Bradshaw or St. Cyr, remained suspicious of Weixler after the Babbitt investigation, with one or the other learning that the rumors concerned Student 1, and yet failed to act.  Taken together, these circumstances could permit a jury to infer that rumors of Weixler's inappropriate behaviors came to Bradshaw's attention periodically, from independent sources, over a significant period of time.  Such repetition itself could reasonably be held to have placed Bradshaw on notice that these rumors needed to be taken seriously.  Given that notice, a jury could find that Bradshaw deliberately, recklessly or callously failed to mount an adequate investigation.  The less plausible allegations of notice to Bradshaw, such as the art teacher report and the additional reports in February 2008, are not necessary to establish deliberate indifference, although if a jury did credit them as happening it would further strengthen such a finding.  Plaintiff has presented enough evidence to create a genuine dispute of material fact on this issue, and so summary judgment is inappropriate with respect to the due process claims against Superintendent Bradshaw.

Bradshaw also argues that she is protected by qualified immunity.  Ordinarily, qualified immunity protects government

officials who may have violated a person's rights if those
rights were not clearly established at the time of the
violation, such that the official could not reasonably have
known of the need to protect those rights.  *Camilo-Robles* v.
*Zapata*, 175 F.3d 41, 43 (1st Cir. 1999).  Where officials are
being sued under a theory of supervisory liability, the
protection of qualified immunity turns on "whether the
supervisor's actions displayed deliberate indifference toward
the rights of third parties and had some causal connection to
the subsequent tort."  *Id.* at 44.  This is essentially the same
standard as governs the underlying question of supervisory
liability under § 1983. *Fournier*, 851 F. Supp. 2d at 222 n.8;
*Blanchard* v. *Swaine*, No. CIV. 08-40073-FDS, 2010 WL 4922699, at
*16 n.25 (D. Mass. Nov. 29, 2010).  Since summary judgment is
inappropriate with respect to Bradshaw's deliberate indifference
on the merits, it is also inappropriate with respect to a
qualified immunity defense.[5]

2.  Count IV: Equal Protection, Employee-Defendants

    Count IV is also a § 1983 claim against the employee-
defendants, in this count based on an underlying violation of
Jill's right to equal protection.  Specifically, Jill alleges
that the school administrators allowed her to be sexually

---

[5] Qualified immunity defenses, for the same reason, will not be
further addressed in this Memorandum's discussion of the other
causes of action against the supervisory employee-defendants.

harassed by Weixler.[6]  Sexual harassment that creates a hostile educational environment can constitute an equal protection violation. *Lipsett*, 864 F.2d at 897-98.  As against the employee-defendants, this is again a theory of supervisory liability and the same deliberate indifference standard as in Count I applies.

Because the sexual harassment by Weixler can be found to have continued until he was put on leave on March 9, 2009, however, the relevant behavior is that which extends through that date.  Thus, Winrow and Day could have been indifferent to Jill's equal protection rights, unlike her due process rights, based on their response to the January 9, 2009 report from the Boys and Girls Club.  On the next weekday after that report, however, Winrow and Day conducted an investigation which involved interviewing Weixler and three students, as well as Weixler's officemate.  While perhaps less than fully rigorous — Plaintiff complains, for example, that Winrow and Day did not sufficiently inquire of Bradshaw about the past investigations into Weixler, and that their questioning of Weixler proved

---

[6] Defendants argue that Plaintiff's equal protection rights were not violated through discrimination based on her disabled status.  However, Plaintiff's equal protection claim appears based on gender discrimination in the form of sexual harassment, not discrimination on the basis of disability.  In any event, disability does not provide the basis for a protected class under the Fourteenth Amendment. *City of Cleburne, Tex*. v. *Cleburne Living Ctr.,* 473 U.S. 432, 442 (1985).  Thus, I treat the equal protection claim as addressed to only the sexual harassment category of Plaintiff's claims.

ineffective in hindsight — their investigation was neither delayed nor insubstantial.  It cannot be said that Winrow and Day were deliberately indifferent to the threat of sexual harassment.  Winrow and Day's motions for summary judgment will be granted on this count.

Superintendent Bradshaw's liability on the equal protection claim could, however, be based on the earlier and additional reports of Weixler's misbehavior.  If she was deliberately indifferent to the risk of a violation of a student's right to bodily integrity, based on her response to those reports, she may also be said to have been deliberately indifferent to the risk that a student would be sexual harassed.  If anything, the January 9, 2009 report provided an additional opportunity to sanction Weixler, to report him to the state, or to conduct a more thorough investigation, further supporting a showing of deliberate indifference by Bradshaw. As with the due process claim, summary judgment is inappropriate as to the equal protection claim against Bradshaw, but appropriate as to such claims against Winrow and Day.

3.  Counts II & V: Fourteenth Amendment Claims against the Town

In Counts II and V, Plaintiff asserts against the Town of Mashpee essentially the same due process and equal protection claims made against the employee-defendants.  Municipal liability under § 1983 exists only when a municipal custom or

policy caused the constitutional injury. *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The acts of Bradshaw and other school officials are not sufficient to constitute a policy or custom giving rise to municipal liability in this case.  Specific acts can constitute such a municipal policy when made by officials with "final policymaking authority." *Pembauer* v. *City of Cincinnati*, 475 U.S. 469, 483 (1986).  Whether an official has final policymaking authority is a matter of state law. *Id.* That said, even full discretion to act on a particular matter is insufficient to constitute final policymaking authority; only a complete delegation of authority to an official suffices. *Id.* at 483 n. 12.  Thus, if an official's decisions are "constrained by policies not of that official's making" or "subject to review by the municipality's authorized policymakers," those decisions are not chargeable to the municipality under § 1983. *City of St. Louis* v. *Praprotnik*, 485 U.S. 112, 127 (1988).

In Massachusetts, the School Committee has final policymaking authority over educational policies. *Armstrong* v. *Lamy*, 938 F. Supp. 1018, 1035 (D. Mass. 1996) (citing Mass. Gen. Laws ch. 71 § 37).  The allegedly unconstitutional acts here, however, were performed by school officials, rather than the Committee.  Such acts cannot subject the Town to liability without more.  Even Superintendent Bradshaw, who possessed significant powers of unilateral action, did not have final

24

policymaking authority over the matters in question.  As a matter of policy, the School Committee was informed of and reviewed all hiring decisions, for example, although it only directly made personnel decisions for a small number of positions and did not do so for Weixler's job.  As to serious disciplinary matters, Bradshaw routinely reported the allegations made against Weixler and the findings of the school's internal investigations to the Committee.  While there is evidence making clear that the Committee generally left personnel issues to Bradshaw and her staff, on the high-stakes issue of how to respond to allegations of abuse, the Committee retained at least some responsibility for ultimate oversight and had not fully delegated the issue to Bradshaw.  More importantly, state law requires school committees to "establish educational goals and policies," Mass. Gen. Laws ch. 71 § 37, while requiring superintendents to "manage the system in a fashion consistent with state law and the policy determinations of that school committee," Mass. Gen. Laws c. 71 § 59. *See also McLaughlin v. City of Lowell*, 8 Mass. L. Rptr. 343, 1998 WL 224929 at *13 (Mass. Super. Ct. 1998) (Gants, J.).  State law thus declares the school committee to be the final policymaking body on educational issues.  Only the School Committee's own

acts, therefore, can subject the Town itself to § 1983
liability.[7]

    As evidence of a town policy or custom that led to the
violation of Jill's constitutional rights, Plaintiff points to
the Mashpee High School policy, laid out in the school's faculty
handbook,[8] for reporting child abuse and neglect under Mass. Gen.
Laws ch. 119, § 51A.  As described in Section III.A.1, *supra*, §
51A requires all educators and others "paid to care for or work
with a child" to report suspected abuse to the state.  The
statute imposes an affirmative obligation to report when there
is "reasonable cause to believe" abuse or neglect has taken
place and sets a low threshold for what constitutes reasonable
cause. *In re Grand Jury Investigation*, 772 N.E.2d 9, 18 (Mass.
2002).

    In Mashpee, the school handbook sets forth the following
procedure for reporting abuse and neglect.  Every member of the
school staff was required to report suspected abuse to the
school nurse, who would check the student involved.  The nurse

───────────────

[7] I recognize that the question whether superintendents have
final policymaking authority is contested. *Doe* v. *Town of
Stoughton*, 12-cv-10467-PBS, 2013 WL 6498959, at *3 (D. Mass.
Dec. 10, 2013) ("Federal district courts have split on whether a
superintendent counts as a policymaker under Massachusetts state
law.").  On this record, Bradshaw cannot be found to act as the
final policy maker in Mashpee as to the matters at issue here.
I conclude that the state statutes are determinative in this
context.
[8] For the purposes of summary judgment, I assume that the faculty
handbook, which was signed by Principal St. Cyr rather than the
School Committee, constitutes a municipal policy.

would be expected to convene a meeting of the "School Investigating Committee," a team that included the principal and the reporting staff member among others.  That committee would decide whether to continue observing the child, drop the case, or have the principal notify the state verbally and in writing.

According to Plaintiff, this policy violated § 51A by interposing an internal school investigation between the mandated reporter and the designated expert investigators at the Department of Children and Families.  Mashpee's policy was itself not followed with regard to Jill Doe or the other girls alleged to have been abused by Weixler — the school nurse was never involved, for example — but Plaintiff suggests that by authorizing a culture of internal investigation, Mashpee's policy prevented school officials from contacting the state and perhaps catching Weixler earlier.

However, Mashpee's policy may be permitted under § 51A. In any case it is not so far removed from § 51A's requirements that it represents a de facto policy of disregard for the procedures surrounding the prevention of sexual assault which could be seen to have caused the violation of Jill's rights.  In school settings, a mandated reporter may, rather than notifying the state directly, "instead notify the person or designated agent in charge of such institution, school or facility who shall become responsible for notifying the department." Mass. Gen. Laws ch. 119, § 51A(a).  Mashpee was expressly permitted to

funnel the reporting obligations of its school staff through the school's hierarchy and to the principal, as the Mashpee handbook instructed.  Under this statutory provision, there remains some ambiguity as to who is meant to determine whether there is reasonable cause to believe abuse was taking place; by requiring the investigating committee to make such a determination after the reporting official already did the same, Mashpee may have added an additional, improper barrier to making a § 51A report. But Plaintiff has cited no case law suggesting that the committee was not entitled to make that determination.  Given the ambiguity, Mashpee's handbook cannot be found to represent a general custom of disregard for § 51A reporting requirements.

Moreover, at issue is not whether Mashpee's policy violated § 51A but rather whether that policy caused the violation of Jill's rights.  Plaintiff has proffered no evidence that the investigating committee in fact acted as a barrier to 51A reporting: either with respect to the Weixler reports, where the committee was never constituted, or as a general practice.[9] Without a showing of either substantial disregard for § 51A's requirements or substantial barriers to the filing of § 51A reports, Plaintiff cannot meet her burden of showing a causal

---

[9] Here, defendants' statistical evidence that Mashpee files § 51A reports at a rate roughly on par with neighboring school districts has some relevance.

link between some town custom or policy and the violation of her
rights.

Only the School Committee's specific acts in this case
could give rise to municipal liability.[10]   A municipality can be
liable for failure to train, supervise and discipline its
employees if that failure "causes a constitutional violation and
'amounts to deliberate indifference to the rights of'" third
parties. *DiRico* v. *City of Quincy*, 404 F.3d 464, 468 (1st Cir.
2005).   The School Committee did not show deliberate
indifference to the rights of Jill and other students.   Rather,
members of the Committee passed earlier reports of Weixler's
inappropriate behavior — even those made in informal settings —
on to school officials for investigation.   The Committee then
received reports on those investigations.   Regardless of the
quality of this oversight, it does not descend to the level of
deliberate indifference to the potential for violations of
students' rights to either bodily integrity or freedom from

---

[10] I have already noted in this litigation that, for these
purposes, "allegations against the School Committee are also
nothing more than an allegation against the Town."  *Doe* v.
*Bradshaw*, 2013 WL 5236110, at *9 (D. Mass. Sept. 16, 2013).
This is also true for state tort liability, where "the Town and
the School Committee rise and fall together."  *Id.* at *12.  *See
also Doe* v. *Fournier,* 851 F. Supp. 2d 207, 215 (D. Mass. 2012)
(dismissing claims against individual School Committee members
and then treating Town and School Committee as linked for
purposes of liability and damages); *cf. Henschel* v. *Worcester
Police Dep't*, 445 F.2d 624 (1st Cir. 1971) (per curiam) (suit
against police department "the same as suing the city").

sexual harassment.   Accordingly, the Town's motions for summary judgment on Counts II and V will be granted.

4.   Count X: Title IX

Count X alleges that the Town and School Committee violated Title IX of the Education Amendments of 1972 by being deliberately indifferent to Weixler's sexual harassment of Jill, which created a hostile environment.[11]   In cases of teacher-on-student harassment, a town is liable if the victim was "subjected to harassment severe enough to compromise the victim's . . . educational opportunities" and the town "had actual knowledge of the harassment" and "exhibited deliberate indifference to it." *Wills* v. *Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).

Defendants would add to those requirements for Title IX liability a standard derived from *Davis* ex rel. *LaShonda D.* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646 (1999), which held that Title IX deliberate indifference liability requires that the school "exercises substantial control over both the harasser and the context in which the known harassment occurs."  That language, however, serves as a limitation on school district liability in cases of peer-on-peer harassment. *Id*. at 643 ("We consider here whether the misconduct identified in *Gebser* —

---

[11] Plaintiff's initial complaint included allegations relating to peer-on-peer harassment, but these were dismissed for failure to state a claim.

deliberate indifference to known acts of harassment — amounts to
an intentional violation of Title IX, capable of supporting a
private damages action, when the harasser is a student rather
than a teacher.  We conclude that, in certain limited
circumstances, it does.").  In cases of teacher-on-student
harassment, in contrast, no such control requirement exists.

Even if control over the harasser and the context of the
harassment were necessary, however, there is an evidentiary
basis to find such control existed here. *Cf. Fitzgerald* v.
*Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("a Title IX
Plaintiff can establish school district liability by showing
that a single school administrator with authority to take
corrective action responded to harassment with deliberate
indifference.").  The school controlled Weixler, the harasser,
through his employment.  The school also controlled many
contexts in which the harassment occurred, including the drive
home from a school event and Weixler's interactions with Jill in
the hallways.  Most importantly, the school controlled Weixler's
access to and power over Jill through his role as a school
employee and Jill's soccer coach.  In this case, the school's
actual knowledge and deliberate indifference are at issue, not
the school's control over the harassment.

The actual knowledge requirement imposes a higher standard
for Title IX claims than for claims arising under § 1983, where
deliberate indifference can follow actual or constructive

knowledge. *Lipsett*, 864 F.2d at 903.  *See also Santiago* v. *Puerto Rico,* 655 F.3d 61, 73 (1st Cir. 2011) (noting that the actual knowledge requirement in Title IX "has considerable bite").  Here, the series of reports and rumors received by school administrators does not rise to actual knowledge.  First, inappropriate behavior of a different nature than the eventual harassment cannot give rise to actual knowledge for Title IX purposes. *Gebser* v. *Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) ("That information, however, consisted of a complaint from parents of other students charging only that Waldrop had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that Waldrop was involved in a sexual relationship with a student."). *See also Doe* v. *Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (text messages that were not clearly sexual, along with familiar behavior between student and teacher, insufficient for actual notice of harassment); *Escue* v. *N. OK Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (inappropriate name-calling and past dates with older non-traditional students insufficient for actual notice of harassment).  Thus, the earliest rumors alleged with regard to Weixler — that he had been buying alcohol for students — must be excluded from the analysis of Title IX liability.  While potentially connected to Weixler's sexual abuse, allegations of alcohol purchase do not contribute to actual knowledge of sexual

abuse.  Only the reports of Weixler's sexual relationships with other students could generate actual knowledge.

Second, although there were many rumors from students that Weixler was engaged sexual relations with students, those rumors did not rise to the level of actual knowledge.  Courts have generally interpreted "actual knowledge" as requiring highly reliable and similar reports of inappropriate teacher behavior. For example, "rumors, investigations, and student statements" have been held not to constitute "actual knowledge." *Shrum* ex rel. *Kelly* v. *Kluck* 249 F.3d 773, 780 (8th Cir. 2001).  Nor was actual knowledge found where a student directly complained about inappropriate behavior to school officials, but the behavior could have been interpreted differently. *Davis* v. *DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1373 (11th Cir. 2000) (a student complained of a touching during a football game and another intended touching, but the court dismissed "an incidental touching during an athletic event and a perceived imminent touching" as not enough to constitute actual notice.") (per curiam).  Putting to one side whether *Davis* is fully persuasive on its facts, the case law is clear that only reliable and unambiguous reports have been deemed sufficient to provide actual knowledge.  *See J.M.* ex rel. *Morris* v. *Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 452-53 (10th Cir. 2010) (a student observing another student lying on the teacher's bed in a motel room); *Doe* v. *Sch. Admin. Dist. No. 19*, 66 F. Supp.

2d 57, 63 (D. Me. 1999) (a substitute teacher reporting both rumors and her own observations of sexualized dancing between student and teacher).

In this case, school officials were only informed of unsubstantiated rumors from students, the sole exception being an unidentified art teacher's possible vague report of overly familiar behavior.  Officials received no unambiguous, first-hand reports from affected students or witnesses.  While the school perhaps ought to have known that Weixler was behaving inappropriately, given the quantity and consistency of rumors about him, even viewing the facts in the light most favorable to the plaintiff, it cannot be said that the school actually knew of his sexual harassment prior to 2009, at which point it took more decisive action.

Indeed, in her memorandum of law, Plaintiff only points to a single piece of evidence as showing actual knowledge: a letter denying Weixler COBRA benefits on April 15, 2009, over a month after he was put on leave.  Actual knowledge after the fact — and after a firing — cannot support deliberate indifference toward sexual harassment already past.  *Gebser*, 524 U.S. at 291.  Defendant's motion for summary judgment will be granted with respect to Count X.

5.  Count XII: Negligence

Count XII, concerning negligence under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, survived defendants'

34

motions to dismiss only on the "narrow theory" that the Town was negligent in hiring Weixler to serve as a junior varsity soccer coach in the summer of 2008.  While allegations related to individual defendants and to claims of negligent supervision, training and investigation are barred by the MTCA, the MTCA allows this theory to move forward as an affirmative act that "materially contributed to creating the specific 'condition or situation' that resulted in the harm.'" *Kent* v. *Commonwealth*, 771 N.E.2d 770, 775-76 (Mass. 2002).  *See also Pettengill* v. *Curtis*, 584 F. Supp. 2d 348, 366-67 (D. Mass. 2008) ("the school committee took an affirmative act in hiring the teacher that could have subjected them to liability")*, Bonnie W.* v. *Commonwealth*, 643 N.E.2d 424, (Mass. 1994) (claim of negligently recommending a person for continued employment not barred)*, Doe* v. *D'Agostino*, 367 F. Supp. 2d 157, 172 (D. Mass. 2005).

Defendants now raise another clause of the MTCA as barring suit: § 10(b), which prevents tort suits based on the performance of discretionary functions.  As the Massachusetts Supreme Judicial Court has interpreted that clause, there is a two-step analysis in applying the discretionary function exception: 1) whether the governmental actor had discretion at all, and 2) whether that discretion was the kind for which § 10(b) provides immunity, namely, whether it involves policymaking or planning.  *Greenwood* v. *Town of Easton*, 828 N.E.2d 945, 948-49 (Mass. 2005).  The First Circuit has held

that, in the specific context of the civil service laws
governing police officer hiring, certain discretionary personnel
decisions rise to this level and are immune from suit under the
MTCA. *Crete* v. *City of Lowell*, 418 F.3d 54, 62-63.  The First
Circuit has further noted that under the Federal Tort Claims
Act, on which the MTCA was modeled and in line with which it is
generally interpreted, all hiring, firing and disciplinary
decisions fall within the discretionary function exception. *Id.*
at 64-65.  Defendants thus argue that § 10(b) bars a suit
alleging the negligent hiring of Weixler as soccer coach.

However, the SJC has held that discipline is not
categorically a policymaking decision that qualifies as a
discretionary function, *Dobos* v. *Driscoll*, 537 N.E.2d 558, 567
(Mass. 1989).  Accordingly, the categorization of personnel
decisions, including hiring, as discretionary under the Federal
Tort Claims Act is not mirrored in the MTCA as construed by
Massachusetts state courts.  Moreover, Massachusetts courts have
instructed that the "discretionary function exception is narrow"
and draw a distinction between discretionary decisions that make
policy and those that implement it. *Greenwood*, 828 N.E.2d at
948-49.  *See also Blanchard* v. *Swaine*, No. CIV. 08-40073-FDS,
2010 WL 4922699, at *14-15 (D. Mass. Nov. 29, 2010) ("section
10(b) does not bar litigation surrounding the implementation of
those policies").  Only those decisions which involve "social,
political, or economic policy considerations" are immunized from

tort liability by § 10(b). *Alake* v. *Boston*, 666 N.E.2d 1022, 1025 (Mass. App. Ct. 1996) (Lenk, J.).  The decision to hire Weixler as a soccer coach was not of policymaking significance: he was hired on the basis of prior coaching experience, his timeliness, and because he was a Mashpee High School graduate. Accordingly, Plaintiff's suit is not barred by any of the MTCA's exceptions and a suit for negligent hiring is available.

To establish a claim for negligent hiring, as with all negligence claims, a plaintiff "must establish that the defendant owed the plaintiff a legal duty, and that a breach of that duty proximately caused injury to the plaintiff." *Petrell* v. *Shaw*, 902 N.E.2d 401, 408 (Mass. 2009).  The Town owed Plaintiff a duty of reasonable hiring as a matter of law. Employers whose employees are "brought in contact with members of the public in the course of the employer's business," as with schools hiring coaches, have a "duty to exercise reasonable care in the selection and retention of [their] employees." *Foster* v. *Loft, Inc.*, 526 N.E.2d 1309, 1310 (Mass. App. Ct. 1988).  "An employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." *Id.* at 1310-11.  An alternative formulation cited frequently by federal courts applying Massachusetts law was provided by Judge Keeton in *Armstrong* v. *Lamy*, 938 F. Supp. 1018, 1046 (D. Mass. 1996):

A claim for negligent hiring requires evidence that the employer failed to exercise due care in the selection of an employee, evidence that the employer knew or should have known that the employee who was hired was unfit and posed a danger to others who would come into contact with the employee during the employment, and evidence that the employer's failure proximately caused the injury of which the plaintiff complains.

Given the existence of such a duty, a reasonable jury could find that the Town failed to take reasonable care in hiring Weixler after earlier reports of inappropriate behavior, whether related to alcohol or sexual activity, and that this failure caused Weixler to have the opportunity to abuse Jill.  A reasonable jury could also find alternatively that the Town discharged its duty, given that he had been cleared in an internal investigation related to the 2008 rumors and that the facts related to the alcohol and art class reports are in dispute.  Accordingly, both parties' motions for summary judgment on Count XII will be denied.

6.  <u>Count XIV: Negligent Infliction of Emotional Distress</u>

Count XIV, as it survived defendants' motion to dismiss, alleges that the Town and School Committee negligently inflicted emotional distress on Jill Doe based on the Town's decision to continue Weixler's employment following February 2008 and January 2009 reports of sexual misconduct.  Proving negligent infliction of emotional distress requires showing: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a

reasonable person would have suffered emotional distress under the circumstances of the case." *Payton* v. *Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982).[12]  This claim may move forward for the same reasons as the claim for negligence made in Count XII. The additional elements required for a negligent infliction of emotional distress claim — emotional distress, that a reasonable person would have suffered, and connection to physical harms — could be found by a reasonable jury under the uncontested facts. Jill's emotional suffering could be held to be the reasonable result of a physical harm, her sexual abuse by Weixler.

Defendants claim that this cause of action is barred under *Doe* v. *Liberty Mut. Ins. Co.*, 667 N.E.2d 1149, 1152 (Mass. 1996), which states that "[a] negligence claim which is premised on the same acts which are contended to be the basis of an intentional sexual misconduct claim is not legally supportable."

---

[12] In a fuller description of the standard for negligent infliction of emotional distress claims, the SJC wrote in *Payton*, in response to a certified question, that a plaintiff must "allege and prove she suffered physical harm as a result of the conduct which caused the emotional distress.  We answer, further, that a plaintiff's physical harm must either cause or be caused by the emotional distress alleged, and that the physical harm must be manifested by objective symptomatology and substantiated by expert medical testimony.  Finally, the emotional distress for which compensation is sought must be reasonably foreseeable: unless a plaintiff proves that the defendant knew or should have known of special factors affecting that plaintiff's response to the circumstances of the case, the plaintiff can recover only for that degree of emotional distress which a reasonable person, normally constituted, would have experienced under those circumstances." *Payton* v. *Abbott Labs*, 386 Mass. 540, 556-57, 437 N.E.2d 171, 181 (1982).

The intentional sexual misconduct, however, was Weixler's, whereas the negligence asserted was that of the town in hiring and retaining him.  These are different parties, performing different acts, and Plaintiff's negligence claim is not legally barred under this doctrine.  *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 558 N.E.2d 958, 970 (Mass. 1990) ("to the extent that the plaintiffs seek to recover in negligence *from the same individuals* whom they have sued for assault and battery, *for the same acts* which are contended to be the basis of those assault and battery claims, the negligence claims are legally unsupportable" (emphasis added)).  The parties' motions for summary judgment will be denied because there are genuine issues of material facts regarding the claims.

7.   Right to Freedom from Sexual Harassment

     Count XVI asserts that the Town and School Committee violated Plaintiff's right to freedom from sexual harassment under Mass. Gen. Laws ch. 214 § 1C.  Sexual harassment in the educational context is defined by Mass. Gen. Laws ch. 151C, § 1(e) and includes both the quid pro quo and hostile environment forms of harassment.[13]  Chapter 214 merely expands who is

_____

[13] Specifically, it is defined as "any sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when: (i) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of the provision of the benefits, privileges or placement services or as a basis for the evaluation of academic achievement; or (ii) such advances, requests or conduct have the purpose or effect of unreasonably

protected by ch. 151C and the remedies available to them, while ch. 151C remains the source of the substantive law. *Lowery* v. *Klemm*, 845 N.E.2d 1124, 1128-29 (Mass. 2006). Thus, suit may only be brought under chapter 214 against educational institutions, rather than individuals, based on limitations rooted in chapter 151C. *Doe* v. *Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6498959, at *5 (D. Mass. Dec. 10, 2013); *Fournier*, 851 F. Supp. 2d at 218.

Based on the uncontested evidence, it is clear that Weixler sexually harassed Jill. Her psychological traumas, rooted in Weixler's physical acts, made the school itself a traumatic site; interference with her education is manifest. Jill's claim under chapter 214, however, is against the Town and School Committee, as required by the statute. Whether those defendants sexually harassed her, under the statute, presents a novel question of law concerning municipal responsibility for the acts of an employee.

Plaintiff asserts that chapter 214 "confers strict vicarious liability on an educational institution for sexual harassment by any employee vested with authority to care for and/or supervise students." In contrast, defendants argue that the "deliberate indifference" standard from Title IX should

---

interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment."

govern.  The Massachusetts courts have not answered this question for either chapter 214 or chapter 151C.  Indeed, the Massachusetts Appeals Court has expressly reserved the issue whether ch. 151C claims require that the school administrators have some knowledge of the harassment. *Morrison* v. *N. Essex Cmty. Coll.*, 780 N.E.2d 132, 141 n.17 (Mass. App. Ct. 2002) (Duffly, J.).  *See also Bloomer* v. *Becker Coll.,* No. CIV.A. 09-11342-FDS, 2010 WL 3221969, at *7 (D. Mass. Aug. 13, 2010) ("There is thus, apparently, no authority stating that knowledge of the misconduct is a necessary element for recovery under Chapter 151C.").

The text of ch. 151C, which declares it an "unfair educational practice" for an educational institution "to sexually harass students in any program or course of study," does not clarify the legislature's intent. Mass. Gen. Laws ch. 151C § 2(g).  Nor do the origins of the strict liability and deliberate indifference standards in related statutory schemes shed any light.  Strict liability for the sexual harassment of agents does exist under chapter 151B, which prohibits sexual harassment in the workplace, and which, like chapter 151C, can support chapter 214 claims. *Coll.-Town, Div. of Interco, Inc*. v. *Massachusetts Comm'n Against Discrimination*, 508 N.E.2d 587, 592 (Mass. 1987).  However, strict liability was found there based on statutory language present in 151B but not 151C. *Id.* (noting, for example, that "General Laws c. 151B, § 4, prohibits

42

discrimination by 'an employer, by himself or his agent.'"). The existence of strict liability for sexual harassment in the workplace, therefore, offers little insight into whether the legislature intended strict liability to exist in a school.

Yet, the reasons for imposing a "deliberate indifference" standard on Title IX sexual harassment claims are equally inapplicable. The Supreme Court emphasized that a deliberate indifference standard was important because Title IX imposed quasi-contractual funding conditions rather than directly regulating behavior, making notice particularly important, and because liability from Title IX's implied remedies should not exceed that from its express remedies, where notice was required. *Gebser*, 524 U.S. at 286-90.  Unlike Title IX, chapters 214 and 151C provide an express cause of action that is not couched as a funding condition; the arguments for a deliberate indifference standard are inapplicable.

In the absence of state law on which to rely, a federal court must do its best to determine what the state courts would hold.  *See Bernhardt* v. *Polygraphic Co. of Am.*, 350 U.S. 198, 209 (1956) ("'estimates' are necessarily often all that federal courts can make in ascertaining what the state court would rule to be its law") (Frankfurter, J., concurring) (citing *Pomerantz* v. *Clark*, 101 F. Supp. 341, 345-46 (D. Mass. 1951) (a federal judge's "task is to divine the views of the state court judges")).  Given my obligation to predict what standard the

state courts would apply, I notice that Justice Duffly, then
speaking for the Appeals Court, while reserving the question,
did dwell on the distinctions between Title IX and chapter 151C,
indicating a discomfort with the deliberate indifference
standard.  Recognizing that discomfort, I will apply a strict
vicarious liability standard at this stage.[14]

Defendants also claim that Plaintiff's suit is barred by
chapter 214's jurisdictional provision, which requires that a
claim that is "also actionable under chapter 151B or chapter
151C" shall not be brought in court "unless a complaint was
timely filed with the Massachusetts commission against
discrimination." Mass. Gen. Laws ch. 214 § 1C.  However, chapter
151C, standing alone, only allows for complaints to the
commission by persons "seeking admission as a student to any
educational institution, or enrolled as a student in a
vocational training institution." *Id.* § 3; *Morrison*, 780 N.E.2d
at 135 n.6.  *See also Bloomer*, 2010 WL 3221969 at *6.  Because
Plaintiff did not fall under those two categories, her claim did
not need to be brought first before the commission against

---

[14] Defendants also argue that because Weixler's actions were not
within the scope of his employment, there should not be
vicarious liability.  The case cited in support of this
proposition, however, concerns common law tort liability, not
statutory liability under ch. 151C. *Doe* v. *Purity Supreme, Inc.*,
664 N.E.2d 815, 817 (1996).  Moreover, since sexual harassment
will rarely, if ever, fall within the scope of employment, *Id.*
at 820, such an argument cannot be squared with the existence of
strict liability under ch. 151B.

discrimination; filing in court was proper and Plaintiff's claim can move forward.

Under a strict vicarious liability standard, the Town and School Committee may be held liable for Weixler's sexual harassment, which is not contested.  Accordingly, they are liable under chapter 214 as a matter of law. Plaintiff's motion for summary judgment will be granted as to Count XVI.

**B.   *Rehabilitation and Disability Claims***

Plaintiff alleges that the Town and School Committee, by failing to refer her for an evaluation of her eligibility for special education services, violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count XIII), and the Americans with Disabilities Act, 42 U.S.C. § 12132 (Count IX). Each statute bars a school district receiving federal funds from discriminating on the basis of disability or excluding a person with a disability from participating in school programs. *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).[15]

---

[15] Section 504 of Rehabilitation Act states that, "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).  The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

Jill did not receive such a referral for evaluation until March 2010, one year after the school learned of her sexual abuse and after significant deterioration in her mental health and ability to access her education.  The parties do not contest that Jill's psychological conditions during this period, or at least by its end,[16] constituted a disability for purposes of both the Rehabilitation Act and the ADA.  Nor do they dispute that Jill ultimately proved eligible for special education once evaluated (at the behest of a state agency, not the Town).  The inference that Jill could have benefitted from an earlier intervention is both inescapable and confirmed by a hearing officer of the state Bureau of Special Education Appeals, whose findings deserve some deference on matters within his educational expertise. *Frazier* v. *Fairhaven School Comm.*, 276 F.3d 52, 61 (1st Cir. 2002).

At issue is the state of mind with which the school officials acted in denying Jill the potential benefits of an earlier referral.  Discrimination claims under the Rehabilitation Act and the ADA require a showing of "disability-based animus." *D.B* ex rel. *Elizabeth B.* v. *Esposito*, 675 F.3d 26, 40 (1st Cir. 2012).  The First Circuit has suggested that

---

[16] Defendants assert that any asserted delay in accessing special education services should be dated from, at the earliest, February 3, 2010 when she was discharged from St. Vincent Hospital with various psychological disorders.  Plaintiff dates the delay to the disclosure of her sexual assault almost a year earlier.

"deliberate indifference" is enough to satisfy this requirement of intentional discrimination.[17]  *Nieves-Márquez* v. *Puerto Rico*, 353 F.3d 108, 125 n. 17 (1st Cir. 2003).  Other circuits have also held that deliberate indifference constitutes animus under these statutes.  *See, e.g., Duvall* v. *County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) (citing the Second and Tenth Circuits, as well as its own precedent).  Deliberate indifference requires "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that ... likelihood." *Barber* ex rel. *Barber* v. *Colorado Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009).

Neither side satisfies the standard needed for its summary judgment motion on this issue.  Viewing the facts in the light most favorable to the plaintiff, the school knew that a troubled teenager suffered an extreme trauma related to her education and

---

[17] In referencing a deliberate indifference standard, the First Circuit cited *Sellers by Sellers* v. *School Bd.*, 141 F.3d 524, 526–27 (4th Cir. 1998), which uses a different "bad faith or gross misjudgment" standard of liability.  Both standards have been employed by the courts of appeals. The deliberate indifference standard is used here.  The First Circuit's opinion directly references only the deliberate indifference standard. Moreover, deliberate indifference serves as a closer stand-in for discriminatory intent than does misjudgment, even gross misjudgment, which sits closer to negligence.  That said, an earlier First Circuit decision referenced the "bad faith or gross misjudgment" standard. *Colin K. by John K.* v. *Schmidt*, 715 F.2d 1, 10 (1st Cir. 1983).  To the extent that the "bad faith or gross misjudgment" standard ought to be applied, the BSEA hearing officer's finding of gross misjudgment deserves significant deference, given his expertise. *Frazier* v. *Fairhaven School Comm.*, 276 F.3d 52, 61 (1st Cir. 2002).

that afterwards her behavior changed dramatically, such that she could not effectively access her education.  Jill's grades and attendance fell sharply and she exhibited behavioral issues, including trouble with anger management.  Only minor general education interventions were made, even after Jill returned from a residential psychiatric facility in January, 2010.  A jury could find that the Town's education professionals knew that a child who had multiple psychiatric diagnoses paired with plummeting academic performance was very likely to need special education services yet failed to respond by referring her for an evaluation.  Moreover, Plaintiff has proffered statements by school officials that could be read as showing frustration with Jill's behaviors and which state that she lacked the "willingness" to benefit from additional interventions. [18]  These statements could be understood as blaming Jill for her needs, showing animus towards Jill for the behavioral manifestations of her disability or providing an explanation why the school proved deliberately indifferent to Jill's needs.  A jury could thus

---

[18] For example, Assistant Principal Day wrote that "A team meeting would not hurt, I think. But until Jill is willing to hear the message, I am not sure it would do any good."  Jill's guidance counselor, Patricia Farrell, wrote that Jill's "lack of effort and interest in school," meant that, when it came to the second term of school, she had "long since burned that bridge behind her."  And John Dolen, an adjustment counselor for the school, is reported to have stated that "[i]n Jill's case it's her willingness.  If she doesn't cooperate, Jill could be very resistant, very stubborn.  If she didn't want to do it, she wasn't going to do it.  Then you have to say to what end is putting services which she is going to refuse."

find that the delay in providing a referral was "more than the result of a slow-moving bureaucracy," but rather evidence of deliberate indifference. *Carmona-Rivera* v. *Puerto Rico*, 464 F.3d 14, 18 (1st Cir. 2006).

However, viewing the facts in the light most favorable to the defendants, the school's Child Study Team consistently met to discuss Jill's case, showing attention to her needs, and worked in good faith to respond appropriately.[19]  Moreover, none of Jill's teachers recommended that she be evaluated for special education eligibility; arguably, that no one recognized her potential special education eligibility suggests that the school did not know that a deprivation of her special education rights was likely.  Thus, a jury could alternatively find that the school was not indifferent to Jill's rights, much less deliberately so.  With respect to Counts XIII and IX, both motions for summary judgment will be denied.

### IV. CONCLUSION

For the reasons set forth above, I GRANT IN PART and DENY IN PART the parties' respective motions for summary judgment.

Specifically, I:

-- GRANT Alan Winrow and Jane Day's motions for summary judgment on Count I, DENY Ann Bradshaw's motion for summary

_____

[19] I note in this connection that the BSEA hearing officer found that the school acted in good faith throughout this process.

judgment on Count I, and DENY Plaintiff's motion for summary judgment on Count I.

--  GRANT Alan Winrow and Jane Day's motions for summary judgment on Count IV, DENY Ann Bradshaw's motion for summary judgment on Count IV, and DENY Plaintiff's motion for summary judgment on Count IV.

--  GRANT the defendants' motion for summary judgment on Counts II and V and DENY Plaintiff's motion for summary judgment on Count V.

--  DENY both Plaintiff and defendants' motions for summary judgment on Counts XIII and IX.

--  GRANT defendants' motion for summary judgment on Count X and DENY Plaintiff's motion for summary judgment on Count X.

--  DENY both Plaintiff and defendants' motions for summary judgment on Counts XII and XIV.

--  GRANT Plaintiff's motion for summary judgment on Count XVI.

Accordingly, trial shall proceed (1) as to defendant Bradshaw on Counts I (constitutional due process) and II (constitutional equal protection); and (2) as to the defendant Town on Counts XII (negligence), XIV (negligent infliction of emotional distress), XIII (§ 504), IX (ADA), XVI (as to ch. 214 damages).

_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT